IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TURNER NETWORK SALES, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 17-CV-7599 (RA) |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF TURNER NETWORK SALES, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

TROUTMAN SANDERS LLP

James A. Lamberth (admitted *Pro Hac Vice*)
Alan W. Bakowski *(*admitted *Pro Hac Vice)*
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308-2256
(404) 885-3000 (voice)
james.lamberth@troutman.com
alan.bakowski@troutman.com

Stephen G. Rinehart
875 Third Avenue
New York, NY  10022
(212) 704-6000
stephen.rinehart@troutman.com

***Attorneys for Plaintiff Turner Network Sales, Inc.***

CONFIDENTIAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

I.      TNS AND DISH'S AFFILIATION AGREEMENTS .......................................... 2

II.     DISH INTENTIONALLY PAID FOR CNN BASED ON TOTAL
        SUBSCRIBERS BECAUSE DISH DETERMINED THAT THE WEATHER
        CHANNEL IS A 24-HOUR PER DAY NATIONAL NEWS SERVICE ......................... 5

III.    DISH SUDDENLY CHANGES ITS POSITION REGARDING THE
        CLASSIFICATION OF THE WEATHER CHANNEL AS A 24-HOUR PER
        DAY NATIONAL NEWS SERVICE ............................................................... 7

IV.     A THIRD-PARTY AUDIT REVEALS UNDERPAYMENTS BY DISH FOR
        THE DISTRIBUTION OF SERVICES UNDER THE 2015 AGREEMENT ................. 9

ARGUMENT AND CITATION TO AUTHORITY ..................................................... 9

I.      DISH BREACHED THE 2015 AGREEMENT BY CHANGING ITS POSITION
        AND FAILING TO PAY ALL LICENSE FEES DUE FOR THE
        DISTRIBUTION OF CNN ............................................................................. 9

        A.      DISH Breached the 2015 Agreement by Improperly Withholding License
                Fees Owed for CNN to Recoup Past Payments .................................... 10

        B.      DISH Was Required to Pay License Fees for CNN Based on the Number
                of Total Subscribers Because The Weather Channel Is a 24-Hour Per Day
                National News Service That Was Received by More Total Subscribers
                Than CNN In DISH's DBS System ..................................................... 14

        C.      TNS Has Suffered Damages as a Result of DISH's Failure to Pay License
                Fees Based on Total Subscribers for the Months When The Weather
                Channel Was Received by More Total Subscribers than CNN ............... 23

II.     DISH BREACHED THE 2015 AGREEMENT BY FAILING TO PAY FOR THE
        DISTRIBUTION OF CNN BASED ON THE ACTUAL NUMBER OF DISH'S
        TOTAL SUBSCRIBERS .............................................................................. 23

III.    DISH BREACHED THE 2015 AGREEMENT BY FAILING TO PAY LICENSE
        FEES OWED FOR THE DISTRIBUTION OF TURNER'S SERVICES BASED
        ON THE ACTUAL NUMBER OF SERVICE SUBSCRIBERS FOR EACH
        SERVICE .................................................................................................. 24

**CONFIDENTIAL**

IV.   DISH BREACHED THE 2015 AGREEMENT AND THE LETTER
      AGREEMENT BY FAILING TO TIMELY PAY LICENSE FEES FOR THE
      SERVICES........................................................................................................ 25

V.    DISH BREACHED THE 2015 AGREEMENT BY IMPROPERLY
      CALCULATING THE NUMBER OF BULK CUSTOMERS ...................................... 27

      A.    Local Channels & Equipment Charges ................................................. 28

      B.    Promotional Rates & Discounted Wholesale Price ............................... 29

VI.   DISH BREACHED THE 2015 AGREEMENT AND THE LETTER
      AGREEMENT BY TAKING A DISCOUNT ON RATES FOR CNN AT THE
      SAME TIME IT WAS VIOLATING ITS CONTRACTUAL OBLIGATIONS ............ 30

VII.  DISH IS LIABLE FOR TNS'S COSTS, FEES, AND INTEREST UNDER THE
      2015 AGREEMENT AND THE LETTER AGREEMENT ............................................ 31

VIII. TNS IS ENTITLED TO SUMMARY JUDGMENT ON THE PARTIES'
      CLAIMS FOR DECLARATORY JUDGMENT CONCERNING DISH'S
      OBLIGATIONS TO PAY LICENSE FEES FOR DISTRIBUTION OF THE
      CNN SERVICE ................................................................................................. 32

IX.   TNS IS ENTITLED TO SUMMARY JUDGMENT ON DISH'S
      COUNTERCLAIM CONCERNING THE MOST FAVORED NATIONS
      PROVISION ...................................................................................................... 32

X.    THE COURT ALSO SHOULD GRANT SUMMARY JUDGMENT AGAINST
      DISH ON ITS COUNTERCLAIM RELATING TO DISH AVAILS ........................... 34

XI.   DISH CANNOT RECOVER ITS COSTS OR ATTORNEYS' FEES .......................... 35

CONCLUSION........................................................................................................... 35

CONFIDENTIAL

## TABLE OF AUTHORITIES

**Cases**

*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 07CV6665(HB), 2009 U.S. Dist. LEXIS 54670 (S.D.N.Y. June 23, 2009) ............................................................ 16, 21

*Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163 (N.Y. 2003) ................................ 17

*Citicorp N.A. v. Fifth Ave. 58/59 Acquisition Co.*, 895 N.Y.S.2d 39 (App. Div. 2010) .............. 14

*Constellation Powersource, Inc. v. Select Energy, Inc.*, No. 3:04-cv-983, 2007 U.S. Dist. LEXIS 4583 (D. Conn. Jan. 23, 2007) ............................................................................... 13

*Dillon v. U-A Columbia Cablevision*, 740 N.Y.S.2d 396 (App. Div. 2002), *aff'd*, 790 N.Y.S.2d 726 (2003) .................................................................................................... 12

*DRMAK Realty LLC v. Progressive Credit Union*, 18 N.Y.S.3d 618 (App. Div. 2015) .............. 12

*Edward Andrews Grp., Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731 (LTS)(AJP), 2005 U.S. Dist. LEXIS 30125 (S.D.N.Y. Nov. 29, 2005) ................................................. 26

*Eighty Eight Bleecker Co. v. 88 Bleecker St. Owners, Inc.*, 824 N.Y.S.2d 237 (App. Div. 2006) ............................................................................................................................. 14

*Evans v. Famous Music Corp.*, 807 N.E.2d 869 (N.Y. 2004) ...................................................... 15

*Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369 (S.D.N.Y. 2006) .............................. 20

*Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508 (App. Div. 1999) .................................... 20

*Gimbel Bros., Inc. v. Brook Shopping Ctrs.*, 499 N.Y.S.2d 435 (App. Div. 1986) ..................... 14

*Horn Waterproofing Corp. v. Bushwick Iron & Steel Co.*, 488 N.E.2d 56 (N.Y. 1985) ............. 21

*Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64 (S.D.N.Y. 1990) .......................................... 12

*Kenneth D. Laub & Co. v. 101 Park Ave. Assoc.*, 556 N.Y.S.2d 881 (App. Div. 1990) ............. 15

*Leirer v. Caputo*, 616 N.E.2d 147 (N.Y. 1993) ........................................................................... 12

*Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297 (App. Div. 1988) ................................................. 16

*McGuire v. Russell Miller, Inc.*, 1 F.3d 1306 (2d Cir. 1993) ....................................................... 31

*MSF Holding Ltd. v. Fiduciary Tr. Co. Int'l*, 435 F. Supp. 2d 285 (S.D.N.Y. 2006), *aff'd*, 235 F. App'x 827 (2d Cir. 2007) ................................................................................... 15

CONFIDENTIAL

*Murray Hill Mews Owners Corp. v. Rio Rest. Assoc. L.P.*, 938 N.Y.S.2d 59 (App. Div. 2012) ................................................................................................................ 20

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520 (2d Cir. 2004) ................................ 35

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168 (2d Cir. 2008) ........................... 31

*Nycal Corp. v. Inoco P.L.C.*, 988 F. Supp. 296 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998) ...................................................................................................... 15

*Ocean Transport Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85 (2d Cir. 1984) ................................................................................................... 18, 20

*Sequa Corp. v. Gelmin*, 91 Civ. 8675, 1996 U.S. Dist. LEXIS 19802 (S.D.N.Y. Dec. 31, 1996) ................................................................................................................ 11

*Shepley v. New Coleman Holdings, Inc.*, 174 F.3d 65 (2d Cir. 1999) ......................................... 15

*Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009) ............................................................... 13

*Travellers' Int'l AG v. Trans World Airlines*, 722 F. Supp. 1087 (S.D.N.Y. 1989) ............... 15, 18

*U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206 (N.Y. 1986) ......................................... 11

*Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368 (E.D.N.Y. 1988) ....................................... 15

*United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641 (S.D.N.Y. 2011) ......... 13

*Viacom Int'l v. Lorimar Prods., Inc.*, 486 F. Supp. 95 (S.D.N.Y. 1980) ..................................... 18

*Webster's Red Seal Publ'ns, Inc. v. Gilberton World-wide Publ'ns, Inc.*, 415 N.Y.S.2d 229 (1979) ......................................................................................................... 20

*Well Luck Co, Inc. v. F.C. Gerlach & Co.*, 421 F. Supp. 2d 533 (E.D.N.Y. 2005) ..................... 20

*Wenger v. Alidad*, 696 N.Y.S.2d 227 (App. Div. 1999) .............................................................. 35

**Statutes**

N.Y. C.P.L.R. § 5001 ................................................................................................................. 31

N.Y. C.P.L.R. § 5004 ................................................................................................................. 31

N.Y. U.C.C. § 1-102 ................................................................................................................... 21

N.Y. U.C.C. § 1-303(e) ............................................................................................................... 21

N.Y. U.C.C. § 1-303(e)(3) ........................................................................................................... 21

**CONFIDENTIAL**

**Other Authorities**

Cambridge Dictionary (2018) ........................................................................................ 16

Collins English Dictionary Online (2018) .................................................................... 16

CONFIDENTIAL

## INTRODUCTION

This straightforward breach of contract case arises from DISH Network L.L.C.'s ("DISH") failure to pay what it owes Turner Network Sales, Inc. ("TNS") under the terms of the Affiliation Agreement between TNS and DISH dated April 1, 2015 (the "2015 Agreement") and the related letter agreement between TNS and DISH dated April 1, 2015 (the "Letter Agreement"). The 2015 Agreement, which covers DISH's distribution of Turner Broadcasting System, Inc.'s television programming services, provides that DISH must pay license fees for the distribution of Cable News Network ("CNN") based on the number of DISH's Total Subscribers rather than the number of CNN Subscribers if any other "24-hour per day national news service" is received by more Total Subscribers than CNN in a DISH system.

For more than seven and a half years, DISH deliberately calculated and paid license fees for CNN based on the number of Total Subscribers because DISH concluded that The Weather Channel is a 24-hour per day national news service that was received by more Total Subscribers than CNN in DISH's direct broadcast satellite ("DBS") system. Then, in the spring of 2017, DISH suddenly reversed its longstanding interpretation of the contract and claimed that it had overpaid for the distribution of CNN. In a wrongful self-help effort to recover payments it had intentionally made since the beginning of the 2015 Agreement, DISH first withheld over $20.4 million in license fees owed for CNN. Then DISH paid license fees for CNN based on the number of CNN Subscribers despite the fact that The Weather Channel was still received by more Total Subscribers than CNN in the DBS System. These actions constitute material breaches of DISH's payment obligations. DISH had no legal right to withhold license fees owed for CNN to recoup past payments, and DISH's own course of conduct and admissions establish as a matter of law that The Weather Channel is a 24-hour per day national news service.

DISH's noncompliance with its payment obligations did not end there. DISH also

CONFIDENTIAL

breached the 2015 Agreement and/or the Letter Agreement by failing to correctly report and remit payments based on the actual number of DISH's Total Subscribers and the actual number of subscribers who received certain Turner services, by failing to make timely payments, and by failing to correctly calculate the number of DISH's "bulk" subscribers.  DISH's breaches also eliminated DISH's right to apply a 20% discount to the license fees owed for the distribution of CNN, resulting in another breach when DISH paid license fees based on discounted rates.

DISH's desperate attempt to manufacture a counterclaim against TNS also fails as a matter of law.  DISH's claim that TNS breached the Most Favored Nations ("MFN") provision of the 2015 Agreement is predicated upon facially erroneous and irrelevant information, and DISH has failed to identify any evidence that TNS breached that provision.  Nor can DISH establish the elements of its claim that TNS breached its obligations by failing to provide DISH Avails for DISH's own commercial advertising.

## FACTUAL BACKGROUND

## I.      TNS AND DISH'S AFFILIATION AGREEMENTS

TNS licenses and distributes the television programming services known as CNN, HLN, The Cartoon Network ("Cartoon Network"), Turner Classic Movies ("TCM"), Boomerang, CNN International ("CNNI"), Turner Network Television ("TNT"), TBS, CNN en Español ("CNNe") and truTV (collectively, the "Services" and each individually, a "Service").  (Decl. of Richard J. Warren ("Warren Decl.") ¶ 4; Decl. of Donna Northington ("Northington Decl.") ¶ 3.[1])  DISH distributes television services on multiple platforms, including DBS and over the internet ("OTT") (each a "System").  (*See* McLeod Dep. at 72; Warren Decl. Ex. 2 ("2015 Agreement")

---

[1] Deposition transcripts, deposition exhibits, discovery responses, and other documents not otherwise identified as an exhibit to a specific declaration are attached as exhibits to the Declaration of Alan W. Bakowski ("Bakowski Decl."), filed contemporaneously herewith.

CONFIDENTIAL

at 3, 6-7, 10.)  Since 2005, DISH has received the right to distribute the Services to DISH's customers pursuant to certain affiliation agreements between TNS and DISH.  (Warren Decl. ¶¶ 9-13; Northington Decl. ¶ 4.)  These agreements obligated DISH to pay monthly license fees for each Service.  The monthly license fees owed for each Service are calculated by multiplying certain per-subscriber rates set forth in the affiliation agreement by either the number of subscribers authorized to receive each Service ("Service Subscribers") or, in certain circumstances, the total number of DISH's subscribers ("Total Subscribers", as defined in each affiliation agreement).  (*See* Northington Decl. ¶ 8.)

Under the parties' 2005 affiliation agreement, DISH was required to pay TNS license fees for CNN by multiplying the rates specified in the agreement for CNN by DISH's Total Subscribers (with some exceptions).  (Warren Decl. ¶ 9; Warren Dep. at 25.)  In 2009, the parties negotiated a new affiliation agreement (the "2009 Agreement") that replaced the 2005 agreement.  During those negotiations, the parties agreed that DISH could pay license fees based on the number of DISH subscribers who were authorized to receive CNN ("CNN Subscribers") rather than the number of Total Subscribers if no other 24-hour per day national news service (other than HLN and, under certain circumstances, Fox News Channel) was received by more Total Subscribers than CNN in a DISH System.  (Warren Decl. ¶ 10; Warren Decl. Ex. 1 ("2009 Agreement"), Sch. B at 50.)  If any 24-hour per day national news service was received by more Total Subscribers than CNN in a System, DISH was required to pay for CNN based on the number of Total Subscribers in that System.  (2009 Agreement, Sch. B at 50.)

In late 2014 and early 2015, the parties negotiated a new affiliation agreement to replace the expiring 2009 Agreement, which was executed on April 1, 2015.  (Miller Dep. at 38-40; Warren Decl. ¶ 13.)  During those negotiations, the parties did not discuss the provision in the

CONFIDENTIAL

2009 Agreement relating to terms of payment for the distribution of CNN, other than the specific rates that would be paid on a per subscriber basis.  (Warren Decl. ¶ 13; Pomeroy Dep. at 52-53.) Apart from those rates, the language from the 2009 Agreement addressing payment for the distribution of CNN was left almost entirely untouched.  (Pomeroy Dep. at 52-54; Warren Dep. at 37-38; Warren Decl. ¶ 13.)  Schedule C of the 2015 Agreement provides in relevant part that DISH shall pay for CNN each month by multiplying the rates by the number of CNN Subscribers, unless any other 24-hour per day national news service (other than HLN, and in certain circumstances, Fox News Channel) is received by a greater number of Total Subscribers than CNN in such System, in which case DISH shall pay for CNN by multiplying the rates by the greater of the number of CNN Subscribers or DISH's Total Subscribers in such System. (2015 Agreement, Sch. C at 65.)

Under the 2015 Agreement (like the 2009 Agreement), DISH is solely responsible for calculating the amounts owed for each Service and remitting monthly payments to TNS using information that DISH creates and maintains concerning the number of its subscribers and other criteria relevant to the determination of the monthly license fees owed for each Service. (McLeod Dep. at 32-34, 43, 46-48, 55-57; Shoutta Dep. at 41, 87-88, 92; Madlock Dep. at 29-30, 34; Pomeroy Dep. at 74-75; 2015 Agreement ¶ 9.A.)  TNS is not involved in DISH's calculation or payment for the Services.  (2009 Agreement ¶ 8; 2015 Agreement ¶ 9.C; McLeod Dep. at 46-47; Pomeroy Dep. at 56-59, 88.)  The 2015 Agreement also requires DISH to make payment in full for each Service on or before 45 calendar days after the last day of each "Accounting Month," which is defined as "the twenty second (22nd) day of a calendar month to the twenty-first (21st) day of the subsequent calendar month."  (2015 Agreement ¶ 7.B.i.)  On April 1, 2015, the parties also executed the Letter Agreement, which grants DISH the right to distribute certain

CONFIDENTIAL

Services to passengers on various airlines.  (Warren Decl. ¶ 7 & Ex. 3 ("Letter Agreement").)

## II. DISH INTENTIONALLY PAID FOR CNN BASED ON TOTAL SUBSCRIBERS BECAUSE DISH DETERMINED THAT THE WEATHER CHANNEL IS A 24-HOUR PER DAY NATIONAL NEWS SERVICE

Throughout the term of the 2009 Agreement, DISH paid TNS monthly license fees for the distribution of CNN based on the number of DISH's Total Subscribers rather than the number of CNN Subscribers.[2]  (Madlock 30(b)(6) Dep. at 30, 37, 45-46; McLeod Dep. at 24, 61-62, 72-73, 148-49, 161-62; Shoutta Dep. at 30-31.)  DISH has admitted that it did so because DISH concluded that at least one 24-hour per day national news service, The Weather Channel, was more widely distributed than CNN.  (Schlichting Dep. at 80-83.)  Specifically, Carolyn Crawford, a Vice President in DISH's Programming Department who was involved in negotiating the 2009 Agreement, "interpreted The Weather Channel as a news channel" and authorized DISH's payments based on Total Subscribers because "The Weather Channel was more broadly distributed [than CNN]."  (Schlichting Dep. at 80-83; Teplinsky Dep. at 15; Pomeroy Dep. at 24.)  For almost six years during the term of the 2009 Agreement, DISH knowingly and purposely paid for CNN based on the number of DISH's Total Subscribers rather than CNN Subscribers.  (*See* McLeod Dep. at 24, 61-62, 72-73, 148-49, 161-62; Madlock 30(b)(6) Dep. at 30, 37, 44-46 & Ex. 106; Pomeroy Dep. at 59-60; Bakowski Decl. Ex. 1 at 2-3.)

Immediately after the execution of the 2015 Agreement, DISH's Finance, Programming, and Media Services departments conducted an internal audit to ensure that DISH's calculation

---

[2] Throughout the term of the 2009 Agreement and continuing into the term of the 2015 Agreement through the Accounting Month ending February 21, 2017, DISH actually remitted payment to TNS based on the number of what DISH termed "Household" subscribers plus the number of commercial, bulk, "PCO," and "other" (airline/airplane) subscribers, which DISH used as a proxy for the number of "Total Subscribers" as defined in the Agreements. (McLeod Dep. at 149; Shoutta Dep. at 140; Madlock 30(b)(6) Dep. at 45-46; Northington Decl. ¶¶ 16, 24-26.)  It is undisputed that DISH intended to make payment for the distribution of CNN based on the number of its Total Subscribers and not the number of CNN Subscribers. (*See* Bakowski Decl. Ex. 4 at 4 (admitting that the above calculation "was intended to approximate Total Subscribers.").)  During the course of this litigation, TNS discovered DISH's "Household" method of calculating Total Subscribers was inaccurate.

CONFIDENTIAL

and payment of license fees to TNS complied with DISH's interpretation of its obligations under the 2015 Agreement.  (McLeod Dep. at 14-18, Shoutta Dep. at 44-45, 55-64.)  After several months of investigation and review of its payments and obligations, DISH knowingly and purposely decided to continue to pay license fees for CNN based on the number of DISH's Total Subscribers as it had under the 2009 Agreement.  (*See* McLeod Dep. at 55-58; Madlock 30(b)(6) Dep. at 67; Pomeroy Dep. at 78-79.)  DISH did so because it interpreted the payment provisions for CNN in the 2015 Agreement and the 2009 Agreement "the same way," and because DISH understood that The Weather Channel is a 24-hour per day national news service that was more widely distributed than CNN in DISH's DBS System.[3]  (Pomeroy Dep. at 54, 78-79; Schlichting Dep. at 80-85.)

In May 2015, when DISH began its analysis of payments under the 2015 Agreement, the Director of DISH's Finance Department confirmed that "we pay on Total Subscribers due to the fact that there are other 24-hour news channels that are more widely distributed than CNN." (Dep. Ex. 4.)  A senior manager in DISH's Programming Department likewise explained DISH's payment obligations in July 2015 by stating that "rather than paying on all actual subs receiving CNN we have to pay on all subs receiving the most widely distributed news service (assume Weather Channel)[.]"  (Pomeroy Dep. at 95; Dep. Ex. 121.)

On July 16, 2015, DISH financial analyst Jonathon Shoutta sent an analysis of DISH's payments for CNN with various "options to manage" those payments to several DISH department heads.  (Shoutta Dep. at 55-58; Dep. Ex. 5.)  Mr. Shoutta explained that one way to reduce payments for CNN would be "to make sure CNN is the most widely distributed 24 hour

---

[3] The service Newsmax also was more widely distributed than CNN between 2014 and 2016, and DISH recognized that Newsmax is "arguably" a 24-hour per day national news service.  (*See* McLeod Dep. at 97-98; Shoutta Dep. at 73; Dep. Ex. 5 at 2; Hutchins Decl. ¶¶ 14-16 & Ex. 5.)

news channel so we only pay on Service Subs for CNN." (Dep. Ex. 5 at 2.)  Mr. Shoutta then

stated that, "Arguably, there are three news channels more widely distributed: CSPAN, Weather

Channel, and Newsmax." (*Id.*)  After noting that The Weather Channel was received by more

subscribers than CNN, Mr. Shoutta wrote, "If it is impossible to get Weather Service [sic] Subs

below CNN subs, then it is less likely that we can make an argument to pay on Service Subs

rather than Total." (*Id.*)  Mr. Shoutta's analysis also stated that "[p]aying on Service Subs

instead of Total Subs for CNN will save us $9.8M/year[.]" (*Id.*)

After receiving a copy of Mr. Shoutta's analysis and discussing it with the director of

DISH's Finance Department, a Director in DISH's Programming Department, Jared Zimmer,

decided that DISH would continue to pay for CNN based on Total Subscribers.  (McLeod Dep.

at 85-86, 88-90.)  Mr. Zimmer was the lead negotiator for DISH during the 2015 Agreement

negotiations, and "he had the most experience with the Turner relationship and Turner contract at

that time." (LeCuyer Dep. at 52-53, 55-56.)  Following this decision, DISH continued to pay

TNS for the distribution of CNN based on the number of DISH's Total Subscribers using its

"Household" method of calculating "Total Subscribers," which DISH admits "was intended to

approximate Total Subscribers," through the Accounting Month ending February 21, 2017.

(Madlock 30(b)(6) Dep. at 30, 37, 45-46, 56; McLeod Dep. at 24, 61-62, 72-73, 148-49, 161-62;

Shoutta Dep. at 31, 140; Bakowski Decl. Ex. 4 at 3-4; Northington Decl. ¶¶ 16, 24-26.)

## III.  DISH SUDDENLY CHANGES ITS POSITION REGARDING THE CLASSIFICATION OF THE WEATHER CHANNEL AS A 24-HOUR PER DAY NATIONAL NEWS SERVICE

After intentionally making payments for the distribution of CNN based on the number of

DISH's Total Subscribers for almost two years under the 2015 Agreement, DISH executives

began to discuss DISH's payments for CNN in February 2017.  (*See* Schlichting Dep. at 56-59;

Teplinsky Dep. at 120-23.)  In considering ways to pay for CNN based on CNN Subscribers

rather than Total Subscribers, DISH officials initially analyzed ways to reduce the number of subscribers who received The Weather Channel, including by removing The Weather Channel from certain packages, so that CNN would be more widely distributed than The Weather Channel and DISH could pay for CNN based on the number of CNN Subscribers.  (*See* Schlichting Dep. at 59-64; Shoutta Dep. at 113-115; Dep. Ex. 7; Teplinsky Dep. at 121-23.)

Ultimately, DISH decided not to make any changes to the packages that included The Weather Channel or CNN at that time.  (McLeod Dep. at 125-26.)  Instead, DISH changed its position concerning The Weather Channel that DISH had consistently taken since the beginning of the 2009 Agreement.  In April and May 2017, without warning and without seeking input from TNS, DISH informed TNS that it had been overpaying for CNN since the beginning of the 2015 Agreement and that DISH would withhold more than $20.4 million from future CNN payments to recover this alleged overpayment.  (Northington Decl. ¶¶ 27-28; Decl. of Scott A. Miller ("Miller Decl.") ¶¶ 13-14 & Ex. 2.)  DISH stated it would do this even though the 2015 Agreement does not permit DISH to offset future payments.  (Schlichting Dep. at 92-94; Pomeroy Dep. at 42, 160-64; Warren Dep. at 66-67.)  DISH also informed TNS that, on a going forward basis, DISH would pay for CNN based on the number of CNN Subscribers rather than Total Subscribers.  (Miller Decl. ¶ 14 & Ex. 2.)

Over the next two months, DISH failed to make any payments to TNS for the distribution of CNN on the DBS System.  (Northington Decl. ¶¶ 30-31.)  DISH then made only partial payments of the license fees owed for CNN over the course of several months until DISH had withheld a total of $20,426,238.83 in license fees owed for the distribution of CNN on its DBS System.  (*Id.* ¶¶ 32-33.)  Since the Accounting Month ending March 21, 2017, DISH has calculated and paid license fees owed for distribution of CNN on its DBS System based on the

number of CNN Subscribers, even though DISH's subscriber reports confirm that The Weather

Channel was received by more Total Subscribers than CNN in DISH's DBS System from the

beginning of the 2015 Agreement through at least the Accounting Month ending December 21,

2017.  (Northington Decl. ¶ 34; Decl. of Robert A. Hutchins ("Hutchins Decl.") ¶ 16 & Ex. 5.)

## IV.   A THIRD-PARTY AUDIT REVEALS UNDERPAYMENTS BY DISH FOR THE DISTRIBUTION OF SERVICES UNDER THE 2015 AGREEMENT

TNS filed this lawsuit against DISH on October 4, 2017, asserting claims for breach of

contract and declaratory judgment arising out of DISH's failure to timely pay all amounts owed

for the distribution of CNN.  TNS previously engaged Media Audits International ("MAI"), the

third-party auditor that had conducted audits under the 2009 Agreement, to inspect and audit

DISH's records relating to its payment obligations under the 2015 Agreement for the period of

April 2015 through December 2016.  (Northington Decl. ¶ 41.)  MAI conducted fieldwork in

2017 and issued written findings to TNS in 2018.  (*Id.* ¶ 42; MAI Dep. at 175-77, 185-87, 195-

97.)  Based on these findings and other information obtained during discovery, TNS filed its

First Amended Complaint on May 16, 2018 to add claims for additional breaches of DISH's

payment obligations.  (*See* First Am. Compl. ¶¶ 31-33, 35.)

## ARGUMENT AND CITATION TO AUTHORITY

## I.   DISH BREACHED THE 2015 AGREEMENT BY CHANGING ITS POSITION AND FAILING TO PAY ALL LICENSE FEES DUE FOR THE DISTRIBUTION OF CNN

From the beginning of the 2009 Agreement through February 21, 2017—***over seven***

***years*** and ***ninety*** monthly payment periods—DISH knowingly and purposely calculated its

license fees for the distribution of CNN based on the number of Total Subscribers (using its

"Household" method) because DISH had determined The Weather Channel qualified as a 24-

hour per day national news service.  DISH is bound by its own years-long admission that The

CONFIDENTIAL

Weather Channel is a 24-hour per day national news service and is liable as a matter of law for its actions to withhold and subsequently underpay license fees owed for distributing CNN.

### A. DISH Breached the 2015 Agreement by Improperly Withholding License Fees Owed for CNN to Recoup Past Payments

It is undisputed that after DISH changed its position regarding payment for CNN in the spring of 2017, DISH withheld $20,426,238.83 in license fees that it owed for the distribution of CNN in a self-help effort to recoup what DISH claimed were past "overpayments" made since the beginning of the 2015 Agreement.  (Northington Decl. ¶¶ 27-29, 33 & Ex. 6; Miller Decl. ¶¶ 14-18 & Exs. 2, 5; Madlock 30(b)(6) Dep. at 77-79, 81-83.)  DISH's claim that it overpaid TNS is baseless—DISH was required to pay license fees based on its Total Subscribers because The Weather Channel is a 24-hour per day national news service that was received by more Total Subscribers than CNN in DISH's DBS System during that time period.  Even so, DISH's withholding of license fees owed for CNN to recover past payments is a separate and independent breach of contract for which TNS is entitled to summary judgment.

#### 1. DISH Has No Right to Offset Payments Under the 2015 Agreement or New York Law

DISH's unilateral decision to withhold license fee payments for CNN from TNS to recover past payments is a breach of DISH's express obligation under the 2015 Agreement to submit payments for each Service within forty-five days after the last day of each Accounting Month.  (2015 Agreement ¶ 9.)  There is no provision in the 2015 Agreement that gives DISH the right to take a credit against license fees owed for any reason, including past alleged overpayments.  Both parties agreed in deposition testimony that the 2015 Agreement does not provide DISH any right to offset monthly license fees owed to TNS to recover past payments, whether mistaken or otherwise.  (Schlichting Dep. at 92-93; Pomeroy Dep. at 160-64; Warren Dep. at 66-67.)  This omission of an offset right was intentional.  DISH executives testified that

CONFIDENTIAL

DISH's regular practice in negotiating affiliate agreements is to request that offset rights be included in those agreements, and DISH has done so in prior negotiations with TNS. (Schlichting Dep. at 90-91; Pomeroy Dep. at 160-62; Warren Dep. at 66-68.)  DISH executives admitted that DISH likely requested that offset rights be included in the 2015 Agreement but that "both sides were aware they were not in the agreement."  (Schlichting Dep. at 93-94; Pomeroy Dep. at 160-62.)  Because the parties did not include any provision in the 2015 Agreement granting DISH an offset right, the contract cannot be construed to give DISH the right to offset payments.  *See Sequa Corp. v. Gelmin*, 91 Civ. 8675, 1996 U.S. Dist. LEXIS 19802, at *187 (S.D.N.Y. Dec. 31, 1996) ("Terms not contained in a written contract are to be interpreted as intentionally not part of the bargain between the parties, and cannot be injected into the bargain struck between the parties after the fact."); *U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1208 (N.Y. 1986) (omission of language in contract "must be assumed to have been intentional under accepted canons of contract construction.").

The parties' negotiations also prove that when they wanted to provide for an offset right, they knew how to do so.  In the Second Amendment to the 2009 Agreement that was executed during negotiations for the 2015 Agreement, DISH specifically requested and TNS agreed to provide DISH a specific right to offset future license fees in connection with certain monies TNS agreed to pay DISH.  (Dep. Ex. 139 at 2; Warren Dep. at 66-69.)  The parties' failure to include an offset right in the 2015 Agreement after previously negotiating and including an offset right in their affiliation agreement further demonstrates the parties' intent that there be no offset right in the 2015 Agreement.

New York common law also does not allow a party to engage in self-help recoupment such as DISH has done here.  As the New York Court of Appeals has explained:

CONFIDENTIAL

> [C]ommon-law recoupment . . . has not been traditionally allowed as a self-help recovery plan.  No justification has been advanced that persuades us to allow this remedy to be invoked in these circumstances in substitution for an independent adjudicative modality of establishing a debt (e.g., by concession, agreement, litigation, or the like) before recoupment can be interposed.  Simply "deeming" or estimating the amount of an alleged past debt by a unilateral audit and ukase is unwarranted.

*Leirer v. Caputo*, 616 N.E.2d 147, 149 (N.Y. 1993).

The 2015 Agreement obligates DISH to make timely payment for each Service on or before 45 calendar days after the last day of each Accounting Month.  (2015 Agreement ¶ 7.B.i.)  It is undisputed that DISH failed to make complete payments for the distribution of CNN by withholding $20,426,238.83 in license fees that DISH owed for CNN beginning with the Accounting Month ending March 21, 2017.  DISH's actions to withhold $20,426,238.83 in license fees owed for CNN constitutes a material breach of the 2015 Agreement, and summary judgment should be entered on TNS's claim for this amount, with interest as described in Section VII below.  *See Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 67 (S.D.N.Y. 1990) ("The failure to tender payment is a material breach of a contract.").

2.      DISH's Attempt to Recoup Earlier Payments Is Barred by the Voluntary Payment Doctrine

DISH's attempt to avoid liability for its self-help recoupment of license fees paid for the distribution of CNN also is foreclosed as a matter of law by the voluntary payment doctrine.  Under New York law, "the voluntary payment doctrine bars recovery of payments made with full knowledge of the facts[.]"  *Dillon v. U-A Columbia Cablevision*, 740 N.Y.S.2d 396, 397 (App. Div. 2002), *aff'd*, 790 N.Y.S.2d 726 (2003).  Payment of a disputed amount with knowledge of the facts acts as an admission of the debt, and the party making the payment loses the right to litigate any claim that a lesser amount was due.  *See id.*; *DRMAK Realty LLC v. Progressive Credit Union*, 18 N.Y.S.3d 618, 621 (App. Div. 2015).  Where a plaintiff

"knowingly and voluntarily" makes payment, the "facts fit New York's voluntary payments doctrine like a glove." *Constellation Powersource, Inc. v. Select Energy, Inc.*, No. 3:04-cv-983, 2007 U.S. Dist. LEXIS 4583, at *17 (D. Conn. Jan. 23, 2007).

It is difficult to imagine circumstances demanding a more cut-and-dried application of the voluntary payment doctrine than the facts of this case.  DISH was ***solely responsible*** for creating, collecting, and maintaining information relating to its payments for the distribution of CNN. (McLeod Dep. at 32-34, 43, 46-48, 57; Shoutta Dep. at 41-42, 87-88, 92; Madlock Dep. at 29-30; 2015 Agreement ¶ 9.A.)  DISH unilaterally calculated the amount it determined it should pay each month based on its understanding of its obligations under the 2015 Agreement.  (McLeod Dep. at 43-44, 46-48; Shoutta Dep. at 92.)  Indeed, the undisputed record shows that shortly after the 2015 Agreement was executed, several DISH departments participated in a detailed internal audit of DISH's payment obligations under the Agreement and determined that DISH should continue to pay for the distribution of CNN on the DBS System based on the number of Total Subscribers because CNN was not the most widely distributed 24-hour per day national news service in the DBS System. (Shoutta Dep. at 44-45, 55-64; McLeod Dep. at 49-51, 55-58, 85-86, 88-90; Madlock 30(b)(6) Dep. at 55, 67; Pomeroy Dep. at 77-79; Schlichting Dep. at 80-83; Dep. Exs. 4, 5, 121.)  Under these circumstances, DISH cannot claim that it simply made a mistake.

Even where a party to a contract mistakenly makes an overpayment, the voluntary payment doctrine precludes its recovery of past overpayments "if the party's ignorance of its contractual rights and obligations resulted from a 'lack of diligence.'"  *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009)).  When a sophisticated party makes payments numerous times without reservation, New York courts uniformly reject the argument that

overpayments were based on a mistake. *See Citicorp N.A. v. Fifth Ave. 58/59 Acquisition Co.*, 895 N.Y.S.2d 39, 40 (App. Div. 2010) (holding that tenants' claim they had been overcharged rent for nine years was barred under the voluntary payment doctrine because they "demonstrated a clear lack of diligence" by "[m]aking such payments without any effort to learn what their legal obligations were"); *Gimbel Bros., Inc. v. Brook Shopping Ctrs.*, 499 N.Y.S.2d 435, 439 (App. Div. 1986) (rejecting plaintiff's argument that it mistakenly overpaid charges to defendant based on an incorrect understanding of its obligations under a lease agreement, noting plaintiff's "marked lack of diligence in determining what its contractual rights were."); *Eighty Eight Bleecker Co. v. 88 Bleecker St. Owners, Inc.*, 824 N.Y.S.2d 237, 239 (App. Div. 2006) (same).

Here, DISH only claimed it had overpaid for CNN after it decided to change its interpretation of the CNN payment provision on which it had relied for more than seven years in making payments for CNN. DISH was a sophisticated party that decided that it was required to pay for CNN based on Total Subscribers if The Weather Channel was received by more Total Subscribers than CNN for over seven consecutive years. New York law precludes DISH from arguing that its withholding of payments for CNN to recoup past payments was proper.

**B. DISH Was Required to Pay License Fees for CNN Based on the Number of Total Subscribers Because The Weather Channel Is a 24-Hour Per Day National News Service That Was Received by More Total Subscribers Than CNN In DISH's DBS System**

It is undisputed that The Weather Channel was received by more Total Subscribers in DISH's DBS System from the beginning of the 2009 Agreement through at least the Accounting Month ending December 21, 2017. (Hutchins Decl. ¶ 16 & Ex. 5; Schlichting Dep. at 80-83.) DISH was required to pay license fees for CNN based on the number of Total Subscribers in DISH's DBS System during that time period because The Weather Channel is a "24-hour per day national news service" under the 2009 and 2015 Agreements.

14

CONFIDENTIAL

1.  Summary Judgment Should Be Granted on a Matter of Contract
    Interpretation Where the Language of a Provision Is Unambiguous or
    Where the Ambiguity Can Be Resolved Through Extrinsic Evidence

It is axiomatic that "[s]ummary judgment on a contract interpretation dispute is clearly permissible when the language of the contract provision is unambiguous." *Nycal Corp. v. Inoco P.L.C.*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998).  Under New York law, the courts' "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into contract.  If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further.  This may be so even if the contract is silent on the disputed issue." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004).

The Court also may grant summary judgment "when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Shepley v. New Coleman Holdings, Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (quoting *Nycal Corp.*, 988 F. Supp. at 299 & nn.9-11); *see also MSF Holding Ltd. v. Fiduciary Tr. Co. Int'l*, 435 F. Supp. 2d 285, 302 (S.D.N.Y. 2006), *aff'd*, 235 F. App'x 827 (2d Cir. 2007).  The determination of the existence of and the value of extrinsic evidence is a question of law for the Court.  *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1375 (E.D.N.Y. 1988).  "Absolute certainty in a contractual provision is not required as long as the intent of the parties can be determined to a reasonable degree of certainty." *Travellers' Int'l AG v. Trans World Airlines*, 722 F. Supp. 1087, 1102 (S.D.N.Y. 1989).  Extrinsic evidence may come from the parties' course of dealing or from industry custom and trade.  *See Kenneth D. Laub & Co. v. 101 Park Ave. Assoc.*, 556 N.Y.S.2d 881, 882 (App. Div. 1990) ("Where the language of an agreement leaves the intention of the parties doubtful or ambiguous, all the prior dealings of the parties are admissible to determine their intent."); *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 07CV6665(HB),

CONFIDENTIAL

2009 U.S. Dist. LEXIS 54670, at *13 (S.D.N.Y. June 23, 2009) ("Industry custom and trade usage may also be considered to assist the Court in determining the intent of the parties.").

> 2. The Weather Channel Is a 24-Hour Per Day National News Service Under the Plain Language of the 2015 Agreement

Here, The Weather Channel is a "24-hour per day national news service" under the plain and ordinary meaning of that phrase. "The words and phrases used in an agreement must be given their plain meaning so as to define the rights of the parties, and in this regard, it is common practice for the courts of [New York] to refer to the dictionary to determine plain and ordinary meaning of words to a contract." *Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (App. Div. 1988) (citations omitted). The dictionary defines a "news service" as "an organization that gathers and publishes or broadcasts news." *News Service*, Collins English Dictionary Online (2018), https://www.collinsdictionary.com/dictionary/english/news-service (Aug. 21, 2018). News, in turn, is defined as "information about a recently changed situation or a recent event." *News*, Collins English Dictionary Online (2018), https://www.collinsdictionary/com/dictionary/ english/news (Aug. 21, 2018); *see also News*, Cambridge Dictionary (2018), https://dictionary. cambridge.org/us/dictionary/english/news (Aug. 21, 2018) (defining "news" as "a printed or broadcast report of information about important events in the world, the country, or the local area."). Coverage of weather is clearly news and it is undisputed that numerous news organizations cover weather and weather-related news. Indeed, Schedule C of the 2015 Agreement expressly recognizes that CNN and HLN are 24-hour per day national news services, and the descriptions of CNN's and HLN's programming in the 2015 Agreement include specific references to "weather reports" as part of their programming. (2015 Agreement ¶ 4.A, B.) The 2015 Agreement thus expressly recognizes that weather reports constitute news programming.

CONFIDENTIAL

*See Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003) ("All parts of a contract must be read in harmony to determine its meaning.").

The Weather Channel manifests all the elements of a 24-hour per day national news service.  It is undisputed that The Weather Channel's programming focuses on weather news and information programming.  (*See* Decl. of Daniel M. Hartman ("Hartman Decl.") ¶¶ 6-7.)  Indeed, several DISH executives admitted that The Weather Channel exhibits news programming.  (*See* McLeod Dep. at 83, 201; LeCuyer Dep. at 212 ("Certainly weather information weather reports [sic] can be a type of news."))  It also is undisputed that The Weather Channel is a 24-hour per day service that exhibits programming for 24 hours each day, 7 days a week.  (Teplinsky Dep. at 83; Hartman Decl. ¶ 8.)  And it is undisputed that The Weather Channel is a "national" service that is distributed across the United States, unlike some regional or local television services that are distributed to more limited geographic markets.  (Pomeroy Dep. at 188; Hartman Decl. ¶ 9.)  Accordingly, under the plain language of the 2015 Agreement, The Weather Channel is a "24-hour per day national news service."  The plain language of the 2015 Agreement dictates the finding that DISH's payment of license fees for CNN based on CNN Subscribers rather than Total Subscribers for those months in which The Weather Channel was received by more Total Subscribers than CNN in DISH's DBS System was a material breach of contract.

        3.       Extrinsic Evidence Also Conclusively Establishes the Parties' Intent that <u>The Weather Channel Is a 24-Hour Per Day National News Service    </u>

Even if the Court were to construe the term "24-hour per day national news service" to be ambiguous, the undisputed extrinsic evidence demonstrates that The Weather Channel constitutes a 24-hour per day national news service under the terms of the 2015 Agreement as a matter of law.  That extrinsic evidence reflects both the parties' dealings prior to the dispute, which show that DISH considered The Weather Channel to be a 24-hour per day national news

service for over seven years before changing its position in the spring of 2017, and industry

custom and trade usage, which overwhelmingly supports the classification of The Weather

Channel as a 24-hour per day national news service.

>    a.   The Parties' Course of Dealing Establishes that Both Parties
>         Considered The Weather Channel to Be a 24-Hour Per Day
>         National News Service.

Under New York law, the parties' interpretation of a contract prior to litigation is the best

evidence of the parties' intent as to the meaning of the contract.  *See Ocean Transport Line, Inc.*

*v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984).  "The practical interpretation

of a contract by the parties, manifested by their conduct subsequent to the formation for any

considerable length of time before it becomes a subject of controversy, is entitled to great, if not

controlling weight in the construction of the contract."  *Travellers Int'l*, 722 F. Supp. at 1102

(quoting *Viacom Int'l v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980)).

Here, the undisputed record shows that for over seven years—throughout the course of

the 2009 Agreement and continuing for two years into the term of the 2015 Agreement—DISH

classified The Weather Channel as a 24-hour per day national news service and TNS confirmed

the same understanding.  After the 2009 Agreement was executed, DISH determined that The

Weather Channel is a 24-hour per day national news service and made payments throughout the

term of the 2009 Agreement based on the number of DISH's Total Subscribers rather than the

number of CNN Subscribers because The Weather Channel was more widely distributed than

CNN in DISH's DBS System.  (Schlichting Dep. at 80-83; Pomeroy Dep. at 59-60; Madlock

30(b)(6) Dep. at 44-46; Bakowski Decl. Ex. 1 at 2-3.)  This was no mistake—it was a deliberate

decision made by a Vice President in DISH's Programming Department who negotiated the 2009

Agreement that DISH's programming and finance departments continued to follow throughout

the term of the 2009 Agreement.  (Schlichting Dep. at 80-85; Madlock (30)(b)(6)) Dep. at 44-46;

CONFIDENTIAL

Dep. Ex. 106 (Jan. 7, 2015 email from senior programming finance official stating that "Mine and Alex's understanding is that we should still be paying [TNS] on total subs."))

DISH reaffirmed its position that The Weather Channel is a 24-hour per day national news service when it conducted its internal audit of its payments shortly after the parties executed the 2015 Agreement.  DISH officials confirmed at that time that "we pay on Total Subscribers due to the fact that there are other 24-hour news channels that are more widely distributed than CNN" and considered The Weather Channel to be one of those channels.  (Dep. Exs. 4, 121.)  Around that time, a senior manager in DISH's Programming Department acknowledged that "rather than paying on all actual subs receiving CNN we have to pay on all subs receiving the most widely distributed news service (assume Weather Channel)[.]" (Pomeroy Dep. at 15, 93-97; Dep. Ex. 121.)  DISH also conducted an analysis of how to reduce its payments for CNN by reducing the number of subscribers for The Weather Channel so that it was lower than the number of CNN Subscribers.  After concluding that The Weather Channel is "[a]rguably" a news service, DISH's analyst noted that "[i]f it is impossible to get Weather Service [sic] Subs below CNN subs, then it is less likely that we can make an argument to pay on Service Subs rather than Total."  (Shoutta Dep. at 73-74; Dep. Ex. 5 at 2.)  After reviewing this analysis and discussing it with the head of DISH's Finance Department, a Director in the Programming Department decided that DISH should continue paying for CNN based on Total Subscribers.  (McLeod Dep. at 88-90.)  It was not until February 2017 that DISH—at the direction of CEO Charlie Ergen—reversed its longstanding position concerning The Weather Channel and stopped paying for CNN based on Total Subscribers.  (Schlichting Dep. at 71-72.)

TNS also understood from its third party auditor that DISH had been paying for CNN based on DISH's Total Subscribers during the term of the 2009 Agreement because The Weather

CONFIDENTIAL

Channel was received by more Total Subscribers than CNN in DISH's DBS System.  (*See* Northington Decl. ¶¶ 19-22.)  The auditor confirmed that DISH classified The Weather Channel as a news service, and TNS agreed with that classification and that DISH should be paying for CNN based on Total Subscribers if The Weather Channel was received by more Total Subscribers than CNN.  (*See id.*; MAI Dep. at 118-25, 136; Dep. Ex. 143 at ASR-5 ("The Weather Channel was classified as a news service by the affiliate"); Dep. Ex. 44 ("We also agree that Weather Channel is a news service and therefore DISH should be paying on Total subs[.]"))

The parties' performance under the 2009 Agreement and 2015 Agreement conclusively demonstrates the parties' intent that The Weather Channel constitutes a 24-hour per day national news service for the purposes of those agreements.  *See Ocean Transport Line, Inc.*, 743 F.2d at 91; *Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1999) ("[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'" (quoting *Webster's Red Seal Publ'ns, Inc. v. Gilberton World-wide Publ'ns, Inc.*, 415 N.Y.S.2d 229, 230 (1979))).  Courts routinely grant summary judgment when the intent of the parties is demonstrated by a longstanding course of conduct prior to the dispute.  *See, e.g.*, *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 380-82 (S.D.N.Y. 2006) (granting summary judgment based on the "undisputed evidence of the course of dealing between the parties under the contracts at issue" where defendant had repeatedly made payments in a manner inconsistent with plaintiffs' interpretation of the contract); *Well Luck Co, Inc. v. F.C. Gerlach & Co.*, 421 F. Supp. 2d 533, 540-41 (E.D.N.Y. 2005) (granting summary judgment because "the parties' subsequent course of dealing unambiguously establishes their intent" under the contract); *Murray Hill Mews Owners Corp. v. Rio Rest. Assoc. L.P.*, 938 N.Y.S.2d 59, 60 (App. Div. 2012) (ruling that summary judgment should have been granted in

CONFIDENTIAL

lease dispute where the tenant consistently paid rent increases over eight years based on provision it was now challenging and renewed its lease on the same terms as the original lease).

Because the 2015 Agreement is covered by New York's Uniform Commercial Code,[4] "the express terms of [the 2015 Agreement] and any applicable course of performance, course of dealing, or usage of trade *must be construed whenever reasonable as consistent with each other*." N.Y. U.C.C. § 1-303(e) (emphasis added). The term "24-hour per day national news service" must be construed to include The Weather Channel given the undisputed fact that DISH *made that precise determination* and then paid license fees for CNN based on the number of Total Subscribers *for more than seven years* until DISH suddenly changed its position in the spring of 2017. As a result, summary judgment should be entered on TNS's claim that DISH breached the 2015 Agreement by failing to pay license fees for CNN based on the number of Total Subscribers in DISH's DBS System for each Accounting Month during the term of that Agreement in which The Weather Channel was received by more Total Subscribers than CNN.

> b.   Industry Custom and Trade Usage Confirms that The Weather Channel Is a 24-Hour Per Day National News Service.

The parties' consistent course of dealing under the 2009 Agreement and the 2015 Agreement alone establishes that The Weather Channel constitutes a 24-hour per day national news service under the 2015 Agreement such that the Court should grant summary judgment to TNS without considering any further extrinsic evidence. *See Atateks Foreign Trade Ltd.*, 2009 U.S. Dist. LEXIS 54670, at *13 ("[T]he parties' course of dealing controls over evidence of commercial custom[.]"); N.Y. U.C.C. § 1-303(e)(3) ("[C]ourse of dealing prevails over usage of

---

[4] DISH remitted payments to TNS under the 2015 Agreement by check (*see* Northington Decl. ¶ 37; Pomeroy Dep. at 66), and payments of contract debts by check or other negotiable instruments are Code-covered transactions that are subject to the general provisions in Article 1 of the U.C.C. *Horn Waterproofing Corp. v. Bushwick Iron & Steel Co.*, 488 N.E.2d 56, 62 (N.Y. 1985); N.Y. U.C.C. § 1-102.

trade.").  But evidence of industry custom and usage (as shown by DISH's own actions) further demonstrates that The Weather Channel is a 24-hour per day national news service.

The Weather Channel is widely recognized as a 24-hour per day national news service in the television industry.  Television programming services are generally classified into different categories or genres, including, among others, "general entertainment," "kids," "sports," and "news."  (Hartman Decl. ¶¶ 10-11, 15 & Ex. 2.)  Those classifications frequently appear in marketing materials regarding the television services offered by distributors, ratings publications, television listing services, and channel lineups (which typically group services in the same genre in the same "neighborhood").  (Hartman Decl. ¶¶ 10-14.)  Tellingly, DISH classifies The Weather Channel as a news service in multiple ways that are transparent to its subscribers and the cable television industry.  DISH offers customers who receive its "Flex Pack" the option to purchase several "add-on" channel packages that are categorized by genre, including a package of news services DISH calls the "News Pack" that has always included The Weather Channel. (*See* McLeod Dep. at 191-96; Schlichting Dep. at 123-24; LeCuyer Dep. at 223-25; Teplinsky Dep. at 152-53; Dep. Exs. 19-23.)  DISH has described its News Pack at various times as "includ[ing] your favorite news programming including: FOX News, FOX Business, The Weather Channel, Bloomberg Television . . . ."  (Dep. Ex. 21.)

DISH also organizes its channel lineup so that programming services of the same genre or classification are placed together.  (Pomeroy Dep. at 233-35; Schlichting Dep. at 125; LeCuyer Dep. at 226, 231-36.)  DISH places The Weather Channel in its channel lineup in the same neighborhood as other news services such as CNN, Fox News, and Bloomberg.  (Pomeroy Dep. at 242-43; Schlichting Dep. at 128-29, 131; LeCuyer Dep. at 228-30, 234-36; Dep. Ex. 22; Hartman Decl. ¶ 13 & Ex. 1.)  Numerous other distributors also place The Weather Channel with

CONFIDENTIAL

other news services in their channel lineups.  (Hartman Decl. ¶ 14.)  Leading industry

publications such as SNL Kagan also classify The Weather Channel as a news service.  (Hartman

Decl. ¶ 15 & Ex. 2.)  DISH itself has analyzed the viewership of CNN and The Weather Channel

and concluded that there is a correlation between their viewership trends.  (Dep. Ex. 27;

Teplinsky Dep. at 70-71.)  This evidence overwhelmingly supports the conclusion that The

Weather Channel is a 24-hour per day national news service under the 2015 Agreement.

### C.   TNS Has Suffered Damages as a Result of DISH's Failure to Pay License Fees Based on Total Subscribers for the Months When The Weather Channel Was Received by More Total Subscribers than CNN

Because The Weather Channel is a 24-hour per day national news service, DISH owed

TNS license fees based on the number of Total Subscribers in DISH's DBS System for each

Accounting Month in which The Weather Channel was received by more Total Subscribers than

CNN in that System.  The damages to which TNS is entitled include the $20,426,238.83 in CNN

license fees that DISH wrongly withheld, as well as the amounts that DISH systematically

underpaid TNS by calculating its license fee payments based on CNN Subscribers instead of

Total Subscribers for every Accounting Month in which The Weather Channel was received by

more Total Subscribers than CNN.  Those underpayments currently total at least $31,663,477[5]

(*see* Hutchins Decl. ¶ 21), and TNS is entitled to summary judgment on its claim in that amount,

with interest as described in Section VII below.

## II.   DISH BREACHED THE 2015 AGREEMENT BY FAILING TO PAY FOR THE DISTRIBUTION OF CNN BASED ON THE ACTUAL NUMBER OF DISH'S TOTAL SUBSCRIBERS

Before TNS filed this lawsuit, DISH represented to TNS that from the beginning of the

term of the 2015 Agreement through the Accounting Month ending February 21, 2017, DISH

---

[5] The damages figures stated in this brief do not take into account additional damages owed to TNS as a result of DISH's improper application of a 20% discount to the rates paid for the distribution of CNN.  *See infra* Section VI.

CONFIDENTIAL

had been paying license fees for CNN based on the number of Total Subscribers in its DBS

System.  (*See, e.g.*, Miller Decl. Ex. 5 ("DISH has incorrectly been overpaying for CNN based

on the number of Total Subscribers to the DBS System . . . .").  During this period, DISH

calculated and paid license fees for the distribution of CNN in the DBS System using its

"Household" method of calculating Total Subscribers.  (Madlock 30(b)(6) Dep. at 56; Bakowski

Decl. Ex. 4 at 3-4; Northington Decl. ¶¶ 24-26.)  DISH has now admitted that while this

calculation "was intended to approximate Total Subscribers" under the 2015 Agreement, DISH

made payments based on a number of subscribers that was "different than Total Subscribers,"

which in fact was less than the number of Total Subscribers.  (Bakowski Decl. Ex. 4 at 3-4

(emphasis added); McLeod Dep. at 170-71; Pomeroy Dep. at 75-76; Hutchins Decl. ¶ 10.)

Because DISH was required to pay license fees based on the ***actual*** number of Total Subscribers

during those Accounting Months, DISH underpaid TNS for the distribution of CNN during that

time period.  Summary judgment should be entered on TNS's claim based on DISH's failure to

pay for the distribution of CNN in the DBS System based on the actual number of DISH's Total

Subscribers.  TNS is entitled to recover the difference between the amounts DISH actually paid

for CNN during these Accounting Months and the amounts that DISH owed based on the actual

number of DISH's Total Subscribers.  The amount of those underpayments totals at least

$1,980,143, before interest.  (Hutchins Decl. ¶ 20.)

III.   **DISH BREACHED THE 2015 AGREEMENT BY FAILING TO PAY LICENSE
       FEES OWED FOR THE DISTRIBUTION OF TURNER'S SERVICES BASED ON
       THE ACTUAL NUMBER OF SERVICE SUBSCRIBERS FOR EACH SERVICE**

DISH also failed to pay all amounts owed for the distribution of the Services by failing to

correctly report and pay on the actual number of Service Subscribers.  The 2015 Agreement

obligates DISH to pay license fees for the distribution of each of the Services based on the

number of Service Subscribers (except for CNN, for which payment is based on the number of

CONFIDENTIAL

CNN Subscribers only when there is no other 24-hour per day national news service received by more Total Subscribers than CNN).  (2015 Agreement, Sch. C.)  The Services CNN, Boomerang, TBS, TCM, TNT, Cartoon Network, and truTV were all included as part of DISH's "Complete" and "Complete Plus Sports" packages during the term of the 2015 Agreement, as shown on DISH's rate cards for packages offered to commercial customers.  (*See* Dep. Ex. 116; Madlock 30(b)(6) Dep. at 138-39; Bakowski Decl. Exs. 8, 9.)  DISH's records prove that DISH has failed to report and pay license fees to TNS based on the subscribers who received the Services through these packages during much of the term of the 2015 Agreement.  (*See* Madlock 30(b)(6) Dep. at 134-35, 137-38, 141-44; Hutchins Decl. ¶ 24.)  DISH also failed to report and pay license fees for certain bulk customers who received the Services in at least two months during the term of the 2015 Agreement.  (*See* Hutchins Decl. ¶¶ 29-30.)  As a result, DISH has breached the 2015 Agreement by underpaying TNS for the distribution of these Services.  TNS is entitled to summary judgment on its claims addressing these underpayments, which total at least $439,956 (*see* Hutchins Decl. ¶ 25), with additional amounts to be quantified at a later date.

IV. **DISH BREACHED THE 2015 AGREEMENT AND THE LETTER AGREEMENT BY FAILING TO TIMELY PAY LICENSE FEES FOR THE SERVICES**

Paragraph 7.B of the 2015 Agreement (which is incorporated into the Letter Agreement) provides that DISH must submit payment to TNS for each Service "[o]n or before forty-five (45) calendar days after the last day of each Accounting Month."  (2015 Agreement ¶ 7.B; Letter Agreement ¶ 4.)  The undisputed record shows that DISH submitted payments for the Services distributed under the 2015 Agreement and the Letter Agreement after the forty-five day payment period for numerous Accounting Months between the Accounting ending March 21, 2017 and the Accounting Month ending August 21, 2018.  (Northington Decl. ¶¶ 38-39.)  DISH's failure to submit timely payments to TNS for the Services beginning with the Accounting Month ending

CONFIDENTIAL

March 21, 2017 constitutes a material breach of the 2015 Agreement and the Letter Agreement. *See Edward Andrews Grp., Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731 (LTS)(AJP), 2005 U.S. Dist. LEXIS 30125, at *12 (S.D.N.Y. Nov. 29, 2005).

In addition to making late payments for the Services, DISH failed to pay ***any license fees*** for Delta Airlines passengers who received the CNN Service until after TNS filed its First Amended Complaint alleging that DISH had failed to pay these license fees owed under the Letter Agreement. (*See* First Am. Compl. ¶ 57; Northington Decl. ¶¶ 51-54.) Shortly after TNS filed its First Amended Complaint, DISH sent TNS an adjusted payment report for its distribution of CNN to airline passengers for Accounting Months ending February 21, 2015 through May 21, 2018. (*Id.* ¶ 54.) That report stated that DISH previously underreported the number of airline passengers during each of these Accounting Months and that DISH was revising its payment report to reflect an additional number of airline passengers for each Accounting Month. (*Id.* ¶ 53 & Ex. 14.) On July 5, 2018, TNS received a payment from DISH in the amount of $400,512.00, reflecting the license fees owed for these previously unreported passengers. (*Id.* ¶ 54.) DISH's Finance Director admitted at her deposition that DISH had failed to report the number of passengers on Delta Airlines and that this was the reason for the underpayment. (*See* McLeod Dep. at 168-69 ("We looked into it, agreed with that finding, and I think it was about $400,000 that we paid.").) DISH failed to include interest on its past due payments. (Northington Decl. ¶¶ 35, 40, 53.) DISH's failure to submit timely payment for these passengers is a material breach of the Letter Agreement for which TNS is entitled to summary judgment. As explained further in Section VII below, TNS is entitled to interest on these past due payments.

CONFIDENTIAL

## V.    DISH BREACHED THE 2015 AGREEMENT BY IMPROPERLY CALCULATING THE NUMBER OF BULK CUSTOMERS

Under Paragraph 8 of the 2015 Agreement, DISH is permitted to use an alternate calculation for determining the number of Customers for payment and penetration purposes "[i]n the event that DISH Distributes any Package of video programming services on a bulk-bill basis (a 'Bulk-Bill Arrangement')."  (2015 Agreement ¶ 8.)  A Bulk-Bill Arrangement is an arrangement where a customer (such as a hotel) purchases services for a number of different units (such as each hotel room) and all units are billed together instead of separately.  (*See* Teplinsky (30)(b)(6) Dep. at 13-14.)  When DISH distributes a Package of services in a Bulk-Bill Arrangement that is "reasonably equivalent" to a Package that DISH provides to non-bulk Customers, DISH may calculate the number of bulk Customers by "dividing (i) the monthly retail rate that DISH charges in connection with the Bulk-Bill Arrangement for such Package by (ii) the residential monthly retail rate that DISH charges a non-bulk Customer for the same or a reasonably equivalent Package."  (2015 Agreement ¶ 8.)  In other words, for these "reasonably equivalent" packages, DISH is allowed to calculate a percentage (or "bulk factor") that is then multiplied by the number of units in the bulk property receiving that package to determine the number of bulk Customers that DISH may use for payment and penetration purposes under the 2015 Agreement.  (Teplinsky 30(b)(6) Dep. at 44-45.)  For example, if the "monthly retail rate" for a bulk package is $10 per unit, and that bulk package is "reasonably equivalent" to a residential package that has a monthly retail rate of $50 per subscriber, the "bulk factor" would be 20%, and DISH would calculate the number of bulk Customers for that package as 20% of the total bulk units receiving that package.  (*Id.*)

During the term of the 2015 Agreement, DISH has improperly calculated the number of bulk Customers receiving "reasonably equivalent" packages in multiple ways.

CONFIDENTIAL

A.       **Local Channels & Equipment Charges**

When performing its bulk factor calculations under Paragraph 8, DISH is required to use as its denominator "the residential monthly retail rate that DISH charges a non-bulk Customer for the same or a reasonably equivalent Package."  That means that DISH must use the monthly retail rate that DISH charges residential customers for the same Package (or a "reasonably equivalent" Package) as that offered to bulk Customers.  But DISH has manipulated its bulk factor calculations by including prices for equipment and local channels as part of its "residential monthly retail rate" when those same prices are not included as part of the "monthly retail rate" for the reasonably equivalent bulk Package.

DISH has admitted that it includes $9 in each of its residential monthly retail rates to account for the costs of the free equipment that DISH includes in its residential Packages. (Teplinsky 30(b)(6) Dep. at 70-71, 150-52.)  In other words, DISH's "residential monthly retail rates" reflect not just the cost of the ***services*** included in the residential Package, but also the ***equipment*** that DISH provides ***without additional charge***.  That violates DISH's obligations because the 2015 Agreement defines a "Package" as solely relating to ***services***, not equipment. (2015 Agreement ¶ 1.NN.)  DISH also admitted that it includes the cost of local channels in each of its residential monthly retail rates.  (*Id.* at 36-39, 109-13; Dep. Ex. 91.)  But since at least July 2017, residential customers can receive the "America's Top" packages without local channels for $10 or $12 less per month than the full residential retail rates that DISH uses in the denominator of its bulk calculations.  (Teplinsky 30(b)(6) Dep. at 37, 39, 111-13; Dep. Ex. 91.)  Bulk customers do not receive free equipment or local channels with their "America's Top" packages, and DISH properly excludes charges for equipment or local channels from the "monthly retail rate" that DISH uses for the numerator of its bulk calculations.  (Teplinsky 30(b)(6) Dep. at 53-54, 61-63, 68-69; McLeod Dep. at 183.)  In other words, the "monthly retail rate" that DISH uses

in the numerator of its bulk calculations reflects *only* the cost of the non-local programming services that are included in the relevant package.

By including charges for equipment and local channels in the "residential monthly retail price" that DISH uses in the denominator, DISH is improperly inflating the denominator of the bulk calculation to artificially lower the number of bulk Customers that DISH reports to TNS. The 2015 Agreement requires DISH to compare the "monthly retail rate" for the bulk package with the "monthly retail rate" for the *same or "reasonably equivalent"* residential package. (2015 Agreement, ¶ 8.)  Those retail rates are for *Packages*, not equipment, and the *same or "reasonably equivalent"* residential package to the bulk package is the residential package that does *not include* local channels.  DISH's manipulation of its bulk calculations constitutes a breach of the 2015 Agreement.

### B.     Promotional Rates & Discounted Wholesale Price

DISH also has improperly manipulated its bulk factors by using incorrect "monthly retail rates" for certain bulk packages in the numerator of its bulk calculations.  DISH publishes rate cards that describe the standard rates that DISH charges to bulk customers for various bulk packages offered by DISH.  (Teplinsky 30(b)(6) Dep. at 25; Dep. Exs. 83, 84.)  But instead of using standard rates published on its rate cards, DISH has used promotional, discounted rates in some of its bulk factor calculations.  (Teplinsky 30(b)(6) Dep. at 85-86.)  DISH also has calculated the bulk factor using the rate some bulk property owners pay wholesalers, which are significantly lower than the retail rate reflected on DISH's rate cards.  (*Id.* at 49, 85.)  DISH does not use discounted promotional or wholesale prices in its residential monthly retail rate. (Hutchins Decl. ¶ 28.)  By artificially reducing the monthly retail rate used in its calculations, DISH has wrongly manufactured a significantly lower number of Customers and a lower payment to TNS for each Service.

CONFIDENTIAL

As a result of DISH's improper bulk calculations, DISH has consistently underreported the number of bulk customers who receive the Services, and consequently underpaid TNS for the Services.  Summary judgment should be entered on TNS's claims for these underpayments.  Because these breaches are continuing, TNS will present evidence as to the amount of its damages for these breaches at a later date.

## VI.  DISH BREACHED THE 2015 AGREEMENT AND THE LETTER AGREEMENT BY TAKING A DISCOUNT ON RATES FOR CNN AT THE SAME TIME IT WAS VIOLATING ITS CONTRACTUAL OBLIGATIONS

Schedule C of the 2015 Agreement allows DISH to discount the rates it pays TNS for the distribution of CNN by 20% *only* if DISH is in compliance with the terms and conditions of the both the 2015 Agreement and the Letter Agreement.  (*See* 2015 Agreement, Sch. C at 65; Pomeroy Dep. at 199-200.)  These terms also are incorporated by reference in the Letter Agreement.  (Letter Agreement ¶ 4.)

Throughout the term of the 2015 Agreement, DISH has applied the 20% discount to the rates that it uses to calculate the monthly license fees it pays for the distribution of CNN under the 2015 Agreement and the Letter Agreement.  But as a result of DISH's numerous breaches of its payment obligations throughout the term of the 2015 Agreement, DISH has not been in compliance with the terms and conditions of both the 2015 Agreement and the Letter Agreement.  Because DISH was not entitled to apply the 20% discount at any time during the term, DISH has underpaid TNS for CNN and materially breached its obligation to pay TNS license fees based on the *undiscounted rates* for CNN.  TNS is entitled to summary judgment on this claim and is entitled to recover as damages the additional amount of license fees that DISH should have paid using undiscounted rates for CNN, with interest.  Because these breaches are continuing, TNS will present evidence as to the amount of its damages based on these breaches at a later date.

CONFIDENTIAL

## VII.   DISH IS LIABLE FOR TNS'S COSTS, FEES, AND INTEREST UNDER THE 2015 AGREEMENT AND THE LETTER AGREEMENT

The 2015 Agreement and the Letter Agreement provide that TNS is entitled to interest on all past due amounts owed under the contracts: "Past due payment shall bear interest at a rate equal to the lesser of (i) ███████████████████ or (ii) the maximum interest rate permitted under New York law."  (2015 Agreement ¶ 7.C; Letter Agreement ¶ 4.)  Under New York law, TNS is entitled to interest on all amounts due under the contracts at a rate of 9% per year, accruing from the date each amount should have been paid.  *See* N.Y. C.P.L.R. §§ 5001, 5004. TNS is entitled to summary judgment on its claims for interest on all amounts that DISH owes as a result of its breaches of the 2015 Agreement and the Letter Agreement.

TNS also is entitled to recover its reasonable expenses and attorneys' fees incurred in this litigation pursuant to Paragraph 7.C of the 2015 Agreement, which provides:

> In the event of litigation regarding any past due payments, the prevailing Party shall be entitled to full reimbursement from the non-prevailing Party for all reasonable costs and expenses (including, without limitation, reasonable court costs and attorneys' fees) incurred by the prevailing Party for such litigation.

(2015 Agreement ¶ 7.C; Letter Agreement ¶ 4.)  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008); *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993) ("[W]here a contract authorizes an award of attorneys' fees, such an award becomes the rule rather than the exception.").  Here, TNS's claims are for nonpayment. Accordingly, summary judgment should be entered on TNS's claim for reasonable costs and expenses, including attorneys' fees.  Because TNS continues to accrue attorneys' fees and expenses, TNS will submit evidence to the Court regarding these amounts after the resolution of TNS's claims.

CONFIDENTIAL

**VIII.  TNS IS ENTITLED TO SUMMARY JUDGMENT ON THE PARTIES' CLAIMS FOR DECLARATORY JUDGMENT CONCERNING DISH'S OBLIGATIONS TO PAY LICENSE FEES FOR DISTRIBUTION OF THE CNN SERVICE**

In its First Amended Complaint, TNS seeks a declaration that DISH is obligated under the 2015 Agreement to pay TNS, Inc. license fees for distribution of the CNN Service based on the number of DISH's Total Subscribers in any System for each Accounting Month in which The Weather Channel is received by a greater number of Total Subscribers than CNN in such System.  (First Am. Compl. ¶ 69.)  TNS also seeks a declaration that DISH is obligated under the terms of the 2015 Agreement and the Letter Agreement to pay license fees for the distribution of CNN by applying the ***undiscounted*** rates specified for CNN for each Accounting Month in which DISH is not in compliance with the terms of the 2015 Agreement.  (*Id.* ¶¶ 70-71.)  In its First Amended Counterclaims, DISH asserts mirror-image claims for declaratory relief, seeking a declaration that The Weather Channel does ***not*** qualify as a "24-hour per day national news service" under the terms of the 2015 Agreement and a declaration that DISH is entitled, on a going-forward basis, to apply the 20% discount on the rates specified for CNN in Schedule C of the 2015 Agreement.  (First Am. Countercls. ¶¶ 66-68.)  For the reasons explained above in Sections I and VI, summary judgment should be entered in favor of TNS on both parties' claims for declaratory judgment.

**IX.  TNS IS ENTITLED TO SUMMARY JUDGMENT ON DISH'S COUNTERCLAIM CONCERNING THE MOST FAVORED NATIONS PROVISION**

DISH has asserted a counterclaim against TNS alleging that TNS breached Paragraph 38 of the 2015 Agreement by purportedly failing to notify DISH of lower net effective per subscriber rates that it offered other distributors for certain of the Services in 2015 through 2018 ("MFN Counterclaim").  (DISH's First Am. Countercls. ¶¶ 54-58.)  DISH's claim is baseless.

Under Paragraph 38 of the 2015 Agreement, if TNS has previously granted or grants to a

CONFIDENTIAL

"Comparable Distributor" a lower net effective per subscriber rate ("NEPSR") or other more favorable provision than certain enumerated provisions of the 2015 Agreement, TNS must "promptly notify DISH in writing" of that provision.  (2015 Agreement ¶ 38.)  While DISH conclusorily alleges that TNS failed to notify DISH in writing of lower NEPSRs that it has granted to Comparable Distributors (*see* DISH's First Am. Countercls. ¶¶ 32-35, 54-58), DISH cannot demonstrate that there is a genuine issue for trial on this claim.  The undisputed evidence shows that each time TNS granted a lower NEPSR to a Comparable Distributor, TNS has offered DISH the option to substitute the more favorable provision.  (*See* Miller Decl. ¶¶ 6-9; Dep. Exs. 46, 50, 51, 53.)  There is no evidence that TNS failed to offer DISH a lower NEPSR under the MFN provision.

The ***only thing*** that DISH has pointed to in support of its MFN Counterclaim is certain TNS revenue estimates published by S&P Market Intelligence (formerly known as SNL Kagan) ("S&P").  (First Am. Countercls. ¶¶ 33-34; Pomeroy Dep. at 262.)  But those revenue estimates do not prove anything about whether TNS has offered lower NEPSRs to Comparable Distributors.  As DISH admitted, the accuracy of the S&P revenue estimates is unverified and unknown.  (Pomeroy Dep. at 273-74.)  S&P neither received nor verified its estimates with TNS, and TNS executive Scott Miller has testified that the S&P revenue figures are not accurate. (Miller Decl. ¶¶ 1, 10; Miller Dep. at 157.)  Indeed, the very reports on which DISH relies ***expressly disclaim the accuracy*** of the information contained therein and state that the projections "are not intended to be statements of fact."  (Ex. 127 at 6; Pomeroy Dep. at 274-75.) Additionally, these revenue estimates are derived from ***total affiliate revenue*** for a Service, not just revenues received from DISH and those distributors that could be Comparable Distributors for the purposes of the MFN provision.  (*Id.*)  Even DISH's corporate representative admitted

CONFIDENTIAL

that the information contained in the S&P estimates would not allow DISH to determine that TNS offered a lower NEPSR to one of DISH's Comparable Distributors; rather, those estimates only can "suggest that a lower rate has been offered to another distributor."  (*Id.* at 276.)

Because DISH's MFN Counterclaim is entirely predicated upon inaccurate, unverified information that even DISH admitted is irrelevant to the proof of its claim, TNS is entitled to summary judgment on DISH's MFN Counterclaim.

## X.   THE COURT ALSO SHOULD GRANT SUMMARY JUDGMENT AGAINST DISH ON ITS COUNTERCLAIM RELATING TO DISH AVAILS

DISH also has alleged that TNS failed to satisfy its obligations under Paragraph 5.C. of the 2015 Agreement to provide DISH Avails—that is, a set number of minutes that TNS must reserve on its Services for DISH's own commercial promotions and advertising.  (*See* First Am. Countercls. ¶¶ 37-53, 59-63.)  But DISH has failed to produce evidence that TNS breached its contractual obligations or that DISH's alleged damages were the result of any such breach.

The 2015 Agreement provides that TNS has the "sole discretion" to preempt DISH Avails on the Services CNN, truTV, HLN, CNNI, and CNNe for "programming of overriding national importance."  (2015 Agreement ¶ 5.C.; Pomeroy Dep. at 246.)  The 2015 Agreement also expressly provides that TNS is not liable for any failure to provide DISH Avails if the failure is due to or arises out of any cause beyond the reasonable control of TNS.  (2015 Agreement ¶ 13.)  DISH has failed to show that any failure to receive DISH Avails occurred as a result of TNS's breach of its contractual obligations rather than due to valid preemption or some other reason outside the control of TNS.  DISH's assertion that is suffered damages as a result of TNS's alleged failure to provide DISH Avails also is fatally flawed because it is wholly speculative.  (*See* Bakowski Decl. Ex. 1 at 6; *Id.* Ex. 2 at 6-7; Pomeroy Dep. at 243-60.) Causation "is an essential element of damages in a breach of contract action; and, as in tort, a

plaintiff must prove that a defendant's breach ***directly and proximately caused*** his or her

damages." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)

(emphasis in original); *see also Wenger v. Alidad*, 696 N.Y.S.2d 227, 228 (App. Div. 1999)

("[D]amages may not be merely speculative, possible or imaginary, but must be reasonably

certain and directly traceable to the breach, not remote or the result of other intervening causes.")

(citations omitted).  Because DISH cannot establish the elements of its Avails counterclaim,

summary judgment should be entered in favor of TNS on this claim.

## XI.   DISH CANNOT RECOVER ITS COSTS OR ATTORNEYS' FEES

DISH's prayer for relief requests that the Court award DISH its costs and reasonable

attorneys' fees pursuant to Paragraph 7.C of the 2015 Agreement.  That provision only provides

for an award of attorneys' fees to the prevailing party "[i]n the event of litigation ***regarding any***

***past due payments***."  (2015 Agreement ¶ 7.C (emphasis added).)  Here, TNS owes no payments

to DISH under the Agreement, and DISH's counterclaims do not, and cannot, relate to past due

payments under the 2015 Agreement.  As a result, the Court should grant summary judgment in

favor of TNS on DISH's request for costs and attorneys' fees.

### CONCLUSION

For the foregoing reasons, TNS is entitled to summary judgment on its claims for breach

of contract and declaratory judgment and should be awarded damages on these claims, including

interest and its reasonable costs and attorneys' fees.  Additionally, the Court should grant

summary judgment in favor of TNS on DISH's Counterclaims.

Dated: October 18, 2018.

James A. Lamberth

35