# EXHIBIT 2

# TO

# DECLARATION

# OF

# RICHARD J. WARREN

*EXECUTION VERSION*

# AFFILIATION AGREEMENT
# FOR
# DISH NETWORK L.L.C.

**THIS AFFILIATION AGREEMENT** is made and entered into to be effective as of the 1st day of April, 2015 (the "**Effective Date**"), by and between TURNER NETWORK SALES, INC. ("**TNS, Inc.**"), and DISH NETWORK L.L.C. ("**DISH**," and, together with TNS, Inc., the "**Parties**," each, a "**Party**").

**WHEREAS**, TNS, Inc. is the authorized agent for licensing the twenty-four (24) hour per day, seven (7) day per week, linear video programming services known as Cable News Network ("**CNN**"), HLN, The Cartoon Network ("**Toons**"), Turner Classic Movies ("**Classics**"), Boomerang, CNN International ("**CNNI**"), Turner Network Television ("**TNT**"), TBS, CNN en Español ("**CNNe**"), truTV, and hTV, including each high definition feed thereof (i.e., 720p, 1080i and/or 1080p) (each such high definition feed, a "**High Definition Feed**" or a "**HD Feed**") ▮▮▮▮▮▮▮▮

**WHEREAS**, DISH desires to receive, promote and Distribute (as defined in <u>Paragraph 1.Q.</u>) the Services (as defined in <u>Paragraph 1.YY.</u>) within the Territory (as defined in <u>Paragraph 1.JJJ.</u>) to Customers (as defined in <u>Paragraph 1.L.</u>) via the Systems (as defined in <u>Paragraph 1.GGG.</u>), under and in accordance with the terms of this Agreement and unless otherwise expressly indicated herein, the terms and conditions of this Agreement shall apply to both the standard definition feeds (each, a "**SD Feed**") and High Definition Feeds of the Services; and

**WHEREAS**, DISH desires to license the Services from TNS, Inc. to Distribute, and TNS, Inc. desires to license the Services to DISH for Distribution by DISH, to Customers via the Systems.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, agreements and representations contained herein, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Definitions.** For purposes of this Agreement, the terms below have the meanings ascribed to them as follows:

    A.     "**Ad Server**" means an advertising server system (e.g., FreeWheel).

    B.     "**Affiliate**," with respect to a party (which party need not be a Party), means any person or entity that directly or indirectly, or through one or more intermediaries, controls, is controlled by, or is under common control with such party. For the purposes of this definition, the term "control" (and the correlative forms "controlling" and "controlled by") means the power to direct or cause the direction of the management, policies and/or affairs of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

    C.     "**Affiliated Entity**" means DISH's parent, DISH Network Corporation, and/or any of DISH Network Corporation's majority owned, direct or indirect subsidiaries, including without limitation, Sling TV L.L.C., provided, however, that Sling TV L.L.C. shall qualify as an "Affiliated Entity" only if the minority or remaining ownership interest(s) (i.e., the equity interests not owned, directly or indirectly by DISH Network Corporation) are owned,

CONFIDENTIAL

directly or indirectly, by EchoStar Corporation and/or a wholly-owned subsidiary of EchoStar Corporation.

      D.      **"Agreement"** means this Affiliation Agreement.

      E.      **"Authorized Device"** means any phone (e.g., iOS, Android), personal computer (e.g., desktop/laptop, PC, Mac), tablet (e.g., iOS, Android), game console, smart TV, Blu-Ray player and other streaming media device (e.g., Microsoft XBOX, Sony TV, Roku, Apple TV, Chromecast), handheld media device (e.g., iPod Touch), portable gaming device, and/or other consumer electronics device that is capable of receiving and displaying, or receiving and enabling the display of, the Services through a DISH OTT Service (as defined in Paragraph 1.P.).

      F.      **"Blackout Information"** means the metadata, API, ANSI/SCTE 35 blackout flag, ZIP codes and other information, in electronic form, to effect blackouts of programming as specified in Paragraph 2.E.

      G.      **"Boomerang Subscribers"** means those Customers authorized by DISH to receive Boomerang.

      H.      **"Classics Subscribers"** means those Customers authorized by DISH to receive Classics.

      I.      **"CNN Subscribers"** means those Customers authorized by DISH to receive CNN.

      J.      **"CNNe Subscribers"** means those Customers authorized by DISH to receive CNNe.

      K.      **"CNNI Subscribers"** means those Customers authorized by DISH to receive CNNI.

      L.      **"Customer"** means (i) with respect to the OTT System (as defined in Paragraph 1.MM.), each residential subscriber authorized by DISH to receive video programming services via a DISH OTT Service, and (ii) with respect to the DBS System (as defined in Paragraph 1.N.), each of the following authorized by DISH to receive any level of video programming service from the DBS System: (a) a single residential dwelling unit (i.e., private home, mobile home) or vehicle (i.e., automobile, tractor trailer, boat); (b) each individual dwelling unit located in a multiple-unit residential complex (e.g., a residential building, apartment, condominium, townhome) and, if applicable, a limited number of private units (e.g., manager's office) in such multiple-unit complex; (c) each guest room, suite or other temporary living quarters in premises where individuals reside on a temporary basis (e.g., each individual room in a hotel, motel, dormitory, assisted living facility, cruise ship, hospital or prison) and a limited number of private locations within such premises (e.g., conference rooms, common area in a dormitory);

45710.20

CONFIDENTIAL

DISH000012261

For clarity, any Customer described in subparagraphs (b) and (c) above that meets the definition of a Bulk-Bill Arrangement as defined in Paragraph 8 may use the bulk rate formula as set forth in Paragraph 8 herein to calculate the number of Customers for payment and penetration purposes.

M.    **"DISH Ad Server"** means the Ad Server that DISH and/or its Affiliates use to insert advertising on the OTT System.

N.    **"DBS System"** means: the distribution system employed by DISH to distribute audio, video, data and other content services to Customers in the Territory whereby the programming signal or feed is (i) received by DISH (and/or its subcontractor(s)) at a Facility (as defined in Paragraph 1.T.) and, if applicable, digitized, compressed, encrypted, encoded, decoded, transcoded and otherwise processed, each of the foregoing to effectuate the rights granted, and to perform the obligations set forth, in this Agreement, and (ii) (a) transmitted via direct broadcast satellite for reception and display by Customers;




3

45710.20

CONFIDENTIAL    DISH000012262

P.      **"DISH OTT Service"** means any OTT Service provided by DISH or DISH's Affiliated Entity, Sling TV L.L.C., that distributes linear video programming services of multiple unaffiliated content providers that is primarily marketed towards English language subscribers and that is accessed using an Authorized Device via a website and/or not more than one (1) application per Authorized Device. For clarity, multiple versions of the same application will be considered one (1) application if each version provides access to the same content and Packages.



Q.      **"Distribute"** (and its correlative forms) means the distribution of video and audio programming to Customers over a System, as part of such System's provision of multiple subscription video programming services over such System, for reception by such System's authorized Customers (i) with respect to the OTT System, via any Authorized Device, and (ii) with respect to the DBS System, via any Subscriber Receiver.

R.      **"Enter Into"** (and its correlative forms **"Entered Into," "Enters Into"** and **"Entering Into"**) means being, having become or becoming a party to a license or other agreement (including, without limitation, any amendment, renewal, extension, or side letter), whether now or hereafter effective, whether by writing or by oral agreement.

S.      **"Excluded Subscribers"** means Customers that receive programming services via a System only from one or more of the following categories

(viii) employees of DISH, government officials and governmental buildings that are not charged for or receive a credit from DISH for the level of service that includes the Service (the total of this subparagraph (viii) of Paragraph 1.S. not to exceed one half of one percent (0.5%) of DISH's total Customers),

4

45710.20

CONFIDENTIAL DISH000012263

[black redaction box]

T.      **"Facility"** means the reception, compression and uplink/data aggregation and/or processing facility(ies) operated by or on behalf of DISH or any of its Affiliates in Cheyenne, Wyoming, Gilbert, Arizona, or American Fork, Utah (or any replacement or additional location used by DISH as an uplink/data aggregation/processing facility).

U.      **"FCC"** means the Federal Communications Commission (or its successor).

V.      **"Fees"** means the monthly license fees payable by DISH pursuant to Paragraph 7.B.

W.      **"Fixed Wireline"** means fiber optic cable, coaxial cable, copper wire, or other wireline architecture.

X.      **"General Entertainment Add-On Package"** means an English-language package of linear television programming networks that contains fifteen (15) or more advertiser-supported, Nielsen-rated services and at least one (1) linear video programming service from at least four (4) of the following categories: children's (e.g., Nickelodeon, Disney Channel), family (e.g., Hallmark Channel, Rural), news (e.g., MSNBC, Fox News Channel), sports (e.g., FS1, NBCSN), lifestyle (e.g., Food Network, Up), religious (e.g., PixL, Inspiration), women (e.g., E!, OWN), men (e.g., FX, Spike), music (e.g., VH1, Fuse) and education (e.g., Discovery, History); provided that, notwithstanding the foregoing to the contrary, "General Entertainment Add-On Package" does not include the OTT Basic Package (as defined in Paragraph 1.KK.).

Y.      **"HLN Subscribers"** means those Customers authorized by DISH to receive HLN.

[black redaction box]

AA.     **"Internet"** means the publicly accessible series of global, interconnected, packet-switched networks that use transmission control protocols ("**TCP**"), Internet protocols ("**IP**") and/or other architecture to communicate and otherwise transmit information to and from users' devices.

BB.     **"Internet Technologies"** means technologies using one or more computer networks that use TCP/IP, IP or other architecture or that use computer terminals, terminal servers, routers, multicasting technology or other data processing or transmission devices (regardless of transmission speed experienced by the end user), whether via cable, wire, wireless, or other technology, regardless of the end user's reception and/or viewing device (e.g., television, computer (including, without limitation, tablets), cellular telephone or other mobile device, Blu-ray player, gaming console, IRD).

5

45710.20

CONFIDENTIAL

MM.    **"OTT System"** means the distribution system used to make available to Customers audio, video, data and other content, including, without limitation, linear video programming services, solely to the extent such system is used to make the Services available to Customers via a DISH OTT Service.

NN.    **"Package"** means any pre-assembled group of linear video programming services.

OO.    **"PCO"** means private cable operator.



RR.    **"Prior Agreement"** means the Affiliation Agreement by and between Turner Network Sales, Inc. and DISH Network L.L.C. dated as of August 14, 2009, as amended.



45710.20

CONFIDENTIAL                                                                 DISH000012266



XX.    **"Secure"** means (i) with respect to the OTT System, that each Service signal is encoded using Microsoft Windows Media DRM, PlayReady DRM, Adobe's Flash Access DRM, Widevine DRM, Secure Media, Nagra PRM, Fairplay and/or such other digital rights management systems as mutually agreed upon by the Parties, employing persistent encryption of the Services using a minimum 128 bit AES algorithm, combined with Rivest, Shamir and Adleman, Elliptical Curve Cryptography, or similar public key cryptography for delivery of decryption keys to a Customer, and (ii) with respect to the DBS System, that each Service signal is persistently scrambled and encrypted using one (or more) of the following industry standards adopted by the National Institute of Standards and Technology:  Data Encryption Standard, Triple Data Encryption Standard, Advanced Encryption Standard, DVB CSA, HDCP 2.0 and/or DTCP-IP (or any recognized successors to any such standard(s)), such that the foregoing (i) and (ii) shall be implemented with respect to the content of the Services from the authorized point of reception to and within the Subscriber Receiver or Authorized Device, as applicable.

YY.    **"Service"** means each of the following twenty-four (24) hour per day, seven (7) day per week, linear video programming services: CNN, HLN, Toons, Classics, Boomerang, CNNI, TNT, TBS, CNNe, truTV and hTV, including all High Definition Feeds, and any Future Feed, if any, licensed to DISH pursuant to Paragraph 2.L. (collectively, the **"Services"**).



AAA.    **"Signals"** means, collectively, the programming signals or feeds containing each of the Services, including all video, audio, data and other components as delivered by TNS, Inc. to the Facility.  **"Signal"** means each of the Signals individually, as applicable.



9

45710.20

DISH000012268

████████████████████████████████████████

CCC.     **"Site(s) and App(s)"** means website(s) and application(s).

DDD.     **"SMATV"** means satellite master antenna television facility that services subscribers without using any public right of way.

EEE.     **"Stream"** (including **"Streaming"** and **"Streamed"**) means the electronic transmission of audio-visual content via the Internet in digital form in a manner such that it is presented to an end-user on an end-user display without such content being stored at any point within the transmission path, including, without limitation, on any end-user device (except for the temporary buffering of data inherent in the streaming process).

FFF.     **"Subscriber Receiver"** means any device located at a Customer premises that enables the display of a Service, including, without limitation, through On-Premises Networking Technologies, through the DBS System.

GGG.     **"System"** means each of the following Distributing any Service:

    (i)      the DBS System; and

    (ii)     the OTT System.

HHH.     **"TBS Subscribers"** means those Customers authorized by DISH to receive TBS.

III.     **"Term"** has the meaning set forth in <u>Paragraph 7.A.</u>, as applicable with respect to each Service.

JJJ.     **"Territory"** means (i) the United States, (ii) the District of Columbia, (iii) Puerto Rico, and (iv) the United States Virgin Islands.

KKK.     **"TNS Ad Server"** means the Ad Server that TNS, Inc. uses (or that TNS, Inc. intends to use) to serve advertising on the OTT System. ███████████████

████████████████████████████████████████

LLL.     **"TNT Subscribers"** means those Customers authorized by DISH to receive TNT.

MMM.     **"Toons Subscribers"** means those Customers authorized by DISH to receive Toons.

████████████████████████████████████████

45710.20

CONFIDENTIAL                                                   DISH000012269



OOO.    **"Total Subscribers"** means (i) with respect to the OTT System, each Customer of the OTT System excluding Excluded Subscribers, (ii) with respect to the DBS System, each Customer of the DBS System excluding Excluded Subscribers, and (iii) when used herein to apply to both Systems, the foregoing (i) plus (ii).

PPP.    **"truTV Subscribers"** means those Customers authorized by DISH to receive truTV.

Other capitalized terms contained herein have the meanings ascribed to them in the context of this Agreement.

2.    **Grant of Rights and Minimum Transmission Requirements**.



B.    Additional Rights and Conditions.



45710.20

CONFIDENTIAL

DISH000012270



**4.** **Description of Services.**



45710.20

CONFIDENTIAL

DISH000012284



A.    CNN shall consist of a twenty-four (24) hour per day professionally produced satellite-delivered (or other mutually agreed upon method of delivery), advertiser-supported, video programming service in the English language generally consisting of national and international news, sports programming, finance news, weather reports, features, and such other news related programming as TNS, Inc. or its applicable Affiliate may, from time to time, elect to produce.

B.    HLN shall consist of a twenty-four (24) hour per day professionally produced satellite-delivered (or other mutually agreed upon method of delivery), advertiser-supported, video programming service in the English language, generally consisting of national and international news programming, sports programming, talk shows, investigative programming, finance news, weather reports, features, and such other news related programming as TNS, Inc. or its applicable Affiliate may, from time to time, elect to produce.

45710.20

CONFIDENTIAL

DISH000012285



K.   hTV shall consist of a twenty-four (24) hour per day, professionally produced, satellite-delivered (or other mutually agreed upon method of delivery), advertiser-supported video programming service predominantly consisting of Latin and Hispanic music videos, interviews and such other programming as TNS, Inc. may, from time to time, elect to incorporate in hTV.

5.   **Commencement and Use of Services.**

A.   At all times throughout the Term, DISH shall Distribute each of the Services, in its entirety, without any editing, delay, addition, alteration or deletion, except as otherwise provided in this Agreement (e.g., DISH's right to insert advertising in the DISH Avails via the DISH Ad Server; TNS, Inc.'s right to insert its advertising in the TNS Avails via the TNS Ad Server). With respect to the DBS System, DISH shall deliver each Signal to Customers on a single designated channel dedicated solely to the full-time delivery of such Service, and with respect to the OTT System, DISH shall make each Service available to Customers as a continuous uninterrupted Stream available on a full-time basis. DISH may not squeeze back (i.e., reduce the portion of the screen that the Service content occupies) or overlay any material onto the Service





28

45710.20

CONFIDENTIAL

DISH000012287



C.   TNS, Inc. shall provide to DISH, and DISH will have the right to use, the following number of minutes (**"DISH Avails"**) on each System in accordance with the terms and conditions set forth herein, which time shall be specifically identified by TNS, Inc. (in its sole but reasonable discretion) on each of CNN, HLN, TBS, TNT, Toons, truTV, Boomerang, CNNI, hTV and CNNe (subject to programming of overriding national importance, in TNS, Inc.'s sole discretion, with respect to CNN, truTV, HLN, CNNI and CNNe) for DISH's own commercial promotions and DISH's placement of commercial advertising, including the sale by DISH and/or its Affiliates of the DISH Avails, which DISH Avails, for purposes of clarity, may be sold by DISH or its designated subcontractor:

    (i)   For CNN, (a) three (3) minutes in each hour of CNN on each System that Distributes each of CNN, HLN and TBS pursuant to this Agreement with TNS, Inc. or an Affiliate of TNS, Inc. for such Services; provided that DISH Distributes CNN to ninety-five percent (95%) of Total Subscribers measured cumulatively across both Systems throughout the Term, or (b) two (2) minutes in each hour of CNN on (1) any System that does not Distribute each of CNN, HLN and TBS pursuant to this Agreement with TNS, Inc. or an Affiliate of TNS, Inc. or (2) both Systems if DISH distributes CNN to less than ninety-five percent (95%) of Total Subscribers measured cumulatively across both Systems;



    (vii)   For TNT, three (3) minutes in each hour of TNT on each System that Distributes TNT, CNN, HLN and TBS pursuant to this Agreement, provided that each of TNT, CNN, HLN and TBS are Distributed on each such System on a single designated channel without any editing, delay, addition, alteration or deletion (except as required or permitted pursuant to this Agreement). Notwithstanding

45710.20

CONFIDENTIAL

DISH000012288

the foregoing, DISH will have the right to use two (2) minutes in each hour of any National Basketball Association game on TNT.  On any System that does not meet the requirements in the first sentence of this clause (vii), DISH will have the right to use two (2) minutes in each hour of TNT.

D.      Notwithstanding anything to the contrary, with respect to the DISH Avails available within the OTT System, if DISH inserts promotions or advertisements within the DISH Avails that are different from the promotions or advertisements inserted within such DISH Avails within the DBS System ("**Substitute OTT Ads**"), then such Substitute OTT Ads must be sold (a) by DISH and/or its designated agent, but specifically excluding ad networks, cooperative exchanges, or other services that bundle inventory from multiple sources (except as part of a local cable television cooperative of MVPDs as is customary in the cable television industry as of the Effective Date for local spot advertising) and (b) on a "run of service" and blind basis (i.e., in a manner that does not identify specific Services or programs in which advertisements or promotions will appear) and bundled with advertising inventory from at least four (4) other linear non-TNS, Inc. cable television networks. Except for the DISH Avails, TNS, Inc. owns all video advertising inventory in connection with the Services. In addition, to the extent a DISH OTT Service contains display advertising units that are visible to Service Subscribers when a Service is being Streamed, TNS, Inc. shall be entitled to insert display advertising within such display advertising units during such times that TNS, Inc. inserted video advertising is being Streamed within the Service, and such advertisements will remain in place until the next call for video advertising is made during the Stream of the Service ("**Companion Banner Inventory**"). DISH shall ensure that advertising within such Companion Banner Inventory is capable of being synchronized to the associated video advertising and that the Companion Banner Inventory supports rich media consistent with the Interactive Advertising Bureau's Rich Media Guidelines. Each Party shall retain one hundred percent (100%) of the revenue generated from its sale of advertising inventory allocated to it under this Agreement.

E.      Notwithstanding anything to the contrary in this Agreement, all promotions or advertisements that DISH inserts within the DISH Avails shall (i) not be indecent, lewd or pornographic; (ii) not suggest any false, unauthorized or fraudulent affiliation between DISH and/or any third party advertisers and the applicable Service, or any programming contained in such Service; and (iii) generally be compatible with the reasonable commercial standards of the applicable Services communicated to DISH from time to time in writing, with reasonable advance notice, including, without limitation, a prohibition on advertising (a) related to adult entertainment; (b) which advocates a position on any political or social issue; and/or (c) that promotes the tune in of any concurrent video programming

45710.20

CONFIDENTIAL

DISH000012289



F.      TNS, Inc. shall insert (or cause to be inserted) ANSI/SCTE 35 digital triggers (or any successor thereto) in the Services to identify the placement of DISH Avails in the Services. TNS, Inc. shall insert (or cause to be inserted) ANSI/SCTE 35 digital triggers (or any successor thereto) in the Services to identify the placement of all TNS Avails on the OTT System in order to enable DAI via the TNS Ad Server.

G.      With respect to the OTT System, and solely with respect to each of the Site(s) and App(s) through which DISH Distributes the Services, DISH shall install the SDKs necessary to enable the Ratings Systems on each Authorized Device on which DISH Distributes the Services to the extent such Ratings Systems are available for use with such Authorized Device.



45710.20

CONFIDENTIAL

DISH000012290



7. **Term and Rates.**

A.    <u>Term</u>. Unless earlier terminated pursuant to the provisions hereof, the "**Term**" of this Agreement shall commence on the Effective Date and expire on October 31, 2018.

B.    <u>Rates</u>.

(i)    On or before forty-five (45) calendar days after the last day of each Accounting Month (as hereinafter defined) throughout the Term, DISH shall pay to TNS, Inc., for each System, at the address specified by TNS, Inc., the relevant monthly rate specified in <u>Schedule C</u> which Schedule is hereby incorporated in this Agreement by reference, for the applicable calendar month, based upon the average number of Service Subscribers (average calculated as Service Subscribers on the last day of the previous Accounting Month plus Service Subscribers on the last day of the applicable Accounting Month divided by two) or average number of Total Subscribers, as applicable, for the applicable Accounting Month as provided by DISH pursuant to <u>Paragraph 9</u> (e.g., (a) DISH shall pay the relevant monthly rate for CNN for the calendar month of December 2015 (e.g., $⬛ on or before February 4, 2016, based upon the average number of Service Subscribers or Total Subscribers, as applicable, between November 21, 2015 and December 21, 2015 and (b) DISH shall pay the relevant monthly rate for CNN for the calendar month of January 2016 (e.g., $⬛ on or before March 7, 2016,

38

45710.20

CONFIDENTIAL

DISH000012297

based upon the average number of Service Subscribers or Total Subscribers, as applicable, between December 21, 2015 and January 21, 2016). For purposes of clarification, any Customer receiving multiple feeds of, or multiple Packages containing, any Service (e.g., a Customer receiving both the CNN SD Feed and the CNN HD Feed, or a Customer receiving Boomerang in both America's Top 120 and in any other Package) shall be counted as only one (1) Service Subscriber, provided that any Customer receiving a Service via both Systems shall be counted as two (2) Service Subscribers.



(ii) As used herein, the term **"Accounting Month"** means the twenty second (22nd) day of a calendar month to the twenty-first (21st) day of the subsequent calendar month.



39

CONFIDENTIAL

DISH000012298



C.    Past due payments shall bear interest at a rate equal to the lesser of (i) ▮ or (ii) the maximum interest rate permitted under New York law. In the event of litigation regarding any past due payments, the prevailing Party shall be entitled to full reimbursement from the non-prevailing Party for all reasonable costs and expenses (including, without limitation, reasonable court costs and attorneys' fees) incurred by the prevailing Party for such litigation.

D.    In Systems Distributing a High Definition Feed of a Service, such Distribution shall be at no extra charge to DISH provided that DISH is Distributing such High Definition Feed of such Service without imposing a fee for a Customer to receive such High Definition Feed, other than (i) an equipment charge, or other similar type fee, for a Subscriber Receiver or other equipment necessary for a Customer to receive and use high definition programming; and/or (ii) the applicable fee to receive the level of cable television service containing the SD Feed of such Service.

E.    If during the Term TNS, Inc. acquires the exclusive television rights within the Territory (with the exception of local, free, over-the-air broadcast exhibitions) to exhibit at least eight (8) live National Football League ("NFL") regular season and/or playoff games per NFL season ("**NFL Package**") on TNT, TBS or truTV, then notwithstanding anything to the contrary in this Agreement, provided that all such NFL games are scheduled by TNS, Inc. in good faith to air on one, and only one, of TNT, TBS or truTV (the single Service selected for such NFL games, the "**Football Service**"), then TNS, Inc. shall have the right to increase the monthly per subscriber rates set forth in Schedule C on each percentage tier of the Football Service (such increase, the "**Rate Increase**"); provided that the Rate Increase shall not become effective until the later of (i) the expiration of no less than one hundred twenty (120) calendar days' prior written notice from TNS, Inc. to DISH regarding TNS, Inc.'s election to implement the Rate Increase, and (ii) the calendar year when a NFL game is first scheduled to be included on the Football Service (the date on which each of clause (i) and (ii) are satisfied, the "**Rate Increase Effective Date**"). Except as provided below with respect to the 2017 and 2018 calendar years, the Rate Increase shall not exceed ▮ on any percentage tier of the monthly per subscriber rates set forth in Schedule C for the Football Service in any calendar year. Beginning on January 1, 2017 and on January 1, 2018, the prior calendar year's Rate Increase shall increase by ▮ and the resulting Rate Increase for each such year shall not be subject to the foregoing ▮ limitation. For example, if TNS, Inc. acquires the television rights to eight (8) NFL regular season games to be exhibited beginning in September 2015 on TNT, then, solely for periods following the Rate Increase Effective Date, TNS, Inc. may increase the monthly per subscriber rates set forth in Schedule C for TNT by an additional ▮ for each percentage tier for each of calendar years 2015 and 2016 and by an additional ▮ for

41

45710.20

truTV) and all eight (8) NFL games aired on the Football Service between August 2016 and January 15, 2017, but TNS, Inc. did not have the rights to exhibit within the Territory at least eight (8) NFL regular season and/or playoff games on TNT, TBS or truTV for the 2017-2018 NFL season, then the Rate Increase effected in connection with TNS, Inc.'s rights with respect to the 2016-2017 NFL season would cease to be effective as of January 31, 2017 (i.e., the last day of the calendar month during which the last NFL game appeared on the Football Service).

**8.**   **Calculating the Number of Bulk Customers.** In the event that DISH Distributes any Package of video programming services on a bulk-bill basis (a **"Bulk-Bill Arrangement"**) in a reasonably equivalent Package that DISH provides to non-bulk Customers, then, notwithstanding anything to the contrary contained in this Agreement, the number of Customers for payment and penetration purposes will be calculated by dividing: (i) the monthly retail rate that DISH charges in connection with the Bulk-Bill Arrangement for such Package by (ii) the residential monthly retail rate that DISH charges a non-bulk Customer for the same or a reasonably equivalent Package; however, in no event will the number of Customers attributable to a property subject to a Bulk-Bill Arrangement be greater than the total number of units in such property.   For purposes of this Paragraph 8, **"reasonably equivalent"** means that at least ninety-five percent (95%) of the video programming services in the residential Package are the same as the video programming services in the bulk Package.   In the event that DISH Distributes any Package on a Bulk-Bill Arrangement in a Package that is not a reasonably equivalent Package that DISH provides to non-bulk Customers, but that includes, at a minimum, the following Services: CNN, TNT, Toons, TBS and HLN (a **"Turner Package"**), then the number of Customers attributable to such Bulk-Bill Arrangement will be thirty percent (30%) of the total number of units in such property.   In the event that DISH Distributes any Package on a Bulk-Bill Arrangement that is neither in a reasonably equivalent Package that DISH provides to non-bulk Customers nor in a Turner Package, then the actual number of Customers        for        each        Service        shall        be        reported.

**9.**   **Reports and Audits.**

A.   DISH shall, no later than forty-five (45) calendar days following the end of each Accounting Month (e.g., (i) such report delivered on February 4 shall contain information for the Accounting Month ending on December 21st or (ii) such report delivered on March 7 shall contain information for the Accounting Month ending January 21st), submit to TNS, Inc. a report setting forth on a System-by-System basis for each Service, with Puerto Rico broken out and provided on a separate report for each System, the information set forth on, and on forms similar to the form set forth on attached Schedule D, which Schedule is hereby incorporated in this Agreement by reference.

At TNS, Inc.'s reasonable request, but not more frequently than once every twelve (12) calendar months, DISH agrees to provide such other information as may be reasonably required by TNS, Inc. for accurate billing purposes in the event that TNS, Inc. is unable to obtain such information through its own reasonable efforts,  provided that any such request not customarily made in the ordinary course of business shall be initiated at the request of an officer of TNS, Inc. bearing a title of Vice President or higher.

B.   Upon written request, but no more frequently than once every twelve (12) months, DISH shall provide a copy of each System's (i) channel line-up cards and (ii) published rates for each of the System's satellite-delivered (or other mutually agreed upon method of delivery) video programming packages and a la carte services in the

43

45710.20

event that TNS, Inc. is unable to obtain such information through its own reasonable efforts.

C.      DISH shall keep complete and accurate books and records directly relating to this Paragraph 9 in accordance with generally accepted accounting principles. All such books and records shall be maintained by DISH throughout the Term and for not less than one (1) year thereafter.  Acceptance by TNS, Inc. of any payment by DISH shall not be construed as acceptance of any aforementioned subscriber count supplied in the corresponding monthly report, or as waiver of any rights of TNS, Inc. hereunder. Independent third parties that are authorized representatives of TNS, Inc. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shall have the right, no more than once in a three hundred sixty-five (365) day period during the Term and for one (1) year thereafter, at TNS, Inc.'s expense, to inspect, audit and copy those books and records of DISH pertaining to DISH's obligations hereunder for the then-immediately prior twenty-four (24) month period (i.e., such books and records shall be limited to those books and records pertaining to the twenty-four (24) month period immediately preceding the date of such audit), at DISH's offices, during normal business hours upon not less than thirty (30) calendar days' prior notice, to determine the accuracy of any or all of DISH's reports hereunder, for the sole purpose of verifying the accuracy of payments made under this Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



10.    **Confidentiality.**    The terms and conditions (other than the existence of this Agreement) and all other non-public information disclosed by one Party to the other Party in connection with this Agreement shall be kept confidential by the Parties and shall not be disclosed by either Party to any third party (other than the Parties' respective officers, directors and employees, in their capacity as such, and each Parties' respective auditors, consultants, financial advisors, lenders, attorneys (subject to such parties agreeing to be bound by the provisions of this Paragraph 10) and only using such information as is necessary in the course of

45710.20

CONFIDENTIAL

DISH000012303

fulfilling their responsibilities to the disclosing Party) except: (A) to the extent necessary to comply with applicable Law, in which event the disclosing Party shall so notify the other Party, as promptly as practicable (and, if possible, prior to making any disclosure), and redact this Agreement to the extent possible and seek confidential treatment of such information; (B) as part of the auditing procedure outlined in Paragraph 9.C. and as part of its normal reporting or review procedure to its parent company and such parent's subsidiaries, provided that any such independent third party  and/or person has agreed to be bound by the confidentiality obligations of this Paragraph 10 (or, if applicable, the NDA executed pursuant to Paragraph 9.C.) and shall only use such information as is necessary in the course of fulfilling their responsibilities to the disclosing party; (C) as part of a due diligence effort in the event of a sale or transfer of, or investment in, either Party; provided, however, such third party agrees to be bound by the confidentiality obligations of this Paragraph 10 and shall only use such information for purposes of conducting such due diligence; and/or (D) in order to enforce or defend against any claims arising from this Agreement; provided, however, that in the event either Party seeks to file this Agreement or otherwise disclose any terms of this Agreement in any pleading or paper, that Party must seek to file this Agreement and/or any pleading or paper disclosing any term of this Agreement under seal and take all other reasonable steps necessary to maintain the confidentiality of the terms of this Agreement. Except for DISH's obligations to provide data to TNS, Inc. set forth in this Agreement and/or to the extent necessary to comply with the valid order of a court of competent jurisdiction or other regulatory authority, DISH has no obligation to provide any other data to TNS, Inc.

11.  **Promotion.**

A.    Throughout the Term, (i) DISH will use commercially reasonable efforts to promote the sale of the Services to its Customers and potential customers over the Systems and (ii) TNS, Inc. will make available to DISH reasonable quantities of TNS, Inc.'s then-available promotional, marketing and sales materials related to the Service(s).

B.    At all times throughout the Term, the Services and programs thereon shall be listed in all of DISH's electronic program guides or other navigational tools in the Systems.

12.  **Default.**  If (i) either Party defaults on the payment of any material amounts due and payable in accordance with the terms and conditions of this Agreement  and/or breaches or otherwise fails to comply with any material representation, warranty, covenant and/or other material term or condition of this Agreement, including, without limitation, a Security Breach with respect to the DBS System (any such default, failure or breach, a "**Breach**") and, such Breach continues, as applicable: (a) for a period of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with respect to any payment Breach or (b▮▮▮▮▮▮▮▮▮▮▮ with respect to any other Breach (excluding any Breach resulting in a Security Breach with respect to the OTT System, which is addressed in Paragraph 5.J.), each of the cure periods set forth in clauses (a) and (b) beginning only after receipt of written notice thereof from the non-Breaching Party setting forth the basis of any such Breach, (ii) a Party has filed a petition in bankruptcy, is insolvent, or has sought relief under any Law related to its financial condition or its ability to meet its obligations in accordance with the terms and conditions of this Agreement; or (iii) a Party has had any involuntary petition in bankruptcy filed against it, or any relief under any such law has been sought by any of its creditors, unless such involuntary petition is dismissed, or such relief is denied within ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ after it has been filed or sought, then the non-Breaching Party, in addition to all other rights and remedies such Party may have at Law, at equity, under contract (including, without limitation under this Agreement) or otherwise, all of which are expressly reserved, may,

45

CONFIDENTIAL                                                    DISH000012304

and shall have the right to, terminate this Agreement with respect to the applicable Service(s) and any other agreement(s) relating to branded content from the applicable Service(s) (e.g., VOD & Broadband License Agreement, etc.), provided that if a default relates solely to the OTT System, the non-Breaching Party shall have the right to terminate this Agreement with respect to the applicable Service(s) but solely with respect to the OTT System and this Agreement shall remain in full force and effect with respect to the DBS System. Following the applicable cure period set forth above, TNS, Inc., in addition to all other rights and remedies it may have, shall have the right with respect to a Breach related to (i) the OTT System, to require DISH to promptly suspend the Distribution under this Agreement of the applicable Service(s) with respect solely to the OTT System until such Breach is resolved, or (ii) the DBS System, to suspend or require DISH to promptly suspend the Distribution under this Agreement of the applicable Service(s) (including, without limitation, suspension of service through deauthorization of descramblers or requiring DISH to suspend Distribution under this Agreement) with respect to one or both Systems until such Breach is resolved.

13. **Force Majeure.** Notwithstanding anything to the contrary contained in this Agreement, neither TNS, Inc. nor DISH will incur any liability to the other Party or its Affiliates with respect to any failure of TNS, Inc. or DISH, as the case may be, to transmit or distribute the Service or perform any of its other obligations under this Agreement if the failure is due to or arises out of any cause beyond the reasonable control of TNS, Inc. or DISH, as applicable, such as: (A) any act of God; (B) any act of a public enemy; (C) any act of any local, county, state, federal or other government in its sovereign capacity; (D) any act of war or terrorism; (E) any riot; (F) any fire, flood or adverse weather condition (including, without limitation, solar flare or sun outage with respect to satellite transmission interference); (G) any epidemic or quarantine; (H) any act of sabotage; or (I) any failure or degradation in performance of DISH's or TNS, Inc.'s satellite(s) or any transponder on such satellite(s) (each, a "**Force Majeure Event**"), and such non-performance will be excused for the period of time that such failure(s) causes non-performance:



45710.20

CONFIDENTIAL

DISH000012305

**14.** **Cumulative Remedies.**  All rights and remedies of a Party hereunder shall be cumulative and in addition to (and not in lieu of) such rights and remedies as may be available to a Party at law or in equity.

**15.** **Severability.**  The invalidity under applicable law of any provision of this Agreement shall not affect the validity of any other provision of this Agreement, and in the event that any provision hereof would be determined to be invalid or otherwise illegal, this Agreement shall remain effective and shall be construed in accordance with its terms as if the invalid or illegal provision were not contained herein; provided, however, that both Parties shall negotiate in good faith with respect to an equitable modification of the provision, or application thereof, with respect to this Agreement.

**16.** **Relationship of the Parties.**  The relationship of the Parties hereto is that of independent contractors. Nothing herein shall be deemed to create any joint venture, partnership or agency relationship between the Parties, and neither Party is authorized to or shall act toward third parties or the public in any manner, which would indicate any such relationship with the other. No Customer shall be deemed to have any privity of contract or direct contractual or other relationship with TNS, Inc. No supplier to TNS, Inc. of advertising or programming included in a Service(s) by TNS, Inc. shall be deemed to have any privity of contract or direct contractual or other relationship with DISH by virtue of this Agreement. No supplier to DISH of advertising or programming included in a Service(s) by DISH shall be deemed to have any privity of contract or direct contractual or other relationship with TNS, Inc. by virtue of this Agreement.

**17.** **Limitation of Liability.**  Except with regard to a Party's indemnification obligations or with regard to breaches of confidentiality, in no event shall either Party be liable to the other Party, any subscriber or any other third party for any indirect, consequential, incidental, exemplary or punitive damages, including, without limitation, loss of revenue, loss of subscribers or potential subscribers or clients, claims of subscribers, loss of goodwill or loss of profits, arising in any manner from this Agreement and the performance or non-performance of the obligations hereunder whether foreseeable or not.

**18.** **Applicable Law.**  This Agreement shall be governed by and interpreted under the laws of the State of New York in all respects, subject to applicable provisions of the Communications Act of 1934, as amended, The Cable Communications Policy Act of 1984, as amended, the Cable Television Consumer Protection and Competition Act of 1992, the Telecommunications Act of 1996 and any applicable federal orders, rules or regulations. Any and all disputes relating or arising out of this Agreement shall be litigated solely and exclusively in the United States District Court for the Southern District of New York; provided, however, that in the event that the United States District Court for the Southern District of New York does not have subject matter jurisdiction over any matter for which it is specified herein as the proper venue, then such matter shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in the city of and county of New York, New York. TNS, Inc. and its present and future Affiliates, and DISH and its present and future Affiliated Entities, consent to the *in personam* jurisdiction of such courts for such purposes. The Parties waive, fully and completely, any objection to venue in such courts, including, without limitation, any right to dismiss and/or transfer any action pursuant to Title 28 U.S.C. Section 1404 or 1406 (or any successor statute).

45710.20

CONFIDENTIAL

DISH000012306



DISH shall, at no time, be entitled to use the Licensed Marks, the programs or any other material received from TNS, Inc. for any purpose except to promote the Services and the availability of particular programs contained therein.

**25.** **Waiver.** No term or condition of this Agreement shall be waived, and no breach shall be excused, unless such waiver or excuse is in writing and signed by the Party against whom such waiver or excuse is claimed. The failure of any Party to insist upon strict performance of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or similar nature.

**26.** **No Inference Against Author.** DISH and TNS, Inc. each acknowledge that this Agreement was fully negotiated by the Parties and, therefore, no provision of this Agreement shall be interpreted against any Party because such Party or its legal representative drafted such provision.

**27.** **Approval.** This Agreement shall be binding on the Parties only when signed by their authorized representatives named below.

**28.** **Captions and Headings.** The captions and headings are inserted in this Agreement for convenience only, and shall in no event be deemed to define, limit or describe the scope or intent of this Agreement, or of any provision hereof, nor in any way affect the interpretation of this Agreement.

**29.** **Survival of Provisions.** The provisions of Paragraphs 1, 5.H., 10, 14, 15, 17, 18, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31 and 37 hereof shall survive termination of this Agreement. In addition to the foregoing, Paragraphs 5.N.(i), 7.B., 7.C., 9.A., 9.B. and 9.C. shall survive the termination of this Agreement until all obligations thereunder have been satisfied.



45710.20

CONFIDENTIAL

DISH000012310



38. **Most Favored Nations**.

A.    **MFN**. If TNS, Inc. has previously granted or grants, whether by writing or oral agreement (including, without limitation, any amendment, renewal, extension, or side letter), a More Favorable Provision (as defined in subparagraph (D) below) that is applicable during the Term of this Agreement to any Comparable Distributor (as defined in subparagraph (B) below) distributing a Service within the Territory, then and in that event, TNS, Inc. will promptly notify DISH in writing of such More Favorable Provision and all of the Material Terms (as defined below), if any, related to such More Favorable Provision. DISH will have the option, to elect by written notice to TNS, Inc. sent promptly following DISH's receipt of such notification, to accept the More Favorable Provision and Material Terms of such Comparable Distributor's agreement in substitution for, or in addition to, as applicable, the applicable material terms and conditions of this Agreement, provided that DISH substitutes or adds, as the case may be, all such Material Terms.

45710.20



CONFIDENTIAL

DISH000012314



45710.20

56

CONFIDENTIAL

DISH000012315



**D.**     **Definitions.**

(i)      **"NEPSR"** means net effective per subscriber rate.

(ii)     **"More Favorable Provision"** means a lower NEPSR or **a** Material Provision

(iii)    **"Material Provision"** means the following:

45710.20

CONFIDENTIAL

DISH000012316

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

**IN WITNESS WHEREOF,** the Parties, through their duly authorized representatives, hereto have duly executed this Agreement as of the day and year first written above.

**TURNER NETWORK SALES, INC.**

By: _____

(Authorized Signature)

_____
(Type or Print Name of Signatory)
RICHARD J. WARREN
Executive Vice President
Title: Content Negotiations and Strategy
_____

**DISH NETWORK L.L.C.**

By: _____

(Authorized Signature)

Warren Schlichting
(Type or Print Name of Signatory)

Title: SVP, Programming &
Media Sales

58

45710.20

DISH000012317

# SCHEDULE C - RATES

In consideration of DISH's agreement to Distribute the Services in accordance with Paragraphs 2 and 7 of the body of this Agreement, the applicable monthly rates to be paid by DISH to TNS, Inc. shall be in accordance with the following:

## A. CABLE NEWS NETWORK

The following rates shall apply per month for each CNN Subscriber, unless any other 24-hour per day national news service (other than HLN) is received by a greater number Total Subscribers than CNN in such System, in which case, the following rates shall apply per month and the DISH shall pay on the greater of (A) each CNN subscriber or (B) each of DISH's Total Subscribers in such System. Notwithstanding the foregoing, for so long as (i) Fox News Channel is received by a greater number Total Subscribers than CNN in a System and (ii) DISH does not add Fox News Channel to any additional packages (i.e. packages in addition to those which it does not also add CNN), the rates set forth below shall apply per month for each CNN Subscriber.

| **2015** | **2016** | **2017** | **2018** |
|---|---|---|---|




In consideration of DISH's (i) compliance with the carriage (i.e., packaging and penetration) requirement set forth in Paragraph 2.D.(i) of the Agreement for CNN and (ii) having a valid affiliate agreement(s) with TNS, Inc., or any of its parent, subsidiaries or affiliates, to Distribute each of the Turner networks that DISH Distributes in any System as of the Effective Date and being in compliance with the terms and conditions of each of such affiliate agreement(s), the above rates shall be discounted by twenty percent (20%).



65

45710.20

CONFIDENTIAL

DISH000012324

# SCHEDULE D

# FORM OF MONTHLY REPORT

**DISH NETWORK**
**SAMPLE – Monthly Payment Report**

Dish Network
TURNER - CABLE NEWS NETWORK
JPMorgan
806 Tyvola Road, Suite 108
Charlotte NC 28217

DOM1214CNN
4783 PROGRAMMING
Period: 11/22/2014 – 12/21/2014

| | Beginning Subs | Ending Subs | Average Subs | Rate | | License Fees Due | |
|---|---|---|---|---|---|---|---|
| **Total DISH Subscribers** | 12,750,000.0 | 12,600,000.0 | 12,675,000.0 | | | | |
| **Households** | 11,250,000.0 | 11,200,000.0 | 11,225,000.0 | $ | 0.50000 | $ | 5,612,500.00 |
| **Residential** | | | | | | | |
| N CNN USDISHRESI | 10,825,000.0 | 10,785,000.0 | 10,805,000.0 | $ | 0.00000 | | - |
| **Commercial** | | | | | | | |
| N CNN USDISHCOMM | 110,000.0 | 115,000.0 | 112,500.0 | $ | 0.50000 | $ | 84,256.03 |
| **Bulk** | | | | | | | |
| N CNN USDISHBULK | 390,000.0 | 380,000.0 | 390,000.0 | $ | 0.50000 | $ | 288,514.16 |
| **PCO** | | | | | | | |
| N CNN USPCO | 3,250.0 | 2,900.0 | 3,075.0 | $ | 0.50000 | $ | 2,260.33 |
| **Others** | | | | | | | |
| N CNN AIRPLANES | 2,300.0 | 2,250.0 | 2,275.0 | $ | 0.50000 | $ | 1,693.12 |
| | 11,334,264.0 | 11,293,069.0 | 11,313,666.5 | | | $ | 5,989,223.64 |

| | | |
|---|---|---|
| Total Due | $ | 5,989,223.64 |

45710.20

CONFIDENTIAL

DISH000012328