**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x
:
TURNER NETWORK SALES, INC.,                     :        Civ. Action No. 17-cv-7599-RA
:
Plaintiff,                            :
:
v.                                        :
:
DISH NETWORK L.L.C.,                            :
:
Defendant.                            :
:
—————————————————————x
:
DISH NETWORK L.L.C.,                            :
:
Counter-Plaintiff,                    :
:
v.                                        :
:
TURNER NETWORK SALES, INC.                      :
:
Counter-Defendant.                    :
:
—————————————————————x

**<u>OPPOSITION OF DISH NETWORK L.L.C. TO</u>**
**<u>TURNER NETWORK SALES, INC.'S MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ............................................................................................3

    I.       THE TNS AND DISH AFFILIATION AGREEMENTS. ......................................3

    II.      DISH MISTAKENLY OVERPAID FOR CNN.......................................................4

LEGAL STANDARD........................................................................................................6

ARGUMENT ......................................................................................................................7

    I.       DISH Was Not Required To Pay For CNN Based On Total Subscribers
          Because The Weather Channel Is Not A 24-Hour Per Day National News
          Service ..............................................................................................................7

          A.      The Unambiguous Contract Language Alone Establishes That The
                  Weather Channel Is Not An "Other 24-Hour Per Day National
                  News Service." ........................................................................................7

          B.      If Ambiguous, Extrinsic Evidence Confirms That The Weather
                  Channel Is Not An "Other 24-Hour Per Day National News
                  Service." ................................................................................................10

               1.      Industry Practice Refutes The Contention That The
                      Weather Channel Is An Other 24-Hour Per Day National
                      News Service. ................................................................................10

               2.      Neither TNS's Accounting Department Nor Its Independent
                      Auditor Thought The Weather Channel Was A 24-Hour Per
                      Day National News Service Until They Were Told To By
                      TNS's Legal Department.................................................................13

    II.      THE VOLUNTARY PAYMENT DOCTRINE DOES NOT APPLY. .................17

          A.      DISH Paid For CNN Based Upon A Mistake Of Fact..............................18

          B.      The Voluntary Payment Doctrine Cannot Resolve Factual Disputes
                    Regarding Knowledge and Intent At Summary Judgment. .......................21

           C.      For The Voluntary Payment Doctrine To Apply, The Party Must
                    Have Full Knowledge of All Relevant Facts – Failure to Disclose
                    Relevant Facts Precludes The Doctrine's Application. ..............................23

    III.     TNS HAS FAILED TO CARRY ITS BURDEN TO ESTABLISH THAT
          DISH'S RECOVERY OF OVERPAYMENTS BREACHED THE 2015
          AGREEMENT....................................................................................................25

IV.     THE BULK BILLING CLAIMS RAISE TRIABLE ISSUES OF FACT.............27

        A.      DISH's Bulk Bill Calculation Properly Recognizes the Bulk Rate
                in Each "Bulk-Billing Arrangement.".........................................................28

        B.      DISH Properly Included Its Regular Retail Rates in Its Bulk-
                Billing Calculation, Which Includes Local Channels and
                Equipment Charges...................................................................................28

V.      MINOR PAYMENT ERRORS BY DISH DO NOT CONSTITUTE
        MATERIAL BREACHES OF THE 2015 AGREEMENT. .................................29

        A.      The Payment Errors. ................................................................................30

                1.      Complete And Complete Sports Packages. ..................................30

                2.      The Apogee Bulk Bill Fees..........................................................30

                3.      Late Payments of CNN License Fees. ..........................................30

                4.      Delta Subscribers. .......................................................................30

        B.      The Payment Errors, Both Individually and In Aggregate, Are
                Immaterial and Cannot Support the Damages Sought, Which
                Would Amount To an Unreasonable Forfeiture or Unlawful
                Penalty......................................................................................................31

VI.     THE AVAILS COUNTERCLAIM RAISES TRIABLE ISSUES OF
        FACT. ........................................................................................................33

VII.    THE ATTORNEYS' FEES PROVISION IN THE 2015 AGREEMENT
        MUST BE NARROWLY CONSTRUED; ENTITLEMENT TO FEES IS
        FOR THE TRIER OF FACT TO DETERMINE.................................................35

CONCLUSION................................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*In re Adelphia Commc'ns Corp.*,
  No. 02-41729, 2006 WL 898047 (Bankr. S.D.N.Y. Mar. 31, 2006) ......................................32

*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*,
  No. 07 CV 6665 (HB), 2009 WL 1803458 (S.D.N.Y. June 23, 2009),
  *aff'd*, 402 F. Appx. 623 (2d Cir. 2010).....................................................................................10

*In re B&L Oil Co.*,
  782 F.2d 155 (10th Cir. 1986) ..................................................................................................26

*Banque Worms v. BankAmerica Int'l*,
  570 N.E.2d 189 (N.Y. 1991)......................................................................................................19

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
  361 F. Supp. 2d 283 (S.D.N.Y. 2005)........................................................................................31

*Choice Money Transfer, Inc. v. Societe Int'l de Change, Arimec, LLC*,
  No. 17 CIV 2639 (JSR), 2017 WL 6507108 (S.D.N.Y. Dec. 18, 2017) ...................21, 23, 25

*Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*,
  979 F.2d 268 (2d Cir. 1992).......................................................................................................10

*Citicorp N. Am., Inc. v. Fifth Ave. 58/59 Acquisition Co., LLC*,
  895 N.Y.S.2d 39 (2010).......................................................................................................18, 24

*Constellation Power Source, Inc. Select Energy, Inc.*,
  No. 3:04CV983 MRK, 2007 WL 188135 (D. Conn. Jan. 23, 2007) .......................................18

*Couch v. Perales*,
  585 N.E.2d 772 (N.Y. 1991)......................................................................................................26

*Daleview Nursing Home v. Axelrod*,
  464 N.E.2d 130 (N.Y. 1984).....................................................................................................26

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
  740 N.Y.S.2d 396 (App. Div. 2002).........................................................................................18

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
  790 N.E.2d 1155 (N.Y. 2003)....................................................................................................23

*DRMAK Realty LLC v. Progressive Credit Union*,
  18 N.Y.S.3d 618 (App. Div. 2015)...........................................................................................18

*Eastman Kodak Co. v. Altek Corp.*,
  936 F. Supp. 2d 342 (S.D.N.Y. 2013).........................................................................................9

*Edward Andrews Grp., Inc. v. Addressing Servs. Co.*,
No. 04 Civ. 6731 (LTS) (AJP), 2005 WL 3215190 (S.D.N.Y. Nov. 30, 2005) .....................30

*Eighty Eight Bleecker Co., LLC v. 88 Bleecker St. Owners, Inc.*,
824 N.Y.S.2d 237 (App. Div. 2006) .....................................................................................24

*Evans v. Famous Music Corp.*,
807 N.E.2d 869 (N.Y. 2004)...................................................................................................6

*United States ex rel. Feldman v. City of New York*,
808 F.Supp.2d 641 (S.D.N.Y. 2011).....................................................................................24

*Finest Invs. v. Sec. Tr. Co. of Rochester*,
468 N.Y.S.2d 256 (1983)........................................................................................................9

*Fink v. Time Warner Cable*,
810 F. Supp. 2d 633 (S.D.N.Y. 2011)....................................................................................24

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*,
111 F.3d 284 (2d Cir. 1997)..................................................................................................31

*Freston v. Gulf Oil Co. U.S.*,
565 P.2d 787 (Utah 1977)......................................................................................................26

*Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*,
499 N.Y.S.2d 435 (App. Div. 1986)................................................................................18, 24

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*,
903 N.Y.S.2d 346 (N.Y. App. Div. 2010) .............................................................................32

*Int'l Cards Co., Ltd. v. Mastercard Int'l Inc.*,
No. 13 CIV. 2576 (LGS), 2016 WL 3039891 (S.D.N.Y May 26, 2016) ...............................31

*Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*,
790 N.Y.S.2d 84 (App. Div. 2005).........................................................................................18

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010)......................................................................................6, 7, 9, 10

*Leasing Serv. Corp. v. Justice*,
673 F.2d 70 (2d Cir. 1982)....................................................................................................32

*Leirer v. Caputo*,
616 N.E.2d 147 (N.Y. 1993)..................................................................................................26

*Lurzer GMBH v. American Showcase Inc.*,
75 F. Supp. 2d 98 (S.D.N.Y. 1998).......................................................................................32

*In re Malinowski*,
  156 F.3d 131 (2d Cir. 1998)................................................................26

*McGuire v. Russell Miller, Inc.*,
  1 F.3d 1306 (2d Cir. 1993)................................................................35

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
  No. 10 CIV. 5762, 2016 WL 3098842 (S.D.N.Y. June 1, 2016).............................33

*Nat. Market Share, Inc. v. Sterling Nat. Bank*,
  392 F.3d 520 (2d Cir. 2004)................................................................34

*Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*,
  743 F.2d 85 (2d Cir. 1984)................................................................13

*Oscar Gruss & Son, Inc. v. Hollander*,
  337 F.3d 186 (2d Cir. 2003)................................................................35

*Overseas Private Inv. Corp. v. Gerwe*,
  No. 12-CV-5833(RA), 2016 WL 1259564 (S.D.N.Y. Mar. 28, 2016)....................34

*Pross v. Katz*,
  784 F.2d 455 (2d Cir. 1986)................................................................27

*Sequa Corp. v. Gelmin*,
  No. 91 CIV. 8675(DAB) 1996 WL 745448 (S.D.N.Y. Dec. 31, 1996) ................27

*Shang Shing Chang v. Wang*,
  No. 15-CV-4385 (FB) (ST), 2018 WL 1258801 (E.D.N.Y. Mar. 12, 2018)..........23

*Shepley v. New Coleman Holdings, Inc.*,
  174 F.3d 65 (2d Cir. 1999)................................................................10

*Soto v. Gaudett*,
  862 F.3d 148 (2d Cir. 2017)................................................................6

*Spagnola v. Chubb Corp.*,
  574 F.3d 64 (2d Cir. 2009)................................................................17, 24

*In re T.R. Acquisition Corp.*,
  309 B.R. 830 (S.D.N.Y. 2003)................................................................17

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
  No. 12 CIV. 6811 (CM) (JCF), 2014 WL 2199428 (S.D.N.Y. May 23, 2014)..............25

*U.S. Fidelity & Guar. Co. v. Annunziata*,
  67 N.Y.2d 229 (1986) ................................................................27

*United States v. Abady*,
    03 Civ. 1683, 2004 WL 444081 (S.D.N.Y. Mar. 11, 2004) ....................................................32

*People ex rel. Wessell, Nickel & Gross v. Craig*,
    140 N.E. 209 (N.Y. 1923)...........................................................................................................18

*Wrobel v. Cnty. of Erie*,
    692 F.3d 22 (2d Cir. 2012)......................................................................................................6, 27

**Other Authorities**

https://dictionary.cambridge.org/dictionary/english/other...used ....................................................7

https://www.collinsdictionary. com/dictionary/english/other..........................................................7

https://www.merriam-webster.com/ dictionary/any%20other.........................................................7

82 N.Y. Jur. 2d Payment and Tender § 81 ...................................................................................17

## <u>INTRODUCTION</u>

The crux of this motion for summary judgment by Turner Network Sales, Inc. ("TNS") is a straightforward but hotly-contested question – Is The Weather Channel an "other 24-hour per day national news service" like CNN under the terms of the 2015 Affiliation Agreement (the "2015 Agreement") between TNS and DISH Network L.L.C. ("DISH")?  If so, then DISH must pay license fees for CNN based on a higher number of subscribers – Total Subscribers.  If not, then DISH is entitled to pay for CNN based upon a lower number of subscribers – CNN Subscribers.  The difference is tens of millions of dollars.

As a matter of basic contract interpretation, DISH's position on the key payment provision is more reasonable.  The parties conditioned the license fees for CNN on whether DISH transmitted "any *other* 24-hour per day national news service" to more subscribers than CNN.  Employing the term "other" means, under common English usage, that a news service that would trigger DISH's obligation to pay on the larger Total Subscribers number must offer programming comparable or similar to CNN.  The Weather Channel is not remotely comparable to CNN.  Industry custom and practice also supports DISH's position.  As TNS has admitted, the provision is intended to protect CNN from its competitors.  The Weather Channel is not a competitor to, or substitute for, CNN.

Recognizing that this critical question presents a disputed material fact, TNS strains to invoke the "voluntary payment doctrine," arguing that because DISH paid for CNN at a number closer to Total Subscribers for a period of time, DISH is stuck with that payment regardless of whether The Weather Channel actually qualifies as an "other 24-per day national news service."  TNS ignores that when DISH instituted its payment method for CNN – using a metric called Household Subscribers – it closely approximated payment based upon *CNN Subscribers*, the lower number.  Over time, the Household Subscribers metric yielded payments more closely

approximating Total Subscribers, but not due to any deliberate action on DISH's part.

TNS's internal accounting team recognized that DISH originally paid based upon CNN Subscribers.  Importantly, TNS thought this payment proper even though The Weather Channel was more widely distributed than CNN at that time.  Only when DISH's payment began to more closely approximate Total Subscribers – organically and without any deliberate decision by DISH – did TNS conveniently reverse its own internal analysis and justify (internally) keeping DISH's overpayments based upon its decision to begin to view The Weather Channel as an "other 24-hour per day national news service."  Although TNS knew DISH was mistakenly *over*paying for CNN, TNS purposefully avoided highlighting the error for fear that DISH would correct its mistake.  Under these circumstances, the voluntary payment doctrine is inapplicable.

TNS's ancillary arguments are similarly unavailing.  TNS's position regarding bulk bill payments is contradicted by the contract language and undermined by the fact that TNS has known of the issue for years, yet never complained until this litigation.  The remaining alleged breaches are immaterial or resolved (or both).  Finally, TNS's claim that DISH must repay the 20% discount on CNN license fees requires a finding that DISH materially breached the contract. No material breach occurred and as to the alleged immaterial payment errors, TNS's position would result in an unlawful forfeiture or illegal liquidated damages.

With respect to DISH's counterclaims, TNS has admitted that it did not tell DISH about more favorable rates DISH was entitled to receive in future years of the contract, which breached its obligation to "promptly" notify DISH of such rates.  TNS's failure to provide all the advertising avails (air time for the insertion of advertisements) that DISH was entitled to receive is clearly a disputed material fact, since TNS must demonstrate that it exercised "*reasonable* discretion" to the extent it preempted any particular avail.  It did not even try.

## FACTUAL BACKGROUND

### I.     THE TNS AND DISH AFFILIATION AGREEMENTS.

DISH distributes television programming via its direct broadcast satellite platform ("DBS System") and its Internet platform ("OTT System").  TNS offers the following networks for distribution:  CNN, HLN, The Cartoon Network, TNS Classic Movies ("TCM"), Boomerang, CNN International ("CNNI"), TNT, TBS, CNN en Español ("CNNe"), and truTV (collectively, the "TNS Services," each individually, a "TNS Service").

In August 2009, TNS and DISH entered into an affiliation agreement (the "2009 Agreement") that gave DISH the right to distribute the TNS Services.  (Warren Decl. Ex. 1.)[1] DISH was required to pay license fees for CNN based on the number of its subscribers authorized to receive CNN ("CNN Subscribers")[2] "unless any other 24-hour per day national news service" – other than HLN and under certain circumstances, Fox News Channel – was received by more Total Subscribers than CNN, in which case DISH was required to pay for CNN based on the number of Total Subscribers.  (2009 Agt., Sch. B at 50.)

In late 2014 and early 2015, TNS and DISH negotiated a new affiliation agreement that was executed on April 1, 2015 (the "2015 Agreement").[3]  (Warren Decl. Ex. 2.)  While negotiating the 2015 Agreement, TNS knew that DISH had been overpaying for CNN Subscribers under the 2009 Agreement.  It buried that information, and the parties did not discuss the language referencing "any other 24-hour per day national news service" or whether any particular news channels qualified as an "other 24-hour per day national news service."

---

[1] Deposition transcripts, deposition exhibits, discovery responses, and other documents not otherwise identified as an exhibit to a specific declaration are attached to the Declaration of Rees F. Morgan ("Morgan Decl.") filed contemporaneously herewith.

[2] Capitalized terms have the meaning specified in the contract.

[3] The parties also executed the Letter Agreement on April 1, 2015, which grants DISH the right to distribute TNS Services to passengers on various airlines.  (Warren Decl. Ex. 3.)

(Pomeroy Dep. at 52:1-53:6; Warren Decl. ¶ 14.)  The CNN payment language from the 2009 Agreement was incorporated nearly verbatim into the 2015 Agreement.  (Warren Decl. ¶ 13.) The parties did, however, add a new Schedule D to the contract, which memorialized DISH's payment method based on "Households" rather than Total Subscribers or CNN Subscribers.

The 2015 Agreement gives DISH a 20% discount on CNN license fees if DISH provides the required CNN carriage and is "in compliance with the terms and conditions" of the agreement.  (2015 Agt., Sch. C, at 65.)  The 2015 Agreement also contains a Most Favored Nations ("MFN") provision whereby TNS commits "to promptly notify DISH in writing" of any More Favorable Provision that it grants to any Comparable Distributor.  (2015 Agt. ¶ 38 at 55.) In addition, Section 5(C) of the 2015 Agreement gives DISH the right to use a specific number of minutes "in each hour" ("DISH Avails") of the TNS Services for DISH's own promotions or the placement of paid advertising.  (2015 Agt. ¶ 5(c) at 29.)  The precise timing of the DISH Avails "in each hour" is for TNS to determine "in its sole *but reasonable* discretion."[4]  (*Id.*)

## II.   <u>DISH MISTAKENLY OVERPAID FOR CNN</u>

During the entire term of the 2009 Agreement, and until March 2017 under the 2015 Agreement, DISH paid license fees for CNN on the basis of "Households."[5]  (Madlock 30(b)(6) Dep. at 55:9-56:5.)  The Households number that DISH reported to CNN always fell between the number of Total Subscribers and the number of CNN Subscribers.  (McLeod Decl. ¶¶ 7-9.) Contrary to TNS's assertion, DISH never made a deliberate decision to pay for CNN based on

---

[4] On the DBS System, DISH has the right to the following DISH Avails:  3 minutes in each hour of CNN, ████████ and TNT; ████████████████████████████████████ subject to the penetration requirements and limited exceptions stated in Section 5(C).

[5] DISH's Households payments for CNN were made based on the sum of "CNN household subscribers, plus the number of CNN bulk subscribers," "plus the number of CNN commercial receivers, plus the number of CNN PCO subscribers, and . . . CNN airline subscribers."  (Madlock 30(b)(6) Dep. at 36:5-37:20; ; McLeod Decl. ¶ 4.)

Total Subscribers because The Weather Channel was a 24-hour per day national news service. (Shull Decl. ¶¶ 9-11; LeCuyer Decl. ¶ 12; *see further infra* at 14; 19-21.)

At the start of the 2009 Agreement, a former DISH employee, Carolyn Crawford, instructed DISH's Media Services team to pay for CNN based on the Household calculation. (*See* Morgan Decl. Ex. 3); Madlock 30(b)(6) Dep. at 43:12-19.)  At that time, the Households number closely approximated CNN Subscribers, not Total Subscribers.  (Dep. Ex. 151 at 2; MAI Dep. 77:2-81:11.)

TNS's accounting team was confused by DISH's Household payment, and, in fact, created a subledger to record the difference between the Household number and CNN Subscribers because TNS believed that DISH should be paying for CNN based upon the lower CNN Subscriber number.  (Dep. Ex. 60; *see* infra at 13.)  Importantly, TNS knew that The Weather Channel was more highly distributed at the time.  (*See* Warren Dep. at 39:8-23; MAI Dep. at 127:6-19; *see further, infra,* at 14.)

While Households closely tracked CNN Subscribers at the start of the 2009 Agreement, over time the Households number evolved, without any deliberate decision by DISH, to more closely approximate Total Subscribers.  (McLeod Decl.¶¶ 6-7; *see infra* at 14.)  As the difference between CNN Subscribers and Households increased, TNS needed a rationale to keep DISH's increasing over-payments.  In 2013, TNS's legal department instructed TNS's supposedly independent auditor (MAI) that The Weather Channel should be considered an "other 24-hour per day national news service."  (MAI Dep. 126:21-127:19; *see also* Dep. Ex. 159; *see further, infra,* at 14-15.)  MAI dutifully included language about The Weather Channel in its initial CNN payments audit in 2013, but TNS instructed MAI to delete that language before sending the audit to DISH.  (Bakowski Decl. Ex. 41; Dep. Ex. 161 (ASR-5); MAI Dep. 141:22-142:11, 145:14-

147:17; *see infra* at 14-15.)[6]  TNS never told DISH that it supposedly was *under*paying for CNN.

In early 2017, after significant analysis, DISH concluded that it was overpaying for CNN based on its "Household" calculation.  DISH concluded that CNN Subscribers was the appropriate payment calculation because no "other 24-hour per day national news service" was or had been distributed by DISH.  (LeCuyer Decl. ¶ 8; *see further, infra,* at 22.)  DISH recouped its overpayments under the 2015 Agreement via credits on its March-May 2017 payments.  (Madlock 30(b)(6) Dep. at 77-79.)  Turner has retained its windfall under the 2009 Agreement.

## LEGAL STANDARD

"Summary judgment is only appropriate when the evidence is so one-sided that one party must prevail as a matter of law."  *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (internal citation omitted).  The Court must construe "the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in that party's favor."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).

In New York, the Court's "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.  If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further . . . even if the contract is silent on the disputed issue."  *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004).  "[T]he court should not find the contract ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning."  *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).  "Where the parties dispute the meaning of particular contract clauses, the task of the court is to

---

[6] TNS also manipulated MAI's audit of the first two years of the 2015 Agreement.  *See infra* at 15-17.

determine whether such clauses are ambiguous when read in the context of the entire

agreement." *Id.* (internal quotation marks omitted).

## ARGUMENT

**I.**     **DISH Was Not Required To Pay For CNN Based On Total Subscribers Because
The Weather Channel Is Not A 24-Hour Per Day National News Service.**

**A.**     **The Unambiguous Contract Language Alone Establishes That The Weather
Channel Is Not An "Other 24-Hour Per Day National News Service."**

Schedule C of the 2015 Agreement ("CNN rates provision") provides:

The following rates shall apply per month for each CNN Subscriber, unless *any
other 24-hour per day national news service* (other than HLN) is received by a
greater number [of] Total Subscribers than CNN in such System, in which case,
the following rates shall apply per month and the [sic] DISH shall pay on the
greater of (A) each CNN subscriber or (B) each of DISH's Total Subscribers in
such System.  (2015 Agt., Sch. C, at 65) (emphasis added).

The ordinary meaning of the words does not support TNS's position that The Weather

Channel is an "other 24-hour per day national news service."  The meaning of the term "other"

is:  "in addition to the person or thing just mentioned."  *See* https://www.merriam-webster.com/

dictionary/any%20other.  "Other" means "additional . . . as well as the thing or person already

mentioned[.]"  *See* https://dictionary.cambridge.org/dictionary/english/other...used. "Other" is

used (1) to refer to an additional thing or person of the same type as one that has been mentioned

or known about; (2) at the end of a list or a group of examples, to refer generally to people or

things like the ones just mentioned; or (3) to refer to the rest of the people or things in a group,

when you are talking about one particular person or thing.  *See* https://www.collinsdictionary.

com/dictionary/english/other.  In the context of the CNN rates provision, "other" means another

24-hour per day news service like CNN.  Any reasonable assessment of what services could

constitute an "other 24-hour per day national news service" must compare the content included in

those services to the content of CNN.

The parties indicated, at several points in the 2015 Agreement, the types of channels that are comparable to CNN.  The CNN rates provision itself contains examples.  Fox News Channel is carved out of the provision.  (2015 Agt. at 65.)  HLN – a TNS service – is also exempted.  (*Id.*)  In another section of the 2015 Agreement, MSNBC is specifically identified as a "news" network.  (2015 Agt. ¶ 1.X at 5.)  The Weather Channel, on the other hand, is not identified as a news service anywhere in the Agreement.

The parties, moreover, specifically defined CNN as a service "generally consisting of national and international news, sports programming, finance news, weather reports, features, and such other news related programming[.]"  (2015 Agt. ¶ 4.A.)  HLN likewise is defined as a service "generally consisting of national and international news programming, sports programming, talk shows, investigative programming, finance news, weather, reports, features, and such other news related programming[.]"  (2015 Agt. ¶ 4.B.)  The parties thereby provided a roadmap for determining what would be a qualifying national news service.

TNS argues that, because one element of the CNN and HLN descriptions is "weather reports," the Agreement recognizes that "weather reports constitute news programming." (Mem. 16.)  In fact, it is exactly the opposite.  The service descriptions explicitly distinguish "national and international news" from "weather reports."  (2015 Agt. ¶ 4.A.)  In any event, the question is not whether a weather report can be news.  The issue is whether a particular channel offers a mix of news programming comparable to CNN.  As TNS grudgingly concedes in its motion, The Weather Channel's programming is limited to "programming focus[ed] on weather news and information."  (Mem. 17.)[7]  The Weather Channel offers virtually none of the other categories CNN is contractually obligated to provide – it is not a comparable service and

---

[7] Extrinsic evidence, as described *infra* at I.B., confirms that The Weather Channel's programming is not remotely comparable to the breadth and depth of CNN's programming.

therefore not an "other 24-hour per day national news service."  (Costantini Decl. ¶¶ 8-13.)

TNS also argues – based on its expert's opinion – that The Weather Channel is a 24-hour per day national news service because it:  (i) broadcasts 24 hours each day, (ii) is distributed nationwide, and (iii) features "programming focuse[d] on weather news and information." (Mem. 17.)  This analysis strains the ordinary meaning of the Agreement by improperly slicing the phrase "24-hour per day national news service" into three components.  (*Id.*)  The phrase "other 24-hour per day national news service" must be read as an integrated whole and in the context in which it is used in the 2015 Agreement.  *Law Debenture Trust Co.*, 595 F.3d at 467.

TNS's expert ignores the context of the CNN payment provision, including the term "other," the comparable networks noted explicitly in the rates provision and the CNN Service Description in the Agreement.  (2015 Agt. ¶¶ 4.A, 4.B; Sch. C.)  Ignoring this context renders the provision virtually meaningless.  DISH distributes numerous channels that air 24-hours per day, nationally, and arguably feature some news programming that could capture a single category in the litany of topics CNN must cover, including, for example, ABC, CBS, NBC and ESPNews.  No one would argue that the parties intended these networks to be "other 24-hour per day national news services."  Yet, that is the slippery slope TNS's interpretation invites.

TNS's expert also mistakenly views "national" in the key prevision as denoting a geographic footprint.  (Hartman Decl. ¶ 9.)  But the term "national news" does not exist in a vacuum under the 2015 Agreement.  The CNN service description uses the same term to describe news of national *importance*.  (2015 At., ¶ 4.A.)  Parties are assumed to use a term consistently in a contract.  *Finest Invs. v. Sec. Tr. Co. of Rochester*, 468 N.Y.S.2d 256, 258 (1983) ("We may presume that the same words used in different parts of a writing have the same meaning"); *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351-53 (S.D.N.Y. 2013) (a phrase that

could have two meanings should be defined by its clear use elsewhere in the contract). "National" denotes the focus of the news, not where it is physically broadcast.

Read in context and as an integrated whole, the unambiguous language of the 2015 Agreement establishes that The Weather Channel is not an "other 24 hour per day national news service" like CNN.

**B.**      **If Ambiguous, Extrinsic Evidence Confirms That The Weather Channel Is Not An "Other 24-Hour Per Day National News Service."**

"An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture*, 595 F.3d at 466 (2d Cir. 2010) (internal quotation omitted).  On a motion for summary judgment, the Court may consider extrinsic evidence "when the language [of the contract] is ambiguous and there is relevant extrinsic evidence." *Shepley v. New Coleman Holdings, Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999).  "[W]hen resort to extrinsic evidence is necessary to shed light on the parties' *intent*, summary judgment ordinarily is not an appropriate remedy . . . and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant." *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992) (emphasis added).

**1.**      **Industry Practice Refutes The Contention That The Weather Channel Is An Other 24-Hour Per Day National News Service.**

"Industry custom and trade usage may … be considered to assist the Court in determining the intent of the parties." *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, No. 07 CV 6665 (HB), 2009 WL 1803458, at *4 (S.D.N.Y. June 23, 2009), *aff'd*, 402 F. Appx. 623 (2d Cir. 2010).  Pursuant to industry custom and practice, any determination of what constitutes an "other

24-hour per day national news service" must be made by comparing the content of the candidate network to that of CNN.  (Costantini Decl. ¶ 7.)

The Weather Channel does not air programming that is comparable to CNN.  (Costantini Decl. ¶ 9.)  CNN airs news of national import and touts its reputation as a "leader in breaking news."  (Costantini Decl. ¶ 8.)  Its programming is consistently of national interest or related to news events of national interest.  The Weather Channel, on the other hand, is a niche information network.  (Costantini Decl. ¶ 9; Hartman Decl. ¶ 7.)

The Weather Channel's own descriptions of its programming do not mention national or international news, sports, or finance because, unlike CNN, The Weather Channel does not offer such programming.  (Costantini Decl. ¶¶ 8-9.)  In self-reported data, for example, CNN classified 40% of its programming as "news" – The Weather Channel labeled 0% of its programming news.  (Wazzan Decl. ¶¶ 4-6.)  The Weather Channel instead classified over 40% of its content as either documentary or reality programming.  (*Id.*)  David Shull, The Weather Channel's CEO during the period relevant here, did not consider The Weather Channel a "24-hour per day national news service."  (Shull Decl. ¶ 14.)

"National," as used in the phrase "any other 24-hour per day national news service," is understood in the pay-television industry to refer to the substance or focus of the news – not the geographic footprint of the network.  (Costantini Decl. ¶ 8.)  To construe the term "national" as referring to geographic reach ignores the reality of how networks are currently distributed.  (*Id.*)  Every news network distributed by DISH is distributed on a national basis – the only locally-targeted programming in DISH's DBS satellite system, as TNS's expert largely admits, are the local NBC, ABC and CBS affiliates and regional sports networks.  (*Id.*; *see also* Hartman Decl. ¶ 9.)  To interpret the word "national" as referring to the geographic area over which a news

service is distributed would render the term superfluous as used in the 2015 Agreement.

The Weather Channel's inclusion in DISH's News Pack, its location in the news and information channel neighborhoods of other television distributors, or generic references to the channel by industry trade publications (*see* Mem. 22) do not mean that the industry would recognize The Weather Channel as an "other 24-hour per day national news service." (Costantini Decl. ¶ 10.) While channel neighborhoods or clusters may include somewhat similar channels, they are not authoritative statements on the genre of each channel, let alone evidence that a channel is an "other 24-hour per day national news service." (Costantini Decl. ¶ 11.)[8]

Finally, the purpose of the CNN payment provision in the 2015 Agreement, as TNS admits, is to assure that CNN is as widely distributed as its competitors. (Costantini Decl. ¶ 7; Warren Decl. ¶¶ 10-11; Miller Dep. at 53:11-54:7.) CNN's national news competitors include Fox News and MSNBC. CNN, Fox News, and MSNBC are sometimes referred to as the "Big Three" in the news category. The payment provision also serves to protect CNN from upstart news networks that may be entering the industry, such as Al Jazeera America during the relevant period. (Costantini Decl. ¶¶ 14-15.) These networks target their programming to substantially the same national news audience, source and report hard news, and include similar types of programming – national news and international news of national interest, news reporting, opinion shows, analysis, and breaking news. (*Id.*) They compete with each other for "exclusive stories" and to be "first on the scene." (*Id.*; *see also* Wazzan Decl. ¶¶ 11-14.) If Fox News, MSNBC or newcomers like Al Jazeera America gained greater distribution than CNN on DISH's Systems, CNN would be at a competitive disadvantage. (Costantini Decl. ¶¶ 14-15.) The same

---

[8] TNS's expert relies heavily on the neighborhood of news channels in DirecTV's channel lineup. On DirectTV, The Weather Channel is at channel 362. Fox News is channel 360. MSNBC is channel 365. CNN, however, is channel 200. Channel 358 is the "Cash Channel." DogTV is channel 354, and channel 352 is the NASA channel. (Costantini Decl. ¶ 12.)

is not true for The Weather Channel.  (Wazzan Decl. ¶¶ 8-12.)

> **2.**  **Neither TNS's Accounting Department Nor Its Independent Auditor Thought The Weather Channel Was A 24-Hour Per Day National News Service Until They Were Told To By TNS's Legal Department.**

"The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent."  *Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984).  TNS's view at the start of the 2009 Agreement that DISH was required to pay on CNN Subscribers demonstrates that its litigation position is disingenuous.

When DISH began paying for CNN using the "Household" calculation, TNS's Accounting department concluded that DISH was mistakenly *over*paying for CNN and should have been paying on a lesser number, CNN Subscribers.  (Dep. Ex. 60.)  Concerned that they would owe DISH a credit, TNS Accounting set aside the difference.[9]

Although TNS recognized that DISH's "Household" payments approximated payment on CNN Subscribers, TNS and its auditor concluded that was proper.  Media Audits International ("MAI")[10] – the "independent" auditor TNS hired to audit DISH's license fee payments – stated in an April 12, 2011 email:  "For CNN, although the remittance notes 'CNN household subscribers,' these are actually service (viewing) subscribers."  (Dep. Ex. 151 at 2.)  TNS Accounting noted that "audit findings support Dish was paying properly for CNN subscribers . . .. It appears that DISH was paying properly but used the incorrect terminology on their payment back-up."  (Dep. Ex. 59; *see also* Dep. Ex. 60 ("Dish was paying properly for CNN subscribers.

---

[9] Edith Griffin of TNS Accounting explained in a December 1, 2011 staff memorandum that, although "Dish paid for CNN based on 'Household' Subscribers, . . . [s]ince August 2009, Accounting has interpreted CNN 'Residential' Subscribers to be Viewing Subscribers (*Dish's contract requires payment for CNN be based on Viewing Subscribers*) . . .."  (Dep. Ex. 60) (emphasis added); (Northington Dep. 57:5-8) ("she's using kind of for shorthand, viewing to mean CNN Subscribers under the contract, right? A:  Yeah.").

[10] At the time, MAI was named Cable Audit Associates.  We refer to TNS's auditor throughout as MAI for ease of reference.

[MAI] calculated CNN Viewing subscribers, which closely represented Household Subscribers as reported by Dish.").)  While TNS recognized that DISH's Household payment method slightly exceeded CNN Subscribers, TNS decided it was close enough to support releasing the overpayments in its subledger to revenue.  (Dep. Ex. 151 at 1 (CAA informing TNS that DISH is "definitely not paying on Total Subs but appear to be paying on a slightly larger number than viewing 'residential' subs for CNN . . .."); Dep. Ex. 60 (releasing credits to revenue).)

Crucially, TNS and its auditor decided payment on CNN Subscribers was appropriate at the beginning of the 2009 Agreement despite knowing that The Weather Channel was more highly distributed than CNN at the time.  TNS President Richard Warren testified that throughout the 2009 Agreement, TNS knew that "The Weather Channel [was] more highly penetrated" than CNN on DISH's DBS System.  (Warren Dep. at 39:8-23; Mem. 14; *see also* MAI Dep. at 127:6-19 (in 2009 through 2011, The Weather Channel was provided to more subscribers than CNN on DISH's DBS System); Madlock Decl. ¶ 7.)

While Households closely tracked CNN Subscribers at the start of the 2009 Agreement period, over time the Households number evolved to more closely approximate Total Subscribers.  (McLeod Decl. ¶¶ 6-7.)  This happened incidentally and organically because DISH created a new package – America's Welcome Pack –which grew substantially over time, did not include CNN, but did add to the Household metric.  (McLeod Decl. ¶ 7.)  DISH, in other words, did not affirmatively decide to alter its payment methodology in order to pay on a number closer to Total Subscribers.  (*Id*.; Shull Decl. ¶ 11.)  DISH's payment methodology remained exactly the same even as the number of Households changed from approximating CNN Subscribers to approximating Total Subscribers.  (McLeod Decl. ¶¶ 6-9.)

By April 2013, as MAI began to conclude another audit of CNN payments, the difference

between DISH's Household calculation and CNN Subscribers had grown too large to ignore.

Searching for a new justification to keep DISH's overpayments, TNS's legal department

instructed MAI to treat The Weather Channel as an "other 24-hour per day national news

service." (MAI Dep. 126:21-127:19; Dep. Ex. 159 ("Weather Channel classified as News

service and *confirmed with Turner legal*") (emphasis added).)  MAI accepted this instruction and

issued audit findings to TNS stating explicitly that The Weather Channel qualified as a 24-hour

per day national news service.  (MAI Dep. 136:8-137:20.)

TNS decided to hide the issue from DISH.  TNS had MAI issue a revised version of the

CNN audit report on May 7, 2013, which removed any mention of The Weather Channel or the

"other 24-hour per day national news service" condition.  (Dep. Ex. 161; Bakowski Decl. Ex. 41

(ASR-5); MAI Dep. 141:22-142:11.)  Three days later, TNS sent DISH the revised CNN audit

report.  (MAI Dep. 141:22-147:9.)  MAI made no disclosure of The Weather Channel issue to

DISH until after this dispute arose.  (MAI Dep. 136:2-14.)  Nor did TNS complain as DISH

continued to pay for CNN based on Households, a lower number than Total Subscribers.

(Madlock 30(b)(6) Dep. at 55:9-56:5.)

TNS's decision to treat The Weather Channel as a 24-hour per day national news service

concerned some at TNS.  Shortly after sending DISH the revised MAI audit in 2013 that deleted

any mention of The Weather Channel, a TNS financial analyst emailed MAI and the TNS

Accounting team:

> [W]e do not have reserves or credits recorded for the difference between
> Household Subs (paying subs) and Residential Subs.  Therefore, if we consider
> The Weather Channel to not be a 24-hour news service, or if we waive this issue,
> then DISH may have overpaid for the entire contract period.  The potential risk
> could be ~5M (estimated).  (Bakowski Decl. Ex. 22; Northington Dep. at 124:19-
> 125:6.)

TNS's manipulation of the audit process continued even after the filing of the present

lawsuit in October 2017.  MAI sent TNS its first audit of DISH's license fee payments for CNN under the 2015 Agreement on January 26, 2018.  (Dep. Ex. 166.)  Neither TNS nor MAI provided this audit to DISH at first.  (Diaz Dep. at 100:14-23.)  TNS, in fact, never provided it to DISH – DISH only received it from MAI in August 2018 in response to a third party subpoena. (*Id.*)  The first version of MAI's CNN payments audit specifically analyzed the issue of whether an "other 24-hour per day national news service" had more Total Subscribers than CNN, but only raised Bloomberg Television and Fox News as candidates.  (Dep. Ex. 166 at ASR-3; MAI Dep. 192:20-194:12.)  MAI did not even reference, much less assess, The Weather Channel as a potential candidate.  (MAI Dep. 194:23-195:4.)

In March 2018, however, TNS Accounting requested an "urgent" phone call with MAI after meeting with TNS's legal department.  (Dep. Ex. 171 ("We met with our attorney today and as a follow up . . . we will need MAI to revise the audit reports . . . I can explain the reason for the urgency on the phone.").)  Among the topics outlined for discussion on this call was the CNN Household Subscriber Variance in MAI's audit January 2018 draft report – i.e., the analysis of potential "other 24-hour per day national news services."  (*Id.*)  On this phone call, Turner instructed MAI to eliminate the reference in the January 2018 draft report to Bloomberg and Fox News Channel[11] and to instead cite The Weather Channel as the sole reason DISH should be paying based on Total Subscribers.  (MAI Dep. 219:16-220:8.)

TNS's gamesmanship with its supposedly "independent" auditor and The Weather Channel is obvious.[12]  When DISH's Household payment method closely approximated – but

---

[11] Those channels are either specifically exempted under the contract or were actually not more highly distributed than CNN.

[12] All parties understood that, pursuant to the 2015 Agreement, MAI should have served as an objective, neutral third party when evaluating DISH's payment record for CNN, identifying both under and overpayments without being influenced by either party.  (*See*, *e.g.*, MAI Dep. at 163:12 – 164:8 (footnote continued)

slightly exceeded – CNN Subscribers, TNS used MAI's analysis to justify retaining those overpayments because they were "close enough" to CNN Subscribers, even though TNS knew at the time that The Weather Channel was more widely distributed.  When DISH's Household method veered closer to – though still under – Total Subscribers, TNS instructed MAI to consider The Weather Channel an "other 24-hour per day national news service" in order to keep the higher payments.

## II.   <u>THE VOLUNTARY PAYMENT DOCTRINE DOES NOT APPLY.</u>

Because the question of whether The Weather Channel qualified under the CNN payment provision is a disputed material fact defeating summary judgment, TNS resorts to a claim that DISH is precluded from changing its payment methodology under New York's voluntary payment doctrine.[13]  The voluntary payment doctrine precludes a party "from recovering payments 'made with full knowledge of the facts' <u>and</u> with a 'lack of diligence' in determining his contractual rights and obligations."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) (citation omitted).  "The doctrine does not apply, however, when a plaintiff made payments under a mistake of fact or law regarding the plaintiff's contractual duty to pay."  *Id.*

In order to invoke the voluntary payment doctrine here, TNS "is required to establish the intent" of "the corporate entity."  *In re T.R. Acquisition Corp.*, 309 B.R. 830, 840 (S.D.N.Y. 2003); *see also* 82 N.Y. Jur. 2d Payment and Tender § 81 ("Whether a payment is in truth

---

(confirming that "independence" required "objectivity," and that MAI "would report underpayments as well as overpayments" and "wouldn't be influenced in the exercise of [its] judgment by either party"); Diaz Dep. at 162:12 – 163:9 (TNS understood that, under the 2015 Agreement, an "independent third party" auditor "is supposed to be objective" and "neutral").)  TNS clearly undermined its auditor's independence.

[13] To be clear, TNS invokes the voluntary payment doctrine only in an effort to bar DISH's recoupment of overpayments of CNN license fees in March 2017, not in order to bind DISH to a particular interpretation of the 2015 Agreement after that date, as they must because the doctrine applies only to payments that have been made, not payments going forward.  (*See* Mem. at 12-14.)

voluntary, that is, whether it is meant to be made in renunciation of any adverse right, is a question of intention, ordinarily for determination by the jury.  For a payment to be voluntary, the party paying must have the freedom of exercising his or her will and have full knowledge of all the material facts."); *People ex rel. Wessell, Nickel & Gross v. Craig*, 140 N.E. 209, 210 (N.Y. 1923) ("Whether a payment is in truth voluntary, i.e., whether it was meant to be made in renunciation of any adverse right, is in such circumstances, a question of intention.").

The voluntary payment doctrine is particularly ill-suited for this dispute because it is almost exclusively invoked only where the payor *knowingly* made simple payments at odds with its own view of its obligations.[14]  The doctrine is not applicable here because DISH did not knowingly and purposefully decide to pay for CNN contrary to its own view of what it owed.

### A.   DISH Paid For CNN Based Upon A Mistake Of Fact.

"There is a long-established principle that money paid under mistake of material fact may be recovered, unless the party resisting repayment can demonstrate that its position has so changed by reason of the payment as to make repayment inequitable . . . The voluntary payment doctrine, which bars recovery of payments voluntarily made with full knowledge of the facts and in the absence of fraud or mistake of material fact or law . . . does not apply here, where the overpayments were clearly made . . . based on a mistake of fact, namely, the amount of fees actually owed . . .." *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790

---

[14] *See Constellation Power Source, Inc. Select Energy, Inc.*, No. 3:04CV983 MRK, 2007 WL 188135, at *6 (D. Conn. Jan. 23, 2007) ("[party] knowingly paid . . . even though [it] believed it was not required to do so"); *Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 499 N.Y.S.2d 435, 438 (App. Div. 1986) (concluding that "that no mistake of fact was involved"); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396, 398 (App. Div. 2002) ("Here, no … mistake is alleged in that, according to the complaint, plaintiff knew she would be charged a $5 late fee if she did not make timely payment."); *Citicorp N. Am., Inc. v. Fifth Ave. 58/59 Acquisition Co., LLC*, 895 N.Y.S.2d 39, 39-40 (2010), (plaintiffs "were not laboring under any material mistake of fact"); *DRMAK Realty LLC v. Progressive Credit Union*, 18 N.Y.S.3d 618, 621 (App. Div. 2015) ("Here, there is no claim of … mistake.").

N.Y.S.2d 84, 85 (App. Div. 2005) (internal citations omitted).  "New York has long recognized the rule that 'if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter . . . [B] is *not* entitled to retain the money acquired by the mistake of [A], even though the mistake is the result of negligence.'"  *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 191 (N.Y. 1991).  "'[M]oney paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund.'"  *Id.* at 192.

TNS argues that there was no mistake of fact here because, at the outset of the 2009 Agreement, DISH decided to pay for CNN based upon a supposed determination that The Weather Channel qualified as an "other 24-hour per day national news service."  (Mem. at 5-6.) TNS relies almost exclusively on the deposition testimony of DISH executive Warren Schlichting.  (*Id.*)  Mr. Schlichting recounted a conversation in 2017 with DISH Senior Vice President Andrew LeCuyer, in which Mr. Schlichting asked how the erroneous overpayments to TNS had occurred.  According to Mr. Schlichting, Mr. LeCuyer answered that "*as far as we can get with this*," Ms. Crawford had approved the payments in 2009.  (Schlichting Dep. at 82:6-83:2 (emphasis added).)  Mr. Schlichting testified that Mr. LeCuyer "*said something to the effect*, 'The Weather Channel was interpreted to be – you know, somebody interpreted The Weather Channel as a news channel.'"  (*Id.* at 83:17-20 (emphasis added).)

TNS's reliance on this double-hearsay testimony is undermined by the objective factual record, TNS's own contemporaneous determinations, and other testimony.  First, it is true that Ms. Crawford instructed DISH's Media Services team to pay for CNN based upon the Household calculation at the start of the 2009 Agreement.  (Morgan Decl. Ex. 3); Dep. Ex. 145.  But in

2009, the Households closely approximated payment on CNN Subscribers, *not* Total

Subscribers, and therefore that instruction is contrary to any claim that someone at DISH actually

determined that The Weather Channel qualified as an "other 24-hour per day national news

service." (Dep. Ex. 151 at 1 (MAI informing TNS that DISH is "definitely not paying on Total

Subs" in 2009); McLeod Decl. ¶ 6.)

Second, TNS internal documentation establishes that TNS itself recognized that the

Households number effectively represented payment on CNN Subscribers at the beginning of the

2009 Agreement. (Dep. Ex. 60) ("Dish was paying properly for CNN Subscribers. CAA

calculated CNN Viewing subscribers, which closely represented Household Subscribers as

reported by Dish.") More importantly, TNS considered payment on CNN Subscribers proper

even though it knew that The Weather Channel was distributed to more subscribers than CNN at

the time. (Warren Dep. at 39:8-23; *see also* Madlock Decl. ¶ 7; MAI Dep. at 127:6-19.)

Third, Mr. LeCuyer testifies here that his understanding, in early 2017, of events that

occurred nine years earlier involved pure speculation, as the context Mr. Schlichting's testimony

suggests. (Schlichting Dep. at 82:6-83:2 (describing Mr. LeCuyer qualifying his statements with

"as far as we can get with this").) Mr. LeCuyer testifies that he understood in early 2017 that

DISH then paid for CNN based on Total Subscribers. (LeCuyer Decl. ¶¶ 10-11.) Assuming the

same was true in 2009, he therefore speculated that Ms. Crawford had decided to pay on Total

Subscribers in 2009 because she must have identified a qualifying "other 24-hour per day

national news service," which he presumed was The Weather Channel even though he disagreed

with that assessment. (*Id.*)[15] Once he realized that Ms. Crawford had DISH pay for CNN in

2009 based on the Households metric, and that at the time that number actually approximated

---

[15] As Mr. Schlichting's recounting of the conversation indicates, DISH could find no documentation
regarding the rationale for the decision to pay on Households in 2009. (LeCuyer Decl. ¶ 12.)

CNN Subscribers, Mr. LeCuyer's assumption in February 2017 was wrong.  (*Id.*)

Indeed, the opposite must be true – Ms. Crawford utilized the Household number in 2009 because she determined that there was not a more widely distributed "other 24-hour per day national news service."  David Shull, who supervised Ms. Crawford in 2009 before joining The Weather Channel, states that he is unaware of anyone – including Ms. Crawford – ever deciding to pay for CNN because they had determined The Weather Channel qualified as "24-hour per day national news service."  (Shull Decl. ¶ 10.)

### B.   The Voluntary Payment Doctrine Cannot Resolve Factual Disputes Regarding Knowledge and Intent At Summary Judgment.

"[T]he proper operation of the voluntary payment rule must be realistic rather than artificial.  *The rule does not . . . impute knowledge of relevant circumstances of which the payor is not in fact aware, describing as 'voluntary' a payment that was actually the consequence of negligence or inadvertence.*"  *Choice Money Transfer, Inc. v. Societe Int'l de Change, Arimec, LLC*, No. 17 CIV. 2639 (JSR), 2017 WL 6507108, at *6 (S.D.N.Y. Dec. 18, 2017) (emphasis added) (denying summary judgment on voluntary payment grounds).  Here, TNS incorrectly claims that DISH's review of its initial CNN payments under the 2015 Agreement means that DISH made a knowing decision that there was a more widely distributed 24-hour per day national news service.  (*See* Mem. at 13.)  But there is no evidence that DISH made such a determination at the outset of the 2015 Agreement.  The evidence is that DISH simply continued paying for CNN as it had under the 2009 Agreement because the CNN payment terms had not changed.[16]  Indeed, Schedule D of the 2015 Agreement ("Form of Monthly Payment Report")

---

[16] (Shoutta Dep. 67:8-17) (Q: "you understood that DISH considered The Weather Channel to be a 24-hour-per-day national news service, right?" . . .  A: "I was not convinced that these were news networks, and I don't think we had done our research to determine whether or not these all were news networks."); McLeod Dep. 84:15-86:4 ("I don't recall any definitive, this is the network.  It was kind of, (footnote continued)

shows a sample CNN payment based on the same "Households" calculation employed during the
2009 Agreement.  (*See* 2015 Agt. Sch. D at 69.)  TNS specifically approved the sample payment
form.  DISH's payment method was thus a product of inadvertence or, at most, negligence, not a
knowing decision to calculate payments according to Total Subscribers.

After the 2015 Agreement was executed, a new DISH financial analyst, Jonathan
Shoutta, circulated an analysis of DISH's payments for CNN.  Shoutta thought that DISH was
paying incorrectly for CNN because the Household calculation then closely approximated Total
Subscribers, and he did not believe there was an "other 24-hour per day national news services"
with more Total Subscribers than CNN, rejecting The Weather Channel, Newsmax, and C-SPAN
as not "comparable to CNN."  (Shoutta Dep. 65:9-22; 69:2-74:23.)  Shoutta sent this analysis to
several DISH employees, but it was apparently not elevated to key DISH decision-makers.
(Bakowski Decl. Ex. 11.)  TNS incorrectly infers that Jared Zimmer – the DISH deal lead in the
2015 Agreement negotiations who received Shoutta's email – decided that DISH should continue
paying for CNN as it had under the 2009 Agreement based on Shoutta's analysis of possible
24-hour per day national news services and a discussion he had with DISH Finance Director,
Dana McLeod.  (Mem. at 7.)  No evidence indicates that anyone at DISH decided to continue
paying for CNN based on the Household calculation because of The Weather Channel.

Instead, slightly over a year later, after Shoutta again raised concerns, DISH executives
concluded that DISH was paying incorrectly for CNN because no "other 24-hour per day
national news service" was received by more Total Subscribers than CNN.  (LeCuyer Decl. ¶ 8.)

---

we've continued doing this.  The majority of that language didn't change, so we will continue doing it.");
Madlock 30(b)(6) 56:1-14; Pomeroy Dep. 78:20-79:4 ("the intent was to continue paying the same way
that had been paid under the 2009 agreement as the language supporting it was substantially similar");
Pomeroy Dep. 93:5-98:2 (discussing Bakowski Decl. Ex. 36); Schlichting Dep. 51:9-53:22 (discussing
Bakowski Decl. Ex. 10) ("I think we assumed it was business as usual.").)

The argument that DISH's initial review of CNN payments under the 2015 Agreement shows that DISH made a knowing decision to continue paying for CNN because it believed The Weather Channel was a 24-hour national news service incorrectly imputes knowledge and intention to DISH that remain disputed matters of fact.  *See Choice Money Transfer*, 2017 WL 6507108 at *6; *see also Shang Shing Chang v. Wang*, No. 15-CV-4385 (FB) (ST), 2018 WL 1258801, at *5 (E.D.N.Y. Mar. 12, 2018).  DISH's review only went so far as to determine that the consistency between the 2009 and 2015 CNN fee provisions meant that no change in payment method was warranted.  (Pomeroy Dep. 77:16 – 81:15; Madlock 30(b)(6) Dep. 56:1 – 59:25 (DISH's Media Services team prepared initial assessment based upon 2015 Agreement Schedule D).)[17]

### C.   For The Voluntary Payment Doctrine To Apply, The Party Must Have Full Knowledge of All Relevant Facts – Failure to Disclose Relevant Facts Precludes The Doctrine's Application.

TNS also incorrectly argues that the voluntary payment doctrine prevents DISH from recovering its CNN overpayments because of a lack of diligence in determining its contractual rights.  (Mem. 13-14.)  But the diligence inquiry of voluntary payment doctrine does not apply where the payor did not have full knowledge of the relevant facts.  *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003) ("[voluntary payment doctrine] bars recovery of payment voluntarily made *will full knowledge of the facts*, and in the

---

[17] TNS cites two emails from this time period, neither of which relate to DISH's payment review.  (Mem. 6.)  TNS also takes both emails out of context, ignoring the explanations offered by each DISH employee during their depositions.  Ms. McLeod testified that her May 2015 email (Bakowski Dep. Ex. 10), which does not mention The Weather Channel specifically, was based on an assumption that someone at DISH had analyzed whether an "other 24-hour per day national news service" qualified under the 2015 Agreement.  (McLeod Dep. at 64:14-67:1.)  DISH, in fact, had not previously analyzed the issue.  (Shull Decl. ¶¶ 9-11; LeCuyer Decl. ¶ 9-12.)  Mr. Pomeroy testified that his email (Bakowski Dep. Ex. 36) related to a project he asked an intern to perform regarding the hypothetical costs and benefits associated with the TNS blackout in 2014.  (Pomeroy Dep. at 93:13-97:6.)  It had nothing to do with DISH making a determination that The Weather Channel or any other channel qualified under the CNN payment provision.  (*Id.*)

*absence of . . .mistake of material fact*") (emphasis added).[18]  Unlike the commercial lease cases

cited by TNS where tenants paid rent without reservation and made no effort to determine their

obligations for over twenty years and nine years[19]; here, a key reason DISH did not evaluate the

impact of The Weather Channel on its CNN payments is that TNS and its auditor CAA/MAI

deliberately concealed their assumption that The Weather Channel was 24-hour per day national

news service with more Total Subscribers than CNN.  *Compare Spagnola*, 574 F.3d at 73

(voluntary payment doctrine not applicable where there is a disputed claim of fact about whether

party was misled).

Where material facts regarding disclosure and knowledge are disputed, courts have

consistently concluded that summary judgment is inappropriate.  *See Fink v. Time Warner Cable*,

810 F. Supp. 2d 633, 648-49 (S.D.N.Y. 2011) (summary judgment on the basis of the voluntary

payment doctrine denied where plaintiffs' overpayments are "predicated on a lack of full

disclosure by defendant" and where "[i]ssues of disclosure, notice, and authorization are very

---

[18] In *Spagnola*, the Second Circuit refused to apply the voluntary payment doctrine because Spagnola claimed he made increased insurance policy premium payments without full knowledge of the facts and "due to being misled by Chubb as to the basis on which his" premiums were raised.  *Spagnola*, 574 F.3d at 73.  *United States ex rel. Feldman v. City of New York*, 808 F.Supp.2d 641, 657-58 (S.D.N.Y. 2011), is an inapposite False Claims Act case where the voluntary payment doctrine question was resolved based on the fact that the Defendant City of New York did not actually receive the payments in question.

[19] *Gimbel Bros.*, 499 N.Y.S.2d at 438, is distinguishable because there the appellate court reviewed the trial court's findings of fact following a bench trial and determined that, based on the weight of the evidence, the trial court "correctly found that no mistake of fact had been made." *Id.*  Here, the Court may not weigh the evidence and is required to draw all inferences of fact in DISH's favor.  In *Eighty Eight Bleecker Co., LLC v. 88 Bleecker St. Owners, Inc.*, 824 N.Y.S.2d 237, 239 (App. Div. 2006), the plaintiff sought to recover claimed overcharges on rent that it had been paying for over 20 years.  The appellate court applied the voluntary payment doctrine because there was no evidence that plaintiff was laboring under a mistake of fact.  *Id.* at 246 ("[plaintiff] needed only to check the amount of the base rent set forth in the lease to determine if overcharges were indeed being made.").  Here, there is considerable evidence of error by DISH, evidence that TNS recognized DISH's error, and evidence that TNS took steps to prevent DISH from learning of its error.  *Citicorp*, 895 N.Y.S.2d at 39-40, likewise concerns a case where a plaintiff brought a complaint seeking to recover overpayments on rent that it had paid for over 9 years.  The voluntary payment doctrine was applied because there was no issue of mistake of fact given that the plaintiffs needed only to review the amount of rent they were paying compared to the amounts invoiced by defendants to determine if they were being overcharged.  *Id.*

much contested"); *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 CIV. 6811 (CM) (JCF), 2014 WL 2199428, at *11 (S.D.N.Y. May 23, 2014) ("U.S. Bank had some knowledge of the 2010 COI Rate Adjustment, but whether it had 'full knowledge' is very much in dispute . . . *neither the Policies nor PHL's notice letters identified a Target Funding Ratio or specific COI rate or included the formula by which the COI rates were determined.*") (emphasis added). Indeed, courts have denied summary judgment even where the non-moving party had access to information regarding the calculations of payments but nevertheless paid the wrong amount. *See Choice Money Transfer, Inc.*, 2017 WL 6507108, at *6-7 (disputed fact question whether payments were voluntary where the invoices were "confusing"). Here, as in those cases, disputed material facts, including whether DISH had the requisite knowledge and whether TNS concealed DISH's mistake, require the Court to reject TNS's voluntary payment doctrine argument.

## III.   TNS HAS FAILED TO CARRY ITS BURDEN TO ESTABLISH THAT DISH'S RECOVERY OF OVERPAYMENTS BREACHED THE 2015 AGREEMENT.

TNS has not met the high burden of establishing as a matter of law that DISH breached the 2015 Agreement by taking credits for past overpayments of CNN license fees. TNS admits that nothing in the text of the 2015 Agreement precludes DISH from taking credits on current payments for past overpayments. (Mem. 10.) It argues, however, that the contract's silence on this issue should be construed against DISH.

TNS's view is disingenuous given the factual record. TNS itself, as well as its auditor, acknowledged that under the 2015 Agreement and the 2009 Agreement (which was similarly silent regarding credits) overpayments by DISH could be applied – and were applied – as credits against DISH's payment obligations. (*See*, *e.g.*, Dep. Ex. 60; Morgan Decl. Ex. 4 (TNS internal email – "do you know when DISH will be taking credit for that period?"); Morgan Decl. Ex. 5

(TNS Accounting recognizing credits taken by DISH for mistaken overpayments); Morgan Decl.
Ex. 6 (TNS internal email – "Reserves recorded to offset future credit."); Morgan Decl. Ex. 7
(Bulk Subs overpayment Audit Findings); Morgan Decl. Ex. 8; Morgan Decl. Ex. 9 (TNS
internal email – "They did take credits for prior periods (Jan15-Jul16) for Sling on their Oct16
payment due an error").)

The law is no better for TNS.  As the mistake of fact doctrine makes clear, courts permit
parties to recoup overpayments in commercial dealings unless the payment has caused such a
change in the position of the other party that it would be unjust to require it to refund.  *See*
*Freston v. Gulf Oil Co. U.S.*, 565 P.2d 787, 789 (Utah 1977) ("defendant made overpayments by
mistake and when the error was noted it promptly advised plaintiffs, withheld future payments
until the sum had been recovered, and then began making correct payments"); *In re B&L Oil Co.*,
782 F.2d 155 (10th Cir. 1986) (creditor allowed to recoup overpayments even though contract
did not provide for repayment of overpayments); *In re Malinowski*, 156 F.3d 131, 133 (2d Cir.
1998) ("The typical situation in which equitable recoupment can be invoked involves a credit
and debt arising out of a transaction *for the same goods or services*.") (emphasis in original).[20]

---

[20] TNS cites a single inapposite case to suggest that New York law prohibits DISH from claiming credits
on prior overpayments.  *Leirer v. Caputo*, 616 N.E.2d 147 (N.Y. 1993).  But if anything, *Leirer* supports
DISH's position here.  That case addressed whether the Suffolk County Comptroller could rely on
"general, inherent common-law recoupment authority" to withhold 10% of a deputy clerk's paychecks "as
a method of recouping wages paid to her when, allegedly, she was not on the job. *Id*. at 147.  *Leirer* first
recognized that common law recoupment generally is available under New York law.  616 N.E.2d at 149
(where a party has ongoing payment obligations, "common-law recoupment is essentially a defensive
mechanism available to a payer, interjected to offset continuing expenditures to or damage claims against
a payee.").  The court then concluded that its prior precedents, which recognized the authority of public
agencies to recoup monies erroneously paid, did not justify the Comptroller's attempt to withhold wages
from the deputy clerk's paychecks.  *Id*. at 148; *compare Daleview Nursing Home v. Axelrod*, 464 N.E.2d
130 (N.Y. 1984) (approving the withholding of Medicaid reimbursements to nursing homes to recoup
monies wrongfully or erroneously paid); *Couch v. Perales*, 585 N.E.2d 772 (N.Y. 1991) (approving
reductions to public assistance grants under Aid to Families with Dependent Children to recover
erroneous overpayments).  Here, in the context of ongoing payments under a commercial contract, DISH
(footnote continued)

This is true even where a contract is silent on the issue. *Freston* 565 P.2d at 789 ("the right of recoupment is inherent in all contractual matters and is not dependent upon express provisions"); *Pross v. Katz*, 784 F.2d 455, 458 (2d Cir. 1986) ("In many contractual relationships the parties cannot feasibly anticipate and provide contractual language for every contingency.")[21]

TNS's final argument that "offset rights" in an amendment to the 2009 Agreement establishes that the absence of such language was intentional (Mem. 11) is a red herring.  The right in that amendment was limited to where *TNS* had agreed to pay DISH a specific amount, and, as insurance, DISH was authorized to reduce its license fee payments if TNS failed to do so. (Bakowski Decl. Ex. 38 at 2.)  There is no evidence that the parties intended a provision regarding that unique circumstance to serve as a broad pronouncement on the availability of credits for license fee overpayments.

## IV.   THE BULK BILLING CLAIMS RAISE TRIABLE ISSUES OF FACT.

The parties' dispute over the calculation of the bulk rate for bulk billing customers is longstanding and involves multiple disputed facts.  (MAI Dep. 189:5-192:8.)  A Bulk-Bill Arrangement is an agreement where a customer (e.g., a hotel) purchases services for multiple units (e.g., hotel rooms) at a reduced rate.  Under the 2015 Agreement, DISH calculates the number of bulk Customers by "dividing (i) the monthly retail rate that DISH charges in connection with the Bulk-Bill Arrangement for such Package by (ii) the residential monthly

---

recovered overpayments of license fees, just as the public agencies in *Daleview* and *Couch* were permitted to recover benefits erroneously paid.

[21] TNS cites two cases in arguing that the contract's silence prohibits credits.  (Mem. at 11.)  Both are inapposite.  *Sequa Corp. v. Gelmin*, No. 91 CIV. 8675(DAB) 1996 WL 745448 (S.D.N.Y. Dec. 31, 1996) was largely vacated and reversed, which TNS did not note, and in any event involved a ruling after a bench trial, not at not summary judgment when all inferences are to be construed in DISH's favor.  *See Wrobel*, 692 F.3d at 27.  *U.S. Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229 (1986) is even more distinguishable and TNS's parenthetical describing the case is blatantly misleading.  *U.S. Fidelity* held that the use of a term in one provision of a contract, but that term's omission from another parallel provision in the same contract, indicated that the parties intentionally omitted the term from the latter.  67 N.Y.2d at 792.  That is far different from the situation here.

retail rate that DISH charges a non-bulk Customer for the same or a reasonably equivalent package." (2015 Agt. ¶ 8 (emphasis added).)[22] TNS takes issue with DISH's bulk bill payments for two reasons. Both arguments are meritless.

### A.   DISH's Bulk Bill Calculation Properly Recognizes the Bulk Rate in Each "Bulk-Billing Arrangement."

TNS first argues that DISH must calculate the "bulk factor" using the rates listed on its general, published bulk rate card regardless of the actual bulk rate charged in any particular "Bulk-Bill Arrangement." (Mem. 29-30.) This flies in the face of the contract language, which requires that DISH use "the monthly retail rate that DISH charges *in connection with the Bulk-Bill Arrangement for such Package*." (2015 Agt. ¶ 8 (emphasis added).) Thus, although TNS complains that at times DISH uses "promotional' or "discounted" bulk rates for its bulk bill calculation (Mem 29), nothing in the contract requires DISH to only use its published bulk rate card rate, or prohibits its use of even a "promotional" or "discounted" rate.[23] The plain language of the 2015 Agreement establishes the opposite.

### B.   DISH Properly Included Its Regular Retail Rates in Its Bulk-Billing Calculation, Which Includes Local Channels and Equipment Charges.

TNS next contends that DISH manipulated its bulk factor calculations by including charges internally allocated by DISH for equipment and local channels as part of its "residential monthly retail rate," when those costs are not included in the "monthly retail rate" for a "reasonably equivalent" bulk Package. (Mem 28.) It argues that because DISH breaks out charges for local channels and equipment internally for tax purposes, those charges are "add-ons"

---

[22] For instance, if DISH charges $10 per bulk unit (e.g., hotel room) per month for a bulk package, and that bulk package is "reasonably equivalent" to a residential package that has a monthly retail rate of $50 per subscriber, the "bulk factor" would be 20% (i.e., a $10 numerator divided by a $50 denominator). DISH therefore calculates the number of bulk Customers for that package as 20% of the total bulk units receiving it. (Teplinsky 30(b)(6) Dep. at 44:4-45:22.)

[23] To do so, moreover, would result in a windfall for TNS – DISH would have to pay far more to TNS than it receives from its bulk bill customers. (Teplinsky Decl. ¶ 8.)

that should be subtracted from DISH's actual residential monthly retail rate before that amount is used in DISH's bulk bill calculation.  (*Id.*)  But, again, that claim is contrary to the plain language of the 2015 Agreement which requires DISH to use its "residential monthly retail rate."  Internal accounting of amounts for local channels and equipment for tax purposes does not change the retail rate when those charges are not billed separately to retail rate subscribers.  (2015 Agt. ¶ 8.)

Moreover, the failure to provide equipment to bulk customers as part of the package is not a factor in determining whether packages are "reasonably equivalent."  "Reasonably equivalent" is specifically defined in the 2015 Agreement:  the particular Bulk-Billing Arrangement must offer <u>programming</u> that is *ninety-five percent* the same as the package from which DISH is drawing the residential monthly retail rate.  (*Id.*)  TNS makes *no* effort whatsoever  to establish that any Bulk-Billing Arrangement is less than 95% equivalent to the respective residential retail package DISH used in the denominator.  (Mem 28-29.)  The appropriate bulk bill factor calculation clearly remains, at least, a material disputed fact.

## V.   MINOR PAYMENT ERRORS BY DISH DO NOT CONSTITUTE MATERIAL BREACHES OF THE 2015 AGREEMENT.

TNS claims that inadvertent payment errors by DISH on exceedingly small items – that TNS never identified until the parties' dispute over CNN license fees – should result in forfeiture of DISH's contractual right to a 20% discount on CNN license fees.  But minor payment errors made during the term of a complex $3.2 billion commercial agreement are not material breaches and cannot support such a forfeiture.  Moreover, the 2015 Agreement required TNS to provide DISH with notice and an opportunity to cure the alleged breaches before invoking any contractual remedy.  TNS did not do so.

A.   **The Payment Errors.**

1.   **Complete And Complete Sports Packages.**

TNS first identifies missed payments for fees related to the DISH "Complete" and "Complete Sports" packages, which TNS contends total roughly $440,000.  (Mem. 24-25, 30.) TNS first disclosed this alleged payment error in a 2018 MAI audit delivered on July 17, 2018. (Morgan Decl.  ¶ 2; Dep. Ex. 117.)  DISH reviewed the claim, concluded that it inadvertently erred and has issued a check these license fees.  (Madlock Decl. ¶ 4.)

2.   **The Apogee Bulk Bill Fees.**

The second minor payment error TNS identifies is a $6,139 underpayment on bulk customer license fees related to the Apogee wholesaler that distributes bulk packages on behalf of DISH.  (Mem. 25; Hutchins Decl. ¶¶ 29-30.)  Turner notified DISH of the error during this litigation, and DISH will be issuing a check shortly.  (Madlock Decl. ¶ 5.)

3.   **Late Payments of CNN License Fees.**

The third set of minor payment errors that TNS asserts are a material breach of the 2015 Agreement are late payments between March 21, 2017 and August 21, 2018.  (Mem. 25-26; Northington Decl. ¶ 39.)  Three of the seventeen payments listed in TNS's late payments table were on time or early.  Seven of them were one or two days late.  One payment was four days late.  The other four payments were made within roughly two to three weeks of the deadline.[24]

4.   **Delta Subscribers.**

The fourth payment error that TNS asserts was a material breach of the 2015 Agreement

---

[24] *Edward Andrews Grp., Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731 (LTS) (AJP), 2005 WL 3215190 (S.D.N.Y. Nov. 30, 2005), the single case cited by TNS for the proposition that late payments constitute material breach, is distinguishable in that case the defendant failed to make payments due to its inability to pay.  The plaintiff – in accordance with the contract - sent Defendant a Default Notice and granted the Defendant 10 days to cure.  Here, TNS never provided DISH with notice of default and an opportunity to cure as it was required to do under Paragraph 12 of the 2015 Agreement (*see infra* at fn. 28).

are license fees for Delta Airlines passengers under the Letter Agreement, which total roughly $400,000.  TNS first made DISH aware that these fees had not been paid in its First Amended Complaint in May 2018.  DISH investigated, submitted an adjusted payment report to TNS in June 2018, and paid the Delta passenger fees on July 5, 2018.  (Madlock Decl. ¶ 6.)  TNS does not contend that DISH's omission of payment for Delta Subscribers was intentional.

**B.    The Payment Errors, Both Individually and In Aggregate, Are Immaterial and Cannot Support the Damages Sought, Which Would Amount To an Unreasonable Forfeiture or Unlawful Penalty.**

A handful of late monthly payments does not constitute a material breach of the 2015 Agreement.  "Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotations omitted).  Whether a breach is material is generally a question for the trier of fact that "depends on all of the facts and circumstances, including . . . [1] the extent to which the injured party will be deprived of the benefits reasonably expected, [2] the extent to which the injured party can be adequately compensated for its loss, and [3] the good faith of the breaching party." *Frank Felix*, 111 F.3d at 289.[25]  The total identified loss – almost all of which has now been repaid – is roughly $880,000, which is 0.04% of the $3.2 billion that DISH has paid under the 2015 Agreement.  DISH was 99.96% compliant.

Based on the payment errors discussed above, TNS argues that DISH is not entitled to its contractual 20% discount on CNN rates because it was not in compliance with the Agreement.

---

[25] *See Int'l Cards Co., Ltd. v. Mastercard Int'l Inc.*, No. 13 CIV. 2576 (LGS), 2016 WL 3039891, at *4 (S.D.N.Y May 26, 2016) ("Because questions of fact remain as to whether . . . any late payments to merchants constituted a material breach, MasterCard's motion for summary judgment is denied"); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005) (collecting cases) ("Treating materiality as primarily a question of fact, best resolved by the jury, is consistent with the 'wavering and blurred' line that divides the material breach from the trivial.").

(Mem. 30.)[26]  But, TNS's recovery of $120 million for the inadvertent, extremely minor payment errors would result in an unlawful forfeiture.  *See In re Adelphia Commc'ns Corp.*, No. 02-41729, 2006 WL 898047, at *1 (Bankr. S.D.N.Y. Mar. 31, 2006) ("failures to satisfy minor obligations under the contract, which were never noticed or objected to by Keys Gate until it suited Keys Gate's litigation interests to do so, were insufficient to trigger the forfeiture Keys Gate seeks here").[27]  It also would constitute illegal liquidated damages.  Courts will not enforce a liquidated damages provision "if it operates as a penalty or a forfeiture clause."  *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir. 1982) (applying New York law).  Courts "uphold contractual provisions fixing damages for breach when the terms constitute a reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach."  *Id.*  "If the amount fixed by contract is plainly or grossly disproportionate to the probable loss, the contractual provisions exact a penalty and will not be enforced."  *Id.*  The $120 million TNS is seeking for these minor and inadvertent payment errors is grossly disproportionate to TNS's actual loss.[28]

---

[26] TNS premises its claim that DISH is not entitled to the 20% CNN rate discount on the parties' central dispute over the calculation of CNN license fees as well as the bulk bill issue.  As discussed above, significant, disputed material facts preclude summary judgment on those two claims.  As discussed below, moreover, the notice and cure provision in the 2015 Agreement also applies to at least the bulk bill issue.

[27] New York courts interpret contracts to avoid a forfeiture.  *Lurzer GMBH v. American Showcase Inc.*, 75 F. Supp. 2d 98, 102 (S.D.N.Y. 1998); *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) (a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties").  "[N]on-performance of a contractual condition should be excused where 'the condition would cause a disproportionate forfeiture' as long as the non-performance is not a material breach."  *United States v. Abady*, 03 Civ. 1683, 2004 WL 444081, at *5 (S.D.N.Y. Mar. 11, 2004).

[28] Imposition of such a grossly disproportionate penalty, even for TNS's bulk bill claims, arguably violates the 2015 Agreement's notice and cure provision. (2015 Agt. at 45.)  That provision prohibits a party from invoking any contractual remedy – such as eliminating the 20% discount – unless that party first provides the allegedly breaching party with formal notice and an opportunity to cure.  (*Id.*)  Before initiating this litigation, TNS never provided DISH with formal notice and an opportunity to cure the bulk bill dispute or any of DISH's minor payment errors.  (Teplinsky Decl. ¶ 6; Madlock Decl. ¶¶ 4-6.)  Courts (footnote continued)

## VI.    THE MFN COUNTERCLAIM RAISES DISPUTES OF FACT.

The MFN provision of the 2015 Agreement requires TNS to "promptly notify DISH in writing" of any More Favorable Provision that TNS grants to any Comparable Distributor "that is applicable during the term of th[e] Agreement."  (*Id.* ¶ 38(A).)  TNS breached this obligation by failing to "promptly" disclose to DISH in 2015 and in subsequent MFN offers during the term of the 2015 Agreement that TNS had entered into a multi-year agreement with a Comparable Distributor that would entitle DISH to lower rates for CNN in future years during the term of the 2015 Agreement.[29]  The fact that TNS failed to disclose for years the better rates it knew DISH would be entitled to receive clearly breached its obligation to "promptly" notify DISH of such rates.  TNS's failure to notify DISH that it was entitled to lower rates for CNN in future years during the term of the 2015 Agreement damaged DISH by preventing it from planning for lower CNN rates when setting its marketing budget for new subscribers.  (McLeod Decl. ¶¶ 10-12.)[30]

## VI.    THE AVAILS COUNTERCLAIM RAISES TRIABLE ISSUES OF FACT.

TNS sends SCTE-35 digital signals to DISH to identify the minutes "in each hour" that DISH is entitled to use as advertising breaks for DISH's own promotions or its placement of

---

interpreting similar notice and cure provisions have found that they either preclude a claim as a matter of law, or are sufficiently ambiguous that the issue must be reserved for the trier of fact.  *See, e.g., Rossi Concrete, Inc. v. Skyline Wesleyan Church, Inc.*, No. D040891, 2004 WL 384194, at *7 (Cal. Ct. App. Mar. 2, 2004); *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 931-32 (D. Vt. 2001); *but see, e.g., Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 10Civ 4933 (ALC)(GWG), 2013 WL 81263, at *12 (S.D.N.Y. Jan. 8, 2013) (finding provision only applies to termination rights).

[29] *Compare* Miller Dep. 148:14-150:20  (admitting that TNS only provided MFN offers once a year, even if TNS knew it had entered into a multi-year deal entitling DISH to better rate offers in future years as well) *with* Pomeroy Dep. 266:1-267:7 ("if they're able to identify a more favorable term that would have applied during the term of our deal, we would have expected that would have been provided as part of the process" – "I would expect that analysis would identify whether they owe us a rate for the next year and the following year after that and the following year after that if they have a contract in place that has a more favorable term" ).

[30] Even if indirect damages are subject to limitations under Paragraph 17 of the 2015 Agreement, DISH has the right to seek an award of nominal damages for TNS's breach of the MFN.  *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 CIV. 5762, 2016 WL 3098842, at *17 (S.D.N.Y. June 1, 2016)

commercial advertising ("DISH Avails").  (Derry 30(b)(6) Dep. at 114:20-23; Derry Dep. at 20:9-24.)  TNS produced log data showing the SCTE-35 digital signals that it sent to DISH for the period November 16, 2016 to December 8, 2017.  (Derry Dep. at 20:9-21:21.)  DISH analyzed this TNS data and determined that TNS failed to deliver large numbers of avails for both CNN and TNT as required by the 2015 Agreement.  (Derry 30(b)(6) Dep. at 18:13-17; 19:6-12.)  DISH's analysis shows that the avails for CNN and TNT that TNS failed to provide from April 1, 2015 to October 1, 2018 were worth approximately $2.5 million.  (Dep. Exs. 201-203.)

TNS argues that it cannot be liable for its failure to provide DISH Avails because the 2015 Agreement gives TNS discretion to preempt DISH Avails on CNN for programming of overriding national importance.  (2015 Agreement ¶ 5.C.)  The 2015 Agreement, however, requires that TNS's discretion to preempt DISH avails be exercised "reasonably" and on the condition that TNS do so only for "programming of overriding national importance."  *Id.*; *compare Overseas Private Inv. Corp. v. Gerwe*, No. 12-CV-5833(RA), 2016 WL 1259564, at *7 (S.D.N.Y. Mar. 28, 2016) (discussing express limitation on contractual discretion).  TNS's internal documents show that TNS often preempted DISH Avails on CNN for no reason at all or for discretionary reasons unrelated to programming of overriding national importance.[31]  There is thus a material dispute of fact regarding DISH's claim that TNS breached the avails provision.

TNS attempts to reverse its burden as the party moving for summary judgment.  It argues that *DISH* has failed to prove that TNS's failure to deliver avails for CNN and TNT was not due to programming of overriding national importance (in the case of CNN) or some other reason outside the control of TNS.  (Mem. 34-35.)  DISH need only raise a dispute of material fact that

---

[31] *See* Dep. Ex. 68 ("Possible Reason" column showing CNN Local Avails missed with no reason given); *id.* (Possible Reason listed as "Killed for Time"); Dep. Ex. 72 (showing no "Avail Notice Reason" for missed avails); *id.* (showing Avail Notice Reason as "Killed per producer," "Killed for time," and "TBD").

TNS failed to deliver the DISH Avails "in each hour" required by Section 5(C) of the 2015

Agreement.[32]  TNS has the burden to show that its failure to comply with its obligations was

excused, and TNS made no effort to show that, where TNS's own internal tracking documents

for CNN provided no reason or technical reasons for "missed avails," TNS justifiably preempted

DISH avails.  This remains a significant, material disputed fact.

## VII.   THE ATTORNEYS' FEES PROVISION IN THE 2015 AGREEMENT MUST BE NARROWLY CONSTRUED; ENTITLEMENT TO FEES IS FOR THE TRIER OF FACT TO DETERMINE.

TNS's position that it is entitled to recover attorneys' fees on all of its claims for breach of

the 2015 Agreement and the Letter Agreement is at odds with the attorneys' fees provision in

Paragraph 7.C. of the 2015 Agreement, which limits recoverable attorneys' fees to "litigation

regarding any past due payments."  (*Id.*)  "Under New York law, the court should not infer a

party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention

to do so is unmistakably clear' from the language of the contract."  *Oscar Gruss & Son, Inc. v.*

*Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (citation omitted).  Here, the 2015 Agreement limits

attorney's fees to litigation regarding past due payments.  TNS did not bring litigation to collect

outstanding past due payments or interest but rather to settle whether TNS was entitled to keep

DISH's mistaken overpayments for CNN.  If the parties had intended to provide an award of

attorneys' fees to the prevailing party on any claim for breach of contract, they could easily have

done so.  In addition, where, as here, entitlement to attorneys' fees is contested, that

determination is for the trier of fact.  *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir.

1993) ("when a contract provides for an award of attorneys' fees, the jury is to decide at trial

---

[32] The case cited by TNS as support for its position that it is entitled to summary judgment on DISH's Avails counterclaim because DISH has not *proved* causation is inapposite because it does not concern summary judgment.  The Second Circuit there reviewed the district court's findings of fact after an 8-day bench trial.  *See Nat. Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

Dated: San Francisco, California        Respectfully submitted,
       December 3, 2018

                                        COBLENTZ PATCH DUFFY & BASS LLP


                                        By:    _/s/ Richard R. Patch_
                                               Richard R. Patch*
                                               Rees F. Morgan*
                                               Daniel M. Pastor*
                                               One Montgomery Street, Suite 3000
                                               San Francisco, CA  94104-5500
                                               Telephone:  (415) 391-4800
                                               Facsimile:  (415) 989-1663
                                               ef-rrp@cpdb.com
                                               ef-rfm@cpdb.com
                                               ef-dmp@cpdb.com

                                               James Sandnes (JS-1199)
                                               SKARZYNSKI, BLACK LLC
                                               One Battery Park Plaza, 32nd Floor
                                               New York, NY  10004
                                               Telephone:  (212) 820-7700
                                               Facsimile:  (212) 820-7740
                                               jsandnes@skarzynski.com

                                               *Attorneys for Defendant*
                                               *DISH NETWORK L.L.C.*

                                               (*Admitted *Pro Hac Vice*)