USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/27/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TURNER NETWORK SALES, INC.,

Plaintiff,

v.

DISH NETWORK L.L.C.,

Defendant.

No. 17-CV-7599 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff/Counter-Defendant Turner Network Sales, Inc. ("TNS"), a licensor of television programming services, brings this action for breach of contract and declaratory judgment against Defendant/Counter-Claimant DISH Network L.L.C. ("DISH"), a television programming distributor. TNS claims that DISH breached the parties' license agreement by, among other things, failing to properly calculate and pay license fees for the distribution of Cable News Network ("CNN"). DISH brings counterclaims against TNS for breach of two separate provisions of the license agreement. Before the Court is TNS's motion for summary judgment, as well as its motion to strike several paragraphs of a declaration submitted by DISH in opposition to that motion. For the reasons that follow, the motion to strike is denied and the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted. TNS promotes, licenses, and distributes Turner Broadcasting System, Inc.'s television programming services, including CNN. DISH distributes television programming to consumers through its direct broadcast satellite and over the internet platforms (called "Systems"). In 2005, TNS and DISH entered into an affiliation

agreement whereby DISH acquired the right to distribute TNS services, including CNN, in exchange for monthly license fees. Pursuant to that agreement, DISH was to pay TNS a monthly license fee for CNN, which (with certain exceptions) was calculated by multiplying a specified rate by the number of DISH's total subscribers for that month.

In 2009, the parties renegotiated their 2005 affiliation agreement. They agreed to modify the provision of their agreement that governed the calculation of the monthly license fee for CNN. The agreed-upon language, which was incorporated into the 2009 affiliation agreement (the "2009 Agreement"), read in pertinent part as follows:

> [T]he following rates shall apply per month for each CNN Subscriber, unless *any other 24-hour per day national news service* (other than HLN) is received by a greater number Total Subscribers than CNN in such System, in which case, the following rates shall apply per month and [DISH] shall pay on the greater of (A) each CNN subscriber or (B) each of [DISH's] Total Subscribers in such System.

Warren Decl. Ex. 1, Schedule B (emphasis added). The provision (with some exceptions) essentially permitted DISH to pay for CNN based on CNN Subscribers, rather than Total Subscribers, if no "other 24-hour per day national news service" was received by more subscribers than CNN.[1] The provision was intended to incentivize DISH to distribute CNN to at least as many subscribers as any other 24-hour national news service.

Throughout the term of the 2009 Agreement—from August 14, 2009 until March 30, 2015—DISH calculated and paid license fees for CNN based on information generated by DISH, without the involvement of TNS. Each month, DISH submitted a payment report to TNS. These payment reports showed that DISH was paying for CNN using a figure called "Households." The parties dispute what this "Households" figure was intended to represent. TNS asserts that

---

[1] The Agreement defined "CNN Subscriber[s]" as "those Customers authorized by [DISH] to receive CNN," and defined "Total Subscriber[s]" as "each and every Customer of [DISH] receiving any level of television service from a System, provided that . . . the term Total Subscribers shall not include Excluded Subscribers." Warren Decl. Ex. 1 at 1, 5.

Households was used as a proxy for Total Subscribers. It further asserts that DISH paid for CNN using a proxy for Total Subscribers because DISH had internally determined that The Weather Channel—which, it is undisputed, was at most relevant times more widely distributed than CNN— qualified as an "other 24-hour per day national news service" under the 2009 Agreement. DISH, on the other hand, asserts that the Households figure was not intended to be used as a proxy for Total Subscribers, but rather that it closely approximated CNN Subscribers at the start of the 2009 Agreement. Over time, according to DISH, the Households figure grew to more closely approximate Total Subscribers, not because of a deliberate decision on the part of DISH, but rather as an incidental byproduct of the way the services were packaged. DISH asserts that it never made any determination during the term of the 2009 Agreement that The Weather Channel was an "other 24-hour per day national news service," such that DISH was obligated to pay for CNN based on Total Subscribers.

In late 2014 and early 2015, TNS and DISH negotiated a new affiliation agreement. During these negotiations, the parties did not discuss or renegotiate the above-quoted provision of the 2009 agreement. That provision was instead incorporated nearly verbatim into the new affiliation agreement (the "2015 Agreement" or the "Agreement"), which became effective on April 1, 2015. Also on April 1, 2015, the parties entered into a separate agreement (the "Letter Agreement"), whereby DISH acquired the right to distribute CNN (and other TNS services) to Delta Airlines and Virgin Atlantic for delivery to the airlines' passengers. In the Letter Agreement, the parties adopted many of the same provisions that were incorporated into the 2015 Agreement.

From April of 2015 until February of 2017, DISH continued to pay license fees for CNN using the Households figure. Then, in April of 2017, DISH informed TNS that it had been overpaying for CNN during the course of the 2015 Agreement. DISH further informed TNS that

3

it intended to recover its overpayment of approximately $20 million by reducing the monthly license fees it paid for CNN until the amount was recovered in full.[2]  For the following two accounting months, DISH did not include any payment for CNN when it remitted the license fees it owed for the distribution of TNS services.  After that, DISH paid reduced monthly fees for CNN until it had fully recovered its claimed overpayment.  DISH then resumed paying the full CNN monthly license fee, but rather than calculating it using the number of Households, as it had before, it calculated the fee using the number of CNN Subscribers.

In October of 2017, TNS filed the Complaint in this action, and in May of 2018, it filed the Amended Complaint.  The Amended Complaint brings claims against DISH for breach of contract and declaratory judgment.  It alleges that DISH breached the 2015 Agreement by (1) withholding license fees in order to recoup its claimed overpayment for CNN, and (2) subsequently remitting its license fees for CNN based on CNN Subscribers, rather than Total Subscribers.  The Amended Complaint further alleges that DISH breached the 2015 Agreement, as well as the associated Letter Agreement, by, *inter alia*, remitting untimely payments, improperly calculating the fees owed for bulk customers, and taking a discount on CNN license fees despite its non-compliance with the Agreement.  TNS seeks monetary damages and a declaration that DISH is obligated to pay for CNN based on Total Subscribers for any month in which The Weather Channel is received by a greater number of Total Subscribers than CNN.

DISH answered the Amended Complaint and brought counterclaims against TNS for breach of two separate provisions of the 2015 Agreement—the Most Favored Nation provision and the DISH Avails provision.  DISH seeks monetary damages for these alleged breaches, as well

---

[2] DISH did not attempt to recover any overpayment made during the course of the 2009 Agreement.  TNS clarified at oral argument that this was due to the parties' mutual release of claims arising out of the 2009 Agreement, which was entered into at the end of the 2009 Agreement's term.

as a declaration that The Weather Channel does not qualify as an "other 24-hour per day national news service" under the Agreement. TNS filed the instant motion for summary judgment. In opposition, DISH submitted, *inter alia*, the declaration of David Shull. TNS filed a motion to strike several paragraphs of that declaration.

## DISCUSSION

The Court first addresses TNS's motion to strike, followed by its motion for summary judgment. For the reasons that follow, the motion to strike is denied and the motion for summary judgment is granted in part and denied in part.

### I.    Motion to Strike

TNS moves to strike paragraphs 9–14 of the declaration of David Shull. DISH has since withdrawn paragraph 9 of the declaration, so that only paragraphs 10–14 remain in dispute. In these paragraphs, Shull—who was a Senior Vice President and Executive Vice President at DISH from 2008 until 2015, and who subsequently worked as Chief Executive Officer of Weather Group (which provides The Weather Channel)—speaks about two topics. First, in paragraphs 10 and 11, he asserts that—while at DISH—neither he, nor to his knowledge anyone else at DISH, considered The Weather Channel to be an "other 24-hour per day national news service" under the 2009 Agreement. Second, in paragraphs 12–14, he attests that—while CEO of The Weather Channel— he also did not consider The Weather Channel to be a 24-hour national news service comparable to, for example, CNN, MSNBC, or FOX News Channel.

As to paragraphs 10 and 11, TNS argues that they should be stricken because Shull is not competent to testify about these matters. Federal Rule of Civil Procedure 56(c)(4) requires that a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Here, Shull's declaration states that he was a Senior Vice President

5

in DISH's programming department from 2008 until 2013 and that, in 2008 and 2009, he was the lead negotiator of the 2009 Agreement between DISH and TNS. Shull Decl. ¶¶ 4–5. The declaration thus clearly sets forth the basis for Shull's personal knowledge of, and competence to testify about, his interpretation of the term "other 24-hour per day national news service" under the 2009 Agreement. TNS nevertheless argues that Shull lacked the requisite personal knowledge because DISH, in its response to TNS's interrogatories, did not list Shull as an individual with "knowledge of when, how, or who made the decision to pay for CNN on any basis other than CNN Subscribers." This argument is unavailing, because the testimony in paragraph 10 merely concerns Shull's interpretation of the contract (and not any payment decision), and paragraph 11 merely states, consistent with DISH's responses to interrogatories, that Shull has "no recollection" of any decision to pay for CNN based on total subscribers. TNS's motion to strike paragraphs 10 and 11 of the Shull declaration for lack of competence is, accordingly, denied.

TNS further argues that paragraphs 10–14 of the declaration should be stricken because DISH inadequately disclosed the anticipated subjects of Shull's testimony. Rule 26(a) requires that a party's initial disclosures include "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses[.]" Under Rule 37(c), a party who "fails to provide information or identify a witness as required by Rule 26(a) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In exercising its discretion to exclude challenged testimony under Rule 37, "a court should consider: (1) the party's explanation for the failure to comply with the discovery rules; (2) the importance of the testimony of the witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to

6

meet the new testimony; and (4) the possibility of a continuance." *Krawec c. Kiewit Constructors Inc.*, 11-CV-0123 (LAP), 2013 WL 1104414, at *7 (S.D.N.Y. Mar. 1, 2013) (internal quotation marks and brackets omitted) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

Here, DISH identified Shull in its initial disclosures as an individual likely to have discoverable information about this case. The disclosure specifically stated that Shull was "no longer employed by DISH but was DISH's Senior Vice President of Content Acquisition and Programming." Bakowski Reply Aff. Ex. 2. The disclosure further stated that the subjects of Shull's potential testimony included, "among others, the negotiation, interpretation, and performance under the 2009 Agreement." *Id.* As explained above, paragraphs 10 and 11 of the declaration concern Shull's personal knowledge of how the 2009 Agreement was interpreted. The testimony in these paragraphs thus falls squarely within the scope of DISH's initial disclosure, and TNS's motion to strike these paragraphs is, for that reason, denied.

As to paragraphs 12–14, these paragraphs arguably fall outside the scope of the subjects identified in DISH's initial disclosures, since they concern Shull's role at The Weather Channel, not his time at DISH. DISH, moreover, has not provided any explanation for its failure to disclose this potential testimony. The Court agrees with TNS that it would have been more helpful for DISH to have disclosed Shull's role at The Weather Channel, and the possibility of his testimony based on that role, earlier on in the case. Nevertheless, DISH did identify Shull as a potential witness in its initial disclosures, and the disputed testimony was not material to the outcome of TNS's summary judgment motion. TNS has thus suffered no prejudice from DISH's omission that cannot be cured with an opportunity to depose Shull before trial. Since "other less drastic options, including the re-opening of discovery, are feasible and appear more appropriate than preclusion," TNS's motion to strike paragraphs 12 through 14 is denied. *See Krawec*, 2013 WL

1104414, at *7–8 (denying a motion to strike where, despite an inadequate disclosure, the non-movant had identified the individual as a potential witness, there was no evidence of bad faith, and a sanction less severe than preclusion would allow the movant to address the issues testified to in the declaration). TNS will have the opportunity, if it wishes to do so, to re-open fact discovery for the limited purpose of deposing David Shull on matters concerning its claim for post-April 2017 underpayments of CNN license fees.

## II. Motion for Summary Judgment

TNS moves for summary judgment on all of the claims and counterclaims at issue in this case. On a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court first addresses the parties' principal dispute—concerning the payment of license fees for CNN—and then addresses the remaining claims and counterclaims for breach of the 2015 Agreement and Letter Agreement. For the reasons explained below, TNS's motion is granted in part and denied in part.

### A. License Fees for CNN

TNS brings two claims against DISH for improper payment of license fees for CNN—one for the money that DISH withheld in license fees in order to recoup its claimed overpayment, and one for DISH's subsequent monthly payments, which were calculated using CNN Subscribers, rather than Total Subscribers. TNS argues that it is entitled to summary judgment on the first

claim because DISH was not permitted, as a matter of law, to recover the license fees it calculated and voluntarily remitted to TNS under the Agreement. As to the second claim, TNS argues that DISH's payments based on CNN Subscribers breached the Agreement because The Weather Channel—which was at most relevant times more widely distributed than CNN—indisputably qualifies as an "other 24-hour per day national news service" under the Agreement. The Court agrees with TNS as to its first claim, but disagrees as to its second.

### 1. The Recouped Fees

TNS first argues that it is entitled to summary judgment on its claim to recover the fees that DISH recouped for its claimed overpayments running from April of 2015 until February of 2017. It contends that DISH's recoupment was barred as a matter of law by the voluntary payment doctrine. The Court agrees. The voluntary payment doctrine, which "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law," *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003) (citation omitted), squarely applies to the facts of this case. DISH, which—it is undisputed—was solely responsible for calculating the license fees it owed to TNS, voluntarily remitted monthly payments based on its Household subscribers for more than seven years (two of which were during the term of the 2015 Agreement). DISH does not contend that the payments were made under circumstances constituting fraud or duress, or that they were otherwise involuntary. *See Wurtz v. Rawlings Co., LLC*, 12-CV-1182 (JMA) (AKT), 2016 WL 7174674, at *5 (E.D.N.Y. Nov. 17, 2016) ("[T]he voluntary payment doctrine applies only to voluntary payments, not to payments made as a result of fraud or duress."). To the contrary, the record is clear that DISH, a sophisticated entity, was solely responsible for generating its own subscriber data and calculating its own fees, without any involvement—let alone fraud or duress—from TNS

at all. DISH cannot now claim, after years of voluntary payments, that it is entitled to recoup fees that it was solely responsible for calculating based on its own understanding of its obligations under the Agreement.

A substantial body of New York case law supports this result. Consider, for instance, *Gimbel Brothers, Inc. v. Brook Shopping Centers, Inc.*, 499 N.Y.S.2d 435 (App. Div. 2d Dep't 1986), in which the lessee of a premises at a shopping center paid its landlord weekly "Sunday charges" for a year and a half, only to later claim that it had no obligation to do so under the parties' lease agreement. Although the Second Department agreed with the lessee that it had no contractual duty to pay the Sunday charges, it held that the lessee nevertheless was not entitled to recoup the payments that it had already made. *Id.* at 438. The court reasoned that the payments were made "voluntarily, without protest, and that no mistake of fact was involved." *Id.* The evidence established that the payments were authorized and clearly identified on the company's invoices, and that the company, at a subsequent annual budget review meeting, had reversed course and decided to stop paying the charges. *Id.* The lessee "could not specify what precise fact was supposedly mistaken, or what officer at Gimbels actually made a mistake." *Id.* Nor, apparently, had the lessee made any mistake of law. Rather, the court concluded, the lessee simply "displayed a marked lack of diligence in determining what its contractual rights were, and [was] therefore not entitled to the equitable relief of restitution." *Id.* at 439. Several other cases have similarly applied the voluntary payment doctrine to reach comparable results. *See, e.g., Citicorp N. Am., Inc. v. Fifth Ave. 58/59 Acquisition Co., LLC*, 895 N.Y.S.2d 39, 39–40 (App. Div. 1st Dep't 2010) (affirming the dismissal of the plaintiff's complaint based on the voluntary payment doctrine, where "plaintiffs, highly sophisticated entities, made no inquiry for approximately nine years regarding the amount of rent they were paying, and never compared the rent provisions of their

lease to the rent amounts invoiced by defendants in order to determine if they were being overcharged."); *Lavin v. Town of E. Greenbush*, 843 N.Y.S.2d 484, 491 (Sup. Ct. 2007) (on motion for summary judgment, applying the voluntary payment doctrine to preclude recoupment of overpaid wages because "[d]efendant voluntarily paid plaintiff, or paid plaintiff under a mistake of law, and under either circumstance, defendant is not permitted to recoup such payments under the voluntary payment doctrine.").

DISH argues that this case is distinct from those authorities, because here DISH was operating under a mistake of fact or law. It is true, as DISH points out, that the voluntary payment doctrine "does not apply . . . when a plaintiff made payments under a mistake of fact or law regarding the plaintiff's contractual duty to pay." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009). This exception to the doctrine traditionally applied only to mistakes of fact, but was subsequently broadened by statute to "giv[e] courts discretion to allow recovery in situations where a payment was made under mistake of law." *Wurtz*, 2016 WL 7174674, at *5; *see* N.Y. C.P.L.R. § 3005 ("When relief against a mistake is sought in an action or by way of defense or counterclaim, relief shall not be denied merely because the mistake is one of law rather than one of fact."). As other courts have explained, however, the purpose of this statutory modification "was to remove technical objections in instances where recoveries can otherwise be justified by analogy with mistakes of fact." *Wurtz*, 2016 WL 7174674, at *5 (internal quotation marks and brackets omitted); *see also Jossel v. Meyers*, 629 N.Y.S.2d 9, 11 (App. Div. 1st Dep't 1995). The provision "does not permit a mere misreading of the law by any party to cancel an agreement." *Symphony Space, Inc. v. Pergola Properties, Inc.*, 88 N.Y.2d 466, 485 (1996) (quoting Siegel, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B, CPLR § 3005, at 621). "As long as

the mistake has not been induced by the other party's misrepresentations . . . resort to CPLR 3005 may be misplaced." *Gonzalez v. Green*, 831 N.Y.S.2d 856, 861 (Sup. Ct. 2006) (quoting Siegel).

Here, DISH argues that its decision to pay based on Households from 2009 until 2017 was based on a mistake of fact—namely, an assumption that "Households" was a proxy for CNN Subscribers. TNS, however, has demonstrated that there is no genuine dispute of fact on this question. It is undisputed that, in 2009, a DISH vice president named Carolyn Crawford directed DISH's accounting department to pay for CNN based on Households. Mem. in Opp. at 19. It is further undisputed that, in 2015, DISH employees discussed the CNN payment provision and decided to continue paying based on Households, as they had during the entire course of the prior agreement. DISH Statement of Material Facts ("SMF") ¶ 67. TNS has further offered substantial, unrebutted evidence that "Households" was at that time, and at all other relevant times, used by DISH as a proxy for Total Subscribers. This evidence includes, for example, the testimony of Dana McLeod, a DISH Finance Director, who explained that "household and total subscribers [were] often used interchangeably," as well as the testimony of Beverly Madlock, a DISH Senior Accounting Manager, who similarly testified that "households subscribers was intended to be a proxy for total subscribers . . . rather than CNN subscribers." McLeod Dep. at 148; Madlock Dep. at 46. It also includes a 2009 email—part of the same email chain in which Crawford directed payment for CNN based on Households—in which another DISH employee explained to TNS that "[r]esidential subs are only subs that receive CNN while household subs is our entire subs base less what your contract allows us to carve out." Morgan Decl. Ex. 3. In fact, DISH's position at the early stages of this litigation was that its Households calculation "was intended to approximate Total Subscribers." Bakowski Decl. Ex. 4 at 4 (DISH's response to TNS's requests for admissions).

DISH's only evidence in support of its more recently-developed theory that DISH mistakenly thought Households was meant to approximate CNN Subscribers is that, in 2009, the number of Households subscribers was closer to the number of CNN Subscribers than Total Subscribers. But DISH—which has explained that it "could find no documentation regarding the rationale for the decision to pay on Households in 2009," Mem. in Opp. at 20 n.15—offers no evidence to rebut the numerous emails and deposition statements adduced by TNS, which uniformly show that DISH used Households as a proxy for Total Subscribers, not CNN Subscribers. In light of this evidence, and in the absence of any contrary evidence indicating that any DISH employee ever thought Households was a proxy for CNN Subscribers, the fact that in 2009 the number of Households was closer to CNN Subscribers is insufficient to raise a triable issue of fact as to DISH's intended meaning of that term. The unrebutted evidence shows that DISH used Households as a proxy for Total Subscribers, and that it paid for CNN based on Households because DISH employees, with "full knowledge of the facts," decided to do so. *Spagnola*, 574 F.3d at 72.

DISH devotes a substantial portion of its briefing to rebut TNS's contention that DISH decided to pay based on Households because it determined that The Weather Channel was an "other 24-hour per day national news service" within the meaning of the Agreement. Although the Court agrees with DISH that genuine disputes of fact remain on this question—*compare* Schlichting Dep. at 83 ("The Weather Channel was interpreted to be—you know, somebody interpreted The Weather Channel as a news channel") *with* LeCuyer Dep. ¶ 10 ("We could not find—and have not found—any documentation regarding [] Crawford's decision, so this was our conjecture . . . I did not—and still do not—know why she made that decision.")—it does not see the relevance of this dispute to the applicability of the voluntary payment doctrine. Whether DISH

decided to pay based on Households because it determined that The Weather Channel was a 24-hour news service, or for some other reason, it is clear from the record that DISH made this decision with full knowledge of the relevant facts, not based on any mistake. The voluntary payment doctrine, accordingly, applies.

To the extent that DISH contends that its decision to pay based on Households was instead based on a mistake of law—such as a mistaken understanding of its obligations under the contract—such a mistake does not warrant excusal from the voluntary payment doctrine under the circumstances of this case. As explained above, New York's statutory modification to the voluntary payment doctrine, which, under some circumstances, permits excusal from the doctrine in the event of a mistake of law, still "does not permit a mere misreading of the law by any party to cancel an agreement." *Symphony Space*, 88 N.Y.2d at 485. Where, as here, a sophisticated party has for years remitted voluntary payments pursuant to an understanding of its legal obligations (and there is no indication that such understanding was fraudulently induced), courts have consistently held that such party's "lack of diligence in determining what its contractual rights were" precludes recoupment of the voluntarily remitted funds. *Gimbel Bros.*, 499 N.Y.S.2d at 439; *see also, e.g., Eighty Eight Bleecker Co., LLC v. 88 Bleecker St. Owners, Inc.*, 824 N.Y.S.2d 237, 239 (App. Div. 1st Dep't 2006) (precluding recoupment of an overpayment in rent where the plaintiff, a sophisticated entity, "made no inquiry for approximately 20 years regarding the amount of rent it was paying").

Finally, the cases relied on by DISH to argue for the inapplicability of the voluntary payment doctrine are inapposite. Those cases involved claims which were "predicated on a lack of full disclosure by defendant[s]." *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 649 (S.D.N.Y. 2011). For example, in *Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009), an

owner of a homeowner's insurance policy sued his insurer for improperly increasing his premiums. The defendant argued that the plaintiff's claims were barred by the voluntary payment doctrine, because the defendant had sent the plaintiff policy renewals which, in its view, should have alerted the plaintiff to the premiums increase. The Second Circuit reversed the district court's dismissal of the complaint, holding that, in the light most favorable to the plaintiff, the renewal letters—which stated that the plaintiff was receiving "annual premium savings"—could have been misleading. Similarly, in *Choice Money Transfer, Inc. v. Societe International de Change, Arimec, LLC*, 17-CV-2639 (JSR), 2017 WL 6507108, at *6 (S.D.N.Y. Dec. 18, 2017), a court in this district declined to rule in favor of the defendant on the basis of the voluntary payment doctrine, because "[the defendant's] invoices were confusing," potentially causing the plaintiff to pay the defendant more than what it was owed. Here, by contrast, it is undisputed that DISH was solely responsible for calculating its own license fees, based on its understanding of its obligations under the contract, without any involvement from TNS. DISH SMF ¶ 46. DISH—unlike the plaintiffs in *Spagnola* and *Choice Money Transfer*—thus cannot claim that its payments were wrongfully induced by any misleading invoices or incorrect representations from TNS.

Because DISH's payments for CNN during the first two years of the 2015 Agreement were made voluntarily and with full knowledge of the facts, its recoupment of the voluntarily remitted fees was barred by the voluntary payment doctrine. The Court therefore grants TNS's motion for summary judgment on its claim to recover the fees that DISH wrongfully recouped.[3]

---

[3] In light of this holding, the Court does not address the parties' arguments concerning whether the 2015 Agreement permitted DISH to offset its claimed overpayment against its subsequent monthly fees. Even if it had such a right, the offset was wrongful, because the voluntary payment doctrine barred DISH's recovery of the fees.

## 2. The Post-April 2017 Fees Paid Based on CNN Subscribers

The Court denies TNS's motion, however, with respect to its claim that DISH breached the Agreement when, beginning in April of 2017, DISH began calculating its license fees for CNN based on CNN Subscribers, rather than Total Subscribers. TNS argues that DISH was indisputably obligated to pay for CNN based on Total Subscribers, because the Agreement is clear that The Weather Channel—which was at most relevant times received by more Total Subscribers than CNN—was an "other 24-hour per day national news service" under the Agreement. The Court disagrees.

Under New York law, which the parties agree controls, the Court's "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004). "[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (internal quotation marks omitted). "If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further." *Evans*, 1 N.Y.3d at 458. If, however, the contract language is ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent." *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992). "[W]hen resort to extrinsic evidence is necessary to shed light on the parties' intent, summary judgment is ordinarily not an appropriate remedy, and must be denied unless, viewing the evidence in the light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant." *Id.* (citation omitted).

### a. The Contract Language

As to the first inquiry—"whether the contract is unambiguous with respect to the question disputed by the parties," *Law Debenture*, 595 F.3d at 465—the Court concludes that the language is ambiguous. "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation[.]" *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture*, 595 F.3d at 466 (internal quotation marks omitted). On the other hand, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (internal quotation marks and brackets omitted).

The key provision of the contract at issue here is easily susceptible to more than one interpretation. As explained above, the critical contingency on which the license fees for CNN depended was whether "any other 24-hour per day national news service" was received by more subscribers than CNN. If so, DISH was required to pay for CNN based on the greater of CNN Subscribers or Total Subscribers. If not, DISH was permitted to pay for CNN based solely on the number of CNN Subscribers. Yet, the key language ("any other 24-hour per day national news service") is nowhere defined in the Agreement. This critical phrase is subject to multiple possible interpretations. For example, it is not clear how much news a service must broadcast in order to qualify as a "24-hour per day national news service." Must the channel air news exclusively for each of the 24 hours per day that it is on the air? Or might a service qualify as a "24-hour per day

national news service" if it airs mostly news, but also broadcasts the occasional movie, talk show, or reality program? It also is not clear from the contract language what type of news the service must air in order to qualify as a "24-hour per day national news service." Does "news" refer exclusively to breaking news, headline news, or national news? Or does it also encompass other information about recent events, such as the latest developments in sports, entertainment, or the weather? What if a channel—like ESPN, E!, or The Weather Channel—airs only a specific subset of the news, and therefore appeals to a different set of viewers than some of the more traditional news services? These and other ambiguities are readily apparent when one pauses to consider whether the term "other 24-hour per day national news service" has a "definite and precise meaning." *Law Debenture*, 595 F.3d at 467.

TNS argues that the contract language nevertheless unambiguously encompasses The Weather Channel, because that service satisfies each of the key elements of that phrase. That is, The Weather Channel (1) broadcasts 24 hours per day, (2) is distributed nationally, and (3) focuses on weather, which is a type of news. Although TNS's interpretation of the contract is certainly a plausible one, the Court is not persuaded that it is the only interpretation reasonably permitted by the plain language of the Agreement. For one, TNS's interpretation neglects the ambiguities described above concerning how much, and what type of, news a service must air in order to qualify. The Weather Channel—which airs an assortment of programming related primarily to the weather—conceivably falls directly within the gray area created by these ambiguities. TNS's interpretation also does not consider the ambiguity in the term "national," which could—as urged by TNS—refer to the service's geographic distribution or—as suggested by DISH—refer to the type of news the service airs (thus excluding services that focus on local or international news). Finally, as DISH argues, TNS's interpretation does not grapple with the term's use of the phrase

"any other," which could—but does not necessarily—indicate that the news service must be one that is comparable to CNN. Nor does it account for the exceptions expressly provided in the contract provision (for Fox News and Headline News), which may further shed light on the types of services to which the parties intended to refer when they used the phrase "other 24-hour per day national news service." *See* Agreement, Schedule C (providing that DISH shall pay based on CNN Subscribers "unless any other 24-hour per day national news service (*other than HLN*)" is more widely distributed than CNN, and further providing that "[n]otwithstanding the foregoing," DISH may (under certain circumstances) pay based on CNN Subscribers even if Fox News Channel is more widely distributed than CNN).

In short, the key disputed provision of the 2015 Agreement—"any other 24-hour per day national news service"—is "reasonably susceptible of more than one interpretation." *Nycal Corp.*, 988 F. Supp. at 299. The Court thus concludes that the contract language is ambiguous and that the plain language of the Agreement does not entitle TNS to judgment as a matter of law.

### b. Extrinsic Evidence

Since the language of the Agreement is ambiguous with respect to the key disputed term, the Court next considers extrinsic evidence to discern the parties' intent. "[A] court appropriately may dispose of a contract interpretation dispute on summary judgment, although the contract is ambiguous, if the court finds either that there is no relevant extrinsic evidence or that there is relevant extrinsic evidence, but such evidence is so one-sided that it does not create a genuine issue of material fact." *Nycal Corp.*, 988 F. Supp. at 299–300. Here, both TNS and DISH have submitted relevant extrinsic evidence. The evidence, however, does not dispel the ambiguities in the contract provision described above. To the contrary, the evidence confirms that genuine issues of material fact persist concerning the Agreement's intended meaning.

### i. Course of Dealing

First, TNS and DISH present conflicting evidence with respect to the parties' course of dealing. "A course of dealing is commonly defined as a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Choice Money Transfer*, 2017 WL 6507108, at *4 (internal quotation marks omitted). "Evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms." *New Moon Shipping Co., Ltd. v. Man B&W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997). "A course of dealings analysis . . . require[s], of course, an indication of the common knowledge and understanding of the parties." *Id.* "An inference of the parties' common knowledge or understanding that is based upon a prior course of dealings is a question of fact." *Id.*

Here, TNS has not established the absence of a genuine dispute concerning the parties' "common knowledge and understanding," *id.*, of the Agreement's disputed provision. To the contrary, the parties present conflicting evidence regarding how this provision was interpreted and understood. On the one hand, TNS presents evidence to suggest that DISH paid for CNN based on Households because it understood the term "other 24-hour per day national news service" to encompass The Weather Channel. For example, TNS produced an email sent in the spring of 2015 from DISH Financial Director Dana McLeod to individuals in the accounting and programming departments stating, "For CNN the service subscribers are less than the pay-on subscribers since we pay on total subscribers due to the fact that there are other 24-hour news channels that are more widely distributed than CNN." Bakowski Decl. Ex. 10. Similarly, a July 2015 email from a Senior Programming Manager, Mark Pomeroy, to a DISH intern explained that "the pay-on concept for CNN is a bit different, rather than paying on actual subs receiving CNN we have to pay on all subs

receiving the most widely distributed news service (assume Weather Channel)." *Id.* Ex. 36. TNS also points to evidence that, in July of 2015, an analyst in DISH's finance department conducted and circulated an analysis of TNS payment issues, which included a proposal to ensure that CNN was the most widely distributed national news service. *Id.* Ex. 11. This analysis stated that The Weather Channel was "arguably" a news channel that was more widely distributed than CNN.

DISH, on the other hand, offers extrinsic evidence to rebut TNS's contention that the parties mutually understood the phrase "any other 24-hour per day national news service" to include The Weather Channel. For example, DISH presents evidence that, early on in the 2009 Agreement, TNS was under the impression that DISH should be paying based on CNN Subscribers, and was confused by DISH's decision to instead pay based on Households. A memo from an individual in the TNS accounting department shows that from the beginning of the 2009 Agreement until December of 2011, TNS kept a sub-ledger of credits from DISH's payments to reflect the difference between CNN Subscribers and the higher Households figure. Morgan Decl. Ex. 12. This memo explained that "DISH's contract requires payment for CNN based on Viewing Subscribers" and that because DISH was paying for CNN based on Households, "it appeared to Accounting that DISH had overpaid for CNN." *Id.* Only in December of 2011, after an audit indicated that DISH's payments for CNN were correct in light of the fact that—at the time—"the difference between Total Subscribers and Viewing Subscribers was minimal for CNN," did TNS release to revenue the $2.5 million in credits that had accumulated on this sub-ledger. *Id.*

DISH's evidence further indicates that TNS continued to discuss DISH's apparent overpayments in subsequent years, when the difference between CNN Subscribers and Total Subscribers grew. Gregory Bryant, who testified for MAI (the firm that TNS selected to audit DISH's payments), confirmed that whether DISH should be paying for CNN based on Total

Subscribers or CNN Subscribers was a topic of discussion between DISH and MAI during the firm's 2013 audit. During these discussions, according to Bryant's testimony, MAI and TNS checked DISH's website and learned that, at least on its website, DISH classified The Weather Channel as news. Based on this classification, as well as further discussions with TNS's legal department, MAI treated The Weather Channel as a 24-hour national news service for the purposes of its audit, resulting in the conclusion that DISH had been correctly paying for CNN. Construed in the light most favorable to DISH, this evidence rebuts TNS's contention that the parties' course of dealing establishes "the common knowledge and understanding of the parties." *New Moon Shipping*, 121 F.3d at 31. Rather, the conflicting evidence suggests that the parties' intended meaning of the phrase "other 24-hour per day national news service" remains a disputed question of fact.[4]

### ii.    Industry Custom and Usage

The parties' extrinsic evidence concerning industry custom and usage further confirms the existence of genuine issues of fact regarding whether The Weather Channel is an "other 24-hour per day national news service" under the Agreement. *See Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 07-CV-6665 (HB), 2009 WL 1803458, at *4 (S.D.N.Y. June 23, 2009) ("Industry custom and trade usage may also be considered to assist the Court in determining the intent of the parties.").

TNS, on the one hand, has offered evidence that DISH itself includes The Weather Channel in its "News Pack," which is a package of programming services organized around the news genre.

---

[4] This is so even if the Agreement is covered by New York's Uniform Commercial Code, as TNS conclusorily asserts. As explained above, the express terms of the Agreement are ambiguous and the parties have presented conflicting extrinsic evidence with respect to their course of dealing. The rule that the express terms of the contract and the parties' course of dealing "must be construed whenever reasonable as consistent with each other," N.Y. U.C.C. § 1-303(e), thus lends itself to no clear application at this stage of the case.

McLeod Dep. at 192–96; Schlichting Dep. at 123–24; Hartman Decl. ¶ 12. It has also adduced evidence that DISH, as well as other distributors of television programming, place The Weather Channel in the same channel lineup as other new services, indicating those distributors' judgment that The Weather Channel qualifies as news. Hartman Decl. ¶¶ 13–14. TNS has also produced evidence to show that Kagan, a firm that provides research and analysis of the media and communications sector, categorizes The Weather Channel as news in its reports. *Id.* ¶ 16 & Ex. 2. Finally, TNS points to the declaration of Daniel Hartman—an experienced executive in the television industry—to show that DISH is a 24-hour service, which is nationally distributed, and which "focuses on weather news and other information programming related to weather." Hartman Decl. ¶¶ 7–9.

DISH, however, has offered evidence to rebut TNS's contention that The Weather Channel is considered by the television industry to be a 24-hour national news service. For instance, DISH has submitted the declaration of Lynne Costantini—another experienced executive in the television industry—to show that The Weather Channel "is best understood as a niche information network covering weather forecasts and weather-related information, entertainment, and reality programming," whose programming "does not compare to the news programming of national significance aired by CNN." Costantini Decl. ¶ 9. Costantini further states in her declaration that CNN and The Weather Channel are "not competitors," except "in the limited instance of breaking news that relates to weather events of national significance, which is a small portion of CNN's programming focus." *Id.* ¶ 16. Costantini's testimony is bolstered by the expert declaration of C. Paul Wazzan, who conducted a comparison of the two services and concluded that they were "not substitutes." Wazzan Decl. ¶ 7. This conclusion was based on Wazzan's findings that (1) there was little overlap in the content offered by CNN and The Weather Channel, and (2) during periods

of time when only one of the two channels was on the air, ratings of the other channel did not increase. *Id.* ¶¶ 8–14.

The extrinsic evidence offered by the parties thus does little to resolve the ambiguities inherent in the term "other 24-hour per day national news service." In light of this conflicting evidence, the Court cannot say that "no reasonable trier of fact could find against the movant" on the question of the intended meaning of the term "other 24-hour per day national news service." *See Christiania*, 979 F.2d at 274 ("[W]hen resort to extrinsic evidence is necessary to shed light on the parties' intent, summary judgment is ordinarily not an appropriate remedy, and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant.") (citation omitted). Accordingly, TNS's motion for summary judgment on its claim that DISH breached the Agreement by paying based on CNN Subscribers beginning in April of 2017 is denied. Since the meaning of the Agreement's disputed provision remains unresolved, the Court likewise denies TNS's motion for summary judgment on its claim for declaratory judgment.

### B. Additional Breach of Contract Claims

In addition to its claims concerning DISH's payment of license fees for CNN, TNS also brings claims against DISH for breach of several additional provisions of the 2015 Agreement and Letter Agreement. TNS moves for summary judgment on each of these claims. For the reasons that follow, the motion is denied as to TNS's claim for improper bulk billing. The Court reserves ruling on the claims for interest and breach of the 20% discount provision.

#### 1. Improper Bulk Billing

First, TNS contends that it is entitled to judgment on its claim that DISH improperly calculated the fees owed to TNS for DISH's bulk billing customers. The Court disagrees.

Under the 2015 Agreement, DISH is entitled, under certain circumstances, to calculate its fees for bulk customers (such as hotels, which might purchase services for multiple units at a reduced rate) differently than it calculates its fees for other customers. Agreement ¶ 8. Specifically, if DISH distributes a bulk bill package that is reasonably equivalent to a package that it distributes to non-bulk customers, it may determine the number of bulk customers for the purposes of calculating its fees by multiplying the number of units that receive the service by a "bulk factor." This bulk factor is calculated by "dividing (i) the monthly retail rate that DISH charges in connection with the Bulk-Bill Arrangement for such Package by (ii) the residential monthly retail rate that DISH charges a non-bulk Customer for the same or a reasonably equivalent package." *Id.* Thus, for example, "if DISH charges $10 per bulk unit (e.g., hotel room) per month for a bulk package, and that bulk package is 'reasonably equivalent' to a residential package that has a monthly retail rate of $50 per subscriber, the 'bulk factor' would be 20% (i.e., a $10 numerator divided by a $50 denominator)." Mem. in Opp. at 28 n.22. "DISH therefore calculates the number of bulk customers for that package as 20% of the total bulk units receiving it." *Id.*

TNS claims that DISH breached this provision of the Agreement by improperly calculating the bulk factor. Specifically, TNS claims that DISH (1) used its promotional and discounted bulk-bill retail rates (rather than its standard rates) in order to artificially reduce the numerator, and (2) incorporated local channel and equipment charges into its residential monthly retail rates in order to artificially inflate the denominator. It is not obvious to the Court, however, why either of these actions violates the plain language of the Agreement. The Agreement states that the numerator shall be calculated using "the monthly retail rate that DISH *charges in connection with* the Bulk Bill Arrangement for such Package." Agreement ¶ 8 (emphasis added). If what DISH "charges" in connection will a bulk bill arrangement is a promotional or discounted price, rather than its

standard rate, nothing in the plain language of the contract unambiguously precludes the use of that promotional price for the purposes of calculating the bulk factor. Similarly, as to the denominator, the Agreement requires DISH to use "the residential monthly retail rate that DISH *charges* a non-bulk Customer for the same or a reasonably equivalent package." *Id.* (emphasis added). If what DISH "charges" a non-bulk customer includes local channel and equipment charges, nothing in the plain language of the Agreement precludes DISH from incorporating those charges into its bulk factor calculation. As DISH's method of calculating its bulk billing customers was not foreclosed by the plain language of the Agreement, and TNS offers no extrinsic evidence to support its interpretation of the contract, TNS's motion for summary judgment on this claim is denied.

## 2. Underpayments and Untimely Fees

TNS also moves for summary judgment on its claim that DISH breached the 2015 Agreement and Letter Agreement by at times remitting late payments, or underpayments, for various TNS services. As DISH points out, however, these claims have in large part been resolved. Specifically, as to the underpayments, DISH has already admitted to the errors and has paid the balance of the fees it owed. Similarly, although some of DISH's payments for TNS services were remitted after the contractual 45-day period, there is no dispute that TNS has now received the relevant monthly payments (which ranged from one day to approximately three weeks late). *See* Northington Decl. ¶ 39. If the parties are unable to independently resolve TNS's claim for interest on these payments, TNS may submit to the Court a proposed calculation of the interest it claims it is owed, to which DISH will have an opportunity to respond.

### 3. 20% Discount

Finally, TNS seeks summary judgment on its claim that DISH further breached the Agreement by improperly taking a 20% discount on its monthly CNN license fees, even though it was not at all times compliant with the 2015 Agreement and Letter Agreement. The relevant provision of the 2015 Agreement states that "the above rates [for CNN] shall be discounted by twenty percent (20%)" in consideration of, among other things, "having a valid affiliate(s) agreement with TNS . . . and being in compliance with the terms and conditions of each of such affiliate agreement(s)." Agreement Schedule C. In light of the Court's denial of TNS's motion with respect to its claim for the underpayment of post-April 2017 CNN license fees, ruling on whether DISH breached the Agreement by applying a 20% discount would be premature at this juncture. TNS's entitlement to recover the 20% discount will be reconsidered once this claim has been resolved.

### C. DISH's Counterclaims

Lastly, TNS moves for summary judgment on DISH's two counterclaims, one for breach of the Agreement's Most Favored Nation Provision and one for breach of the DISH Avails provision. TNS's motion is granted as to the Most Favored Nation counterclaim but denied as to the DISH Avails counterclaim.

### 1. Most Favored Nation Provision

TNS first argues that it is entitled to summary judgment on DISH's claim that TNS breached the Most Favored Nation provision of the 2015 Agreement. This provision requires TNS to "promptly notify DISH in writing" if it grants to a Comparable Distributor a More Favorable Provision than it offers to DISH. Agreement ¶ 38. In support of its motion for summary judgment on this counterclaim, TNS has submitted the declaration of its Executive Vice President and

Deputy General Counsel, Scott Miller, in which Miller testifies that "[w]hen TNS has granted a lower [Net Effective Per Subscriber Rate ("NEPSR")] to a Comparable Distributor, TNS has notified DISH of that More Favorable Provision by sending a letter to DISH describing the More Favorable Provision and offering DISH the option to substitute that More Favorable Provision." Miller Decl. ¶ 6. Miller further testifies that TNS sent DISH such letters on multiple occasions, including, for example, on May 14, 2015, June 26, 2015, October 19, 2015, January 12, 2016, January 24, 2017, January 19, 2018, and February 14, 2018. *Id.* ¶¶ 7–8. Moreover, DISH has submitted copies of the MFN letters it provided to DISH on May 14, 2015, January 12, 2016, November 3, 2016, and January 19, 2018. Bakowski Decl. Exs. 24–27.

DISH, on the other hand, has done little to rebut TNS's demonstration of apparent compliance with the MFN provision. It cites only to a portion of the deposition of Scott Miller, in which Miller explains that, for the purposes of determining whether a more favorable provision has been offered in a multi-year contract, TNS conducts its rates analysis on an annual basis. Miller Dep. at 148. Thus, explains Miller, if TNS enters into a more favorable multi-year contract with a comparable distributor, TNS's MFN notice to DISH typically informs DISH of the difference between the more favorable provision and DISH's provision for the current year, but not for the subsequent years included in the multi-year agreements. *Id.* Miller further explains that TNS adopted this practice because it makes little sense to conduct a years-long comparison of its contracts with each distributor, in light of the likelihood that factors material to this analysis will change from year to year (such as the execution of other contracts, or changes with respect to which distributors qualify as comparable distributors). *Id.* at 149–50. Miller also testified that TNS discussed this practice with DISH, and that DISH was "comfortable" with it. *Id.* DISH makes no effort to rebut this testimony.

Even construing the evidence in the light most favorable to DISH, the Court concludes that TNS has demonstrated its entitlement to judgment on the MFN counterclaim. Miller's declaration, as well as the MFN notices included in TNS's submission, demonstrate TNS's compliance with this provision. DISH offers no evidence to raise a genuine dispute of fact concerning whether TNS ever failed to inform DISH of a more favorable provision it offered to a comparable distributor. DISH's argument that TNS breached the MFN provision by annually informing DISH of the more favorable terms in its multi-year agreements fails, because nothing in the Agreement precludes TNS from adopting such a practice, and the unrebutted evidence shows that DISH consented to it. Miller Dep. at 150. TNS's motion for summary judgment on the Most Favored Nation counterclaim is, accordingly, granted.

### 2. DISH Avails

TNS's motion is denied, however, with respect to DISH's counterclaim for breach of the DISH Avails provision. That provision grants DISH the right to use a set number of minutes of TNS programming for DISH's own promotions and advertising, "subject to programming of overriding national importance, in TNS, Inc.'s sole discretion." Agreement ¶ 5.C. TNS has not offered any material evidence in support of its motion for summary judgment on this claim. DISH, on the other hand, has submitted the deposition of Julie Derry, the general manager of linear operations at DISH, who testified to internal verification data showing that TNS did not air all of the DISH Avails to which DISH was entitled under the Agreement. Derry 30(b)(6) Dep. at 18–19. DISH further adduced TNS logs identifying the reasons why DISH Avails were preempted on certain occasions, some of which appear to have been of "overriding national importance" (such as "Philly police shooting" and "American sailors captured by Iran") and others of which would appear to require explanation (such as "killed for time"). Morgan Decl. Ex. 13. TNS has not

offered any explanation for its position that those preemptions were valid under the contract. Since TNS has not pointed the Court to any evidence explaining why it believes its preemptions were permissible under the Agreement, and DISH has offered contrary evidence raising genuine questions of fact concerning their permissibility, TNS's motion for summary judgment on this claim is denied. *See* Fed. R. Civ. P. 56(a) (requiring the *movant* to show that there is no genuine dispute as to any material fact).

## CONCLUSION

For the foregoing reasons, TNS's motion to strike portions of the declaration of David Shull is denied. TNS's motion for summary judgment is granted in part and denied in part. No later than October 11, 2019, the parties are to submit a joint letter to the Court proposing next steps. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 76 and 86.

SO ORDERED.

Dated:     September 27, 2019
           New York, New York

Ronnie Abrams
United States District Judge